GRADSTEIN & MARZANO, P.C.
HENRY GRADSTEIN (State Bar No. 89747)
hgradstein@gradstein.com
MARYANN R. MARZANO (State Bar No. 96867)
mmarzano@gradstein.com
HARVEY W. GELLER (State Bar No. 123107)
hgeller@gradstein.com
6310 San Vicente Blvd., Suite 510
Los Angeles, California 90048
T: 323-776-3100  F: 323-931-4990

EVAN S. COHEN (State Bar No. 119601)
esc@manifesto.com
1180 South Beverly Drive, Suite 510
Los Angeles, California 90035
T: 310-556-9800  F: 310-556-9801

Attorneys for Plaintiff
FLO & EDDIE, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLO & EDDIE, INC., a California corporation, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>        v.<br><br>SIRIUS XM RADIO, INC., a Delaware corporation; and DOES 1 through 10,<br><br>            Defendants. | Case No. CV13-05693 PSG (RZx)<br><br>**NOTICE OF MOTION AND MOTION OF PLAINTIFF FLO & EDDIE, INC.'S FOR SUMMARY JUDGMENT**<br><br>**Date:**  July 28, 2014<br>**Time:**  1:30 p.m.<br>**Place:**  Courtroom 880<br>            Honorable Philip S. Gutierrez |

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD., SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on July 28, 2014 at 1:30 p.m. or as soon thereafter as counsel may be heard in Courtroom 880 of the above entitled Court, located at 255 East Temple Street, Los Angeles, CA 90012, before the Honorable Philip S. Gutierrez, plaintiff Flo & Eddie, Inc. ("Flo & Eddie") will and hereby does move for an Order granting summary judgment to Flo & Eddie and against defendant Sirius XM Radio, Inc. ("Sirius XM") as to liability on Flo & Eddie's First Cause of Action for Misappropriation (Cal. Civ. Code § 980(a)(2) and common law), Second Cause of Action for Unfair Competition (Cal. Bus. & Prof. Code § 17200 and common law), and Third Cause of Action for Conversion.

The motion is made pursuant to Fed. R. Civ. P. § 56 and is made on the grounds that there are no triable issues of fact regarding Sirius XM's unlawful reproduction, distribution, and performance of recordings fixed before February 15, 1972 ("pre-1972 recordings"), including the recordings identified on Schedule A attached to the Complaint.  Specifically, Sirius XM's unlicensed reproduction, distribution, and performance of pre-1972 recordings in connection with its satellite and internet radio services violates Cal. Civ. Code § 980(a)(2) and Cal. Bus. & Prof. Code § 17200 and constitutes misappropriation, unfair competition, and conversion under California law.

This motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying declarations of Mark Volman ("Volman Decl.") and Harvey Geller ("Geller Decl.") and exhibits thereto, the depositions of Terrence Smith and David Frear, the court file, any matters of which this Court may properly take judicial notice or may otherwise consider, any reply Flo & Eddie may

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1

1   make, and any further evidence and argument that may be presented to the Court

2   prior to or at the hearing on this Motion.

3

  Dated: June 9, 2014                 GRADSTEIN & MARZANO, P.C.

4

5                             By: _____

6                                    Harvey W. Geller

7

8                             Attorneys for Plaintiff
                            FLO & EDDIE, INC.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

# TABLE OF CONTENTS

I. INTRODUCTION. .... 1

II. FACTUAL AND PROCEDURAL BACKGROUND. .... 3

A. Parties. .... 4

1. Flo & Eddie (The Turtles) .... 4

2. Sirius XM .... 6

B. Sirius XM's Reproductions of Pre-1972 Recordings. .... 7

C. Sirius XM's Performance of Pre-1972 Recordings. .... 9

III. PRE-1972 RECORDINGS ARE PROTECTED BY CALIFORNIA LAW AND CANNOT BE REPRODUCED OR PERFORMED WITHOUT A LICENSE. .... 10

A. California Statutory and Common Law Protects Owners of Pre-1972 Recordings From All Unauthorized Uses. .... 10

B. The Protections Afforded Sound Recordings Include the Performance Right. .... 15

IV. SIRIUS XM INFRINGES PRE-1972 RECORDINGS BY REPRODUCING AND PREFORMING THEM AND DOES NOT HAVE ANY DEFENSES TO THAT INFRINGEMENT. .... 19

V. CONCLUSION. .... 21

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1

## TABLE OF AUTHORITIES

2

<u>Cases</u>

3
*A&M Records, Inc.* v. *Heilman,* 75 Cal. App. 3d 554, 564 (1977) .......................................... passim

4
*Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327, 1342 (1990) .............. 13, 15, 21

5
*Bonneville Int'l Corp. v. Peters,* 153 F. Supp. 2d 763, 766 fn. 3 (E.D. Pa. 2001) ........................... 9

6
*Capitol Records, Inc.* v. *Erickson,* 2 Cal. App. 3d 526 (1969) ............................................. passim

7
*Capitol Records, LLC v. Bluebeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) ................. passim

8
*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) ................. 9

9
*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
20 Cal.4th 163, 180 (1999) ......................................................................................................... 12

10
*Erie v. Tomkins,* 304 U.S. 64 (1938) ............................................................................................. 14

11
*Fnb Mortgage Corp.* v. *Pac. General Corp.,* 76 Cal. App. 4th 1116, 1133 (1999) ...................... 12

12
*Geertz* v. *Ausonio,* 4 Cal. App. 4th 1363, 1370 (1992) ................................................................ 12

13
*Goldstein v. California,* 412 U.S. 546 (1973) ............................................................................... 10

14
*Hollywood Screentest Of America, Inc.* v. *NBC Universal, Inc.,*
15
151 Cal. App. 4th 631, 650 (2007) .............................................................................................. 15

16
*International News Service* v. *Associated Press,* 248 U.S. 215, 239-40 (1918) ..................... 14, 21

17
*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003) ............................. 12

18
*Lane v. Whitaker,* 50 Cal. App. 2d 327, 330 (1942) ..................................................................... 11

19
*Law Offices of Mathew Higbee* v. *Expungement Assistance Services,*
214 Cal. App. 4th 544,551 (2013) ............................................................................................... 17

20
*Lone Ranger Television, Inc.* v. *Program Radio Corp.,* 740 F.2d 718, 725 (9th Cir. 1984) ......... 15

21
*Newton v. Diamond,* 204 F. Supp. 2d 1244 (C.D. Cal. 2002) ...................................................... 10

22
*Ojala* v. *Bohlin,* 178 Cal. App. 2d 292, 301 (1960) ...................................................................... 17

23
*People* v. *Kwak,* 63 Cal. App. 4th 1236,1251-52 (1998) .............................................................. 11

24
*Petrella v. MGM*, 188 L.Ed.2d 979 (U.S. 2014) .......................................................................... 21

25
*Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) .................................... 12

26
*SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1222 (D.C. Cir. 2009) ..................... 9

27
*Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014) ............................................ 13, 21

28

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

<u>Statutes</u>

17 U.S.C. § 106 ...................................................................................................... 11

17 U.S.C. § 301(c) ................................................................................................. 10

Business and Professions Code § 17200 ............................................... 1, 4, 12, 20

Civil Code § 654 .................................................................................................... 11

Civil Code § 655 .................................................................................................... 11

Civil Code § 980 .................................................................................................... 19

Civil Code § 980(a)(2) .................................................................................... passim

<u>Other Authorities</u>

6 W.F. Patry, *Patry On Copyright* § 18.55 at 18-198 (2010 ed.).......................... 10

Digital Performance Right in Sound Recordings Act ............................................ 18

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

# I.    INTRODUCTION.

Sirius XM Radio, Inc. ("Sirius XM") has built a massive multi-billion dollar business that provides music on a subscription fee basis to over 25 million subscribers through its satellite and Internet radio systems.  However, Sirius XM made the decision to only obtain licenses to reproduce and perform those recordings that were initially fixed *after* February 15, 1972 ("post-1972 recordings").  With respect to the tens of thousands of recordings that were initially fixed *before* February 15, 1972 ("pre-1972 recordings"), Sirius XM decided that it did not need to get licenses and did not need to pay any royalties to either reproduce or perform those recordings.

Sirius XM rationalizes its failure to license pre-1972 recordings by making the non-controversial point that post-1972 recordings are covered by the federal Copyright Act and pre-1972 recordings are not.  It is, however, the conclusion that Sirius XM draws from this distinction that subjects it to liability.  Indeed, Sirius XM has concluded that because pre-1972 recordings are not protected by the federal Copyright Act, they must be in the "public domain" and, thus, it can do whatever it wants with those recordings *for free*.  But in its haste to toss the artistic creations of older artists into the dustbin of history, Sirius XM ignores the fact that Section 301 of the Copyright Act explicitly leaves to the individual states the right to protect pre-1972 recordings – *and that California has long provided that very protection*.

To be sure, Cal. Civ. Code § 980(a)(2) – which was enacted by the California Legislature in 1981 for the sole purpose of protecting pre-1972 recordings – expressly grants *exclusive ownership* to "the author of an original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972."  That statute, as well as Business and Professions Code § 17200 and the common law of misappropriation and conversion, are all dispositive of Sirius XM's "public domain" argument.  Recognizing the futility of arguing that pre-1972 recordings are in the public domain, Sirius XM is now trying to define "exclusive

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1  ownership" to mean "partial ownership" which, according to Sirius XM, does not

2  include ownership of the performance right.  However, exclusive means exclusive

3  and has never meant anything else under California law.  California has never

4  carved out the performance right from the bundle of rights that comprise ownership.

5  Accordingly, every single time Sirius XM broadcasts or streams a pre-1972

6  recording, it is violating the law.

7        But Sirius XM's infringing conduct extends far beyond violating the

8  performance right.  Sirius XM is also liable for its reproduction of pre-1972

9  recordings.  Sirius XM admits that it not only reproduced tens of thousands of pre-

10  1972 recordings to create and populate numerous libraries and databases for itself

11  and third parties, but Sirius XM has also admitted that every single time it

12  broadcasts or streams a recording, it makes at least four (and sometimes more) new

13  copies of those recordings.  Sirius XM does not dispute that the exclusive ownership

14  of a pre-1972 recording includes the reproduction right and it does not dispute that

15  every copy it made of a pre-1972 recordings was unauthorized.  Instead, Sirius XM

16  nonsensically contends that since it believes that exclusive ownership does not

17  include the performance right then it is somehow "fair use" for it to take for free all

18  of the other rights that even it admits fall within the definition of "exclusive

19  ownership," including reproduction.  In other words, in Sirius XM's illogical view of

20  the world, if exclusive ownership of a pre-1972 recording does not include the

21  performance right, then enforcement of the remaining exclusive rights ceases to

22  exist as well.

23        Sirius XM is wrong and the time has come for it to understand that it is not

24  enough for it to pay only when it reproduces and performs the recordings of artists

25  whose recordings are covered by the Copyright Act.  Iconic artists whose recordings

26  are protected by state law – such as The Turtles, Nat King Cole, Hank Williams,

27  Billie Holliday, and The Beatles – are not only deserving of their place in history,

28  but they are also entitled to be paid for their work.  California law requires Sirius

2

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1   XM to obtain licenses if it wants to reproduce and perform pre-1972 recordings in

2   connection with its satellite and Internet services, ***and California law holds Sirius***

3   ***XM liable for failing to do so***.  Sirius XM does not give music away for free, and it

4   should not expect legendary artists to do so either.

5   **II.    FACTUAL AND PROCEDURAL BACKGROUND.**

6           Pre-1972 recordings comprise the historical backbone of the music industry

7   and include every sound recording that was fixed prior to February 15, 1972.

8   Those recordings include plaintiff Flo & Eddie, Inc.'s ("Flo & Eddie") iconic hits

9   when they performed as The Turtles, such as "Happy Together," "It Ain't Me

10  Babe," "She'd Rather Be With Me," "You Baby," "She's My Girl," and "Elenore."

11          As part of its satellite, internet, and other related services, Sirius XM exploits

12  without a license pre-1972 recordings.  Sirius XM does not dispute that it has not

13  obtained licenses for the pre-1972 recordings that it has exploited, or that it has not

14  paid any royalties or fees in connection with the pre-1972 recordings it has

15  exploited, or that pre-1972 recordings provide significant value to it.  Rather, Sirius

16  XM takes the position that pre-1972 recordings are in the public domain and, thus,

17  no licenses are required to exploit them.

18          Q.  Is it Sirius XM's position that pre-1972 recordings are in the

19          public domain?

20          A.  Yes. (**Geller Decl. ¶ 4, Ex. 3 [Frear Depo. 25:19:21]**)[1]

21                              * * *

22

23  _____

24  [1]  This testimony was provided by Sirius XM's Executive Vice President, Chief

25  Financial Officer, and Fed. R. Civ. P. 30(b)(6) designee on the issue of Sirius XM's

    decision not to obtain licenses for pre-1972 recordings.  This was at least the second

26  time that Frear testified this way.  The first time was before the Copyright Royalty

    Board, a panel of three judges who determine rates and terms for statutory licenses

27  for post-1972 recordings under the federal Copyright Act.  (**Geller Decl. ¶ 5, Ex. 4**

28  **[Frear Depo. 35:13-36:12]**)

Q. …At any point in time has Sirius XM ever entered into any license which granted it the right to copy any of the recordings on Schedule A?

A. To my knowledge, we've never entered into discussions with The Turtles with respect to their songs. That -- my understanding is that they're in the public domain and so we simply are using them under that theory. **(Geller Decl. ¶ 4, Ex. 3 [Frear Depo. 75:13-76:2])**

In light of Sirius XM's unlicensed and unlawful use of pre-1972 recordings, on August 1, 2013, Flo & Eddie filed suit against it in Los Angeles Superior Court, alleging on behalf of itself and a class of owners of pre-1972 recordings claims for violation of Cal. Civ. Code § 980(a)(2), misappropriation, unfair competition under Cal. Bus. & Prof. Code § 17200, and conversion. On August 8, 2013, Sirius XM removed this case to federal court.[2]

## A.   Parties.

### 1.   Flo & Eddie (The Turtles)

The Turtles were formed by teenagers Howard Kaylan, Mark Volman, Don Murray, Al Nichol, Charles Portz, and Jim Tucker in 1965. As with many bands that began their career in Southern California, The Turtles started out playing surf-rock music. Their enormous talent was immediately recognized by the independent record label White Whale Record Co., Inc. ("White Whale"). White Whale signed The Turtles to a recording agreement on May 24, 1965. Murray and Portz left the

---

[2] Because pre-1972 recordings are governed on a state-by-state basis, aside from this case, Flo & Eddie also filed two additional federal class actions: one in New York on August 16, 2013, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, Southern District of New York, 13-CIV-5784(CM) (the "New York Action"), and one in Florida on September 3, 2013, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, Southern District of Florida, Case No. 13-CV-23182 (KMM) (the "Florida Action").

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

4

group in 1966 and were subsequently replaced by John Barbata and James Pons. In 1969, John Seiter replaced Barbata.  **(Volman Decl. ¶ 2)**

In the late summer of 1965, The Turtles achieved breakthrough success with their cover of the Bob Dylan song "It Ain't Me Babe," which reached the Billboard Top Ten.  The Turtles had another hit with "You Baby," in 1966.  Thereafter, in 1967, The Turtles released "Happy Together."  That song not only became their biggest hit, and No. 1 on the Billboard chart, but it is widely recognized as one of the great iconic recordings of 1960s, and, in particular, the 1967 social phenomenon known as the "Summer of Love."  The hits continued with "She'd Rather Be With Me," also in 1967, "Elenore" in 1968 and "You Showed Me" in 1969. **(Volman Decl. ¶ 3)**

In 1970, a dispute arose between The Turtles and White Whale regarding, among other things, royalties that were owed to The Turtles.  On April 27, 1970, this dispute led to the filing of a complaint by the then-current members of The Turtles against White Whale in Los Angeles Superior Court.  In that suit, The Turtles claimed that White Whale had systematically underpaid them royalties that they were owed from the exploitation of The Turtles' recordings.  Subsequently, the parties agreed to a settlement of the litigation.  As part of that settlement and in exchange for a release and waiver of claims by The Turtles (including a waiver of the large amount of underpaid royalties owed to The Turtles), White Whale transferred to Kaylan, Volman, Nichol, Seiter, and Pons all right, title and interest in and to the original master recordings of The Turtles.  This transfer included the 100 master recordings listed on Exhibit A to the Complaint in the instant case. Thereafter, in exchange for payments from Kaylan and Volman, on May 1, 1971, Nichol, Seiter, and Pons transferred all of their right, title, and interest in and to The Turtles' master recordings and the name The Turtles to Kaylan and Volman. **(Volman Decl. ¶¶ 4-6)**

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1    Ultimately, Kaylan and Volman transferred all of the rights to The Turtles'
2  master recordings to Flo & Eddie, a corporation created in 1971 and owned and
3  controlled exclusively by them.  For the last four decades, Flo & Eddie has been
4  exploiting the Turtles master recordings by, among other things, licensing the rights
5  to make and sell records and licensing the rights for The Turtles recordings to be
6  used in movies, TV shows, and commercials.  More recently, Flo & Eddie has
7  licensed the Turtles recordings to The Orchard to be exploited digitally, including
8  through the iTunes and Amazon stores.  In addition, Kaylan and Volman continue to
9  devote their time and effort to promoting The Turtles and their music, and have been
10  the main act on annual summer tours, such as the "Happy Together Tour," which
11  features The Turtles and other musical groups from the 1960s. **(Volman Decl. ¶ 7)**

12                    **2.    Sirius XM**

13    Sirius XM claims to be the ***largest radio broadcaster in the United States***
14  ***measured by revenue*** and is the result of the 2008 merger of Sirius Satellite Radio
15  and XM Satellite Radio.   Sirius XM operates both a subscription based nationwide
16  satellite radio service as well as a subscription based internet radio service.  Sirius
17  XM claims to have ***25.8 million paying subscribers***.  **(Geller Decl. ¶ 6, Ex. 5.)**  In
18  exchange for monthly subscription fees which range from $9.99-$18.99, a
19  subscriber can get access to, among other things, Sirius XM's broadcasts of
20  commercial-free music.  **(Geller Decl. ¶ 6, Ex. 6.)**

21    Through its network of satellites, ground based terrestrial repeaters, and
22  command and control earth stations, Sirius XM's satellite radio service broadcasts
23  on hundreds of channels, including a number of channels devoted solely to playing
24  pre-1972 Recordings, such as "40s on 4," "50s on 5," and "60s on 6."  **(Geller Decl.**
25  **¶ 6, Ex. 7.)**  In addition to its satellite radio service, Sirius XM also streams and
26  distributes music over the Internet.   Sirius XM's internet radio service includes
27  most of the same channels offered by Sirius XM as part of its satellite service.
28  However, the Internet radio service also offers channels, features, and mobile and

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1   smart phones applications that are not available through the satellite radio service.
2   Two of the features that Sirius XM offers through its Internet service are Sirius XM
3   On Demand (which allows subscribers the ability to download certain broadcasts
4   from a catalog of content to listen to whenever they want) and MySXM (which
5   permits subscribers to personalize their music listening experience). **(Geller Decl. ¶**
6   **6, Ex. 8.)**

7         **B.      Sirius XM's Reproductions of Pre-1972 Recordings.**

8         In virtually every step of the process of operating its satellite and Internet
9   radio services, Sirius XM makes reproductions of pre-1972 recordings (including
10  many of The Turtles recordings identified on Exhibit A to the complaint).  Those
11  reproductions start with Sirius XM's creation of vast music libraries and databases,
12  of which there are three -- Prophet, Dalet 5.1, and Dalet Plus.  **(Geller Decl. ¶ 7, Ex.**
13  **9 [Smith 2/11/14 Depo. 154:2-8])**[3]  In creating these music libraries and databases,
14  Sirius XM copied tens of thousands of pre-1972 Recordings, including many of The
15  Turtles recordings. **(Geller Decl. ¶ 9, Ex. 11 [Smith 3/12/14 Depo. 38:6-44:19])**[4]

16        From there, Sirius XM copied its entire Prophet, Dalet 5.1, and Dalet Plus
17  music libraries and databases to create backup libraries and databases and then
18  copied them again to create disaster recovery libraries and databases.  **(Geller Decl.**
19  **¶ 11, Ex. 13 [Smith 2/11/14 Depo. 154:13-157:7, 73:3-77:19])**  In addition, Sirius

20  _____

21  [3] Sirius XM testified that it maintains information that identifies which recordings
    within the Prophet, Dalet 5.1, and Dalet Plus databases are pre-1972 recordings.
22  **(Geller Decl. ¶ 8, Ex. 10 [Smith 3/12/14 Depo. 12:10-13:6, 17:3-5, 19:24-20:10])**

23

24  [4] Sirius XM testified that it copied at least 18,000 pre-1972 recordings to the
    Prophet database and 24,000 pre-1972 recordings to the Dalet 5.1 and Dalet Plus
25  databases.  However, it also admitted that it probably copied many more than that.
    **(Geller Decl. ¶ 10, Ex. 12 [Smith 3/12/14 Depo. 60:8-62:11])**
26

27

28

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1    XM did not just make copies of its music libraries and databases for itself, it created

2    additional copies of those libraries and databases (including pre-1972 recordings) to

3    give to third parties, such as Omnifone, Rock and Roll Hall of Fame, Graceland

4    Estate, and Margaritaville.  **(Geller Decl. ¶ 12, Ex. 14 [Smith 2/11/14 Depo. 158:2-**

5    **165:15], [Smith 3/12/14 Depo. 51:11-55:14])**

6             Creating music libraries and databases, however, was only the beginning of

7    Sirius XM's copying activities.  In connection with its broadcasting of songs, Sirius

8    XM creates many additional copies of pre-1972 recordings (including The Turtles

9    recordings), starting with what it refers to as "tips and tails."  "Tips and tails" are the

10   beginnings and endings of recordings that are used by Sirius XM's programmers to

11   bracket the voice transitions that it broadcasts between songs.    The "tip and tails"

12   are first copied to workstations by Sirius XM's programmers who then insert the

13   voice transitions in between the "tips" and the "tails."  A copy of the entire sequence

14   (tips, tails, and voice transition) is then transferred from the workstation back to

15   Sirius XM's music libraries and databases and stored for later use.  **(Geller Decl. ¶**

16   **13, Ex. 15 [Smith 2/11/14 Depo. 18:6-25, 52:20-56:17], [Smith 3/12/14 Depo.**

17   **80:2-84:21])**  Thereafter, because Sirius XM broadcasts songs from a "play out"

18   server instead of from one of its libraries, Sirius XM transfers a new copy of each

19   song to one of its "play out" servers each time it broadcasts that song to Sirius XM's

20   subscribers.  **(Geller Decl. ¶ 14, Ex. 16 [Smith 2/11/14 Depo. 19:2-16, 114:15-**

21   **117:11], [Smith 3/12/14 Depo. 88:2-91:16])**[5]  In addition, in order to create

22   redundancies in its broadcasting, after a song is transmitted from the "play out"

23   server but before that song is perceived by Sirius XM's subscribers, Sirius XM

24   makes additional copies (such as buffer copies).  **(Geller Decl. ¶ 15, Ex. 17 [Smith**

25   **2/11/14 Depo. 92:7-97:7, 111:15-112:10, 118:22-120:2, 135:18-137:18, 138:7-13])**

26   _____

27   [5] By way of example, if a particular song is broadcast one hundred times, it will be
     copied to the play out server one hundred times. *Id.*

28

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

Finally, Sirius XM has authorized a third party company, Quickplay Media, to copy all of Sirius XM's broadcasts in order to maintain a five hour cache so that the broadcasts can be repackaged for later on demand delivery to mobile devices. (**Geller Decl. ¶ 16, Ex. 15 [Smith  2/11/14 Depo. 178:16-179:17, 193:16-19; 214:9-19])**

## C.    Sirius XM's Performance of Pre-1972 Recordings.[6]

As part of its satellite and internet radio services, Sirius XM performs pre-1972 recordings (including The Turtles recordings) by broadcasting and streaming those recordings to delivery partners who operate content delivery networks **(Geller Decl. ¶ 17, Ex. 19 [Smith  Depo (2/11/14) 176:5-179:17,]; [Smith 3/11/14 Depo. 46:5-20, 96:21-97:25, 104:8-108:21]),** by broadcasting and streaming those recordings directly to its own subscribers **(Answer Dkt. 38 ¶ 3, Geller Decl. ¶ 18, Ex. 20 [Sirius XM 12/31/13 10-K pp. 1-5], [Smith 2/11/14 Depo. 194:22-25]),** and by broadcasting and streaming those recordings to the end users of the Dish Network **(Geller Decl. ¶ 19, Ex. 21 [Smith 2/11/14 Depo. 224:22-226:18])**  In addition, Sirius XM has authorized third parties to broadcast and stream recordings to Sirius XM's end users.  **(Geller Decl. ¶ 20, Ex. 22 [Smith 2/11/14 Depo. 33:25-35:25; 176:5-18])**

---

[6] The broadcast of a song (whether recorded or performed live) over terrestrial or satellite radio constitutes a performance. *SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1222 (D.C. Cir. 2009).  The same is true for transmissions over the Internet.  *Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 766 fn. 3 (E.D. Pa. 2001) ("A 'public performance' of a recording includes the transmission of a recording."); see also, *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) ("[A] transmission of a performance is itself a performance.")

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

## III. PRE-1972 RECORDINGS ARE PROTECTED BY CALIFORNIA LAW AND CANNOT BE REPRODUCED OR PERFORMED WITHOUT A LICENSE.

Unlike recordings made after February 15, 1972, recordings made prior to that date are not covered by federal copyright law and are protected by the laws of the individual states. While this has always been the rule, it was initially codified by Congress in 1971 when it passed the Sound Recording Amendment which for the first time granted federal copyright protection to post-1972 recordings. In so doing, Congress made it very clear that with respect to pre-1972 recordings "any rights or remedies under the common law or statutes of any state shall not be annulled or limited by this title until February 15, 2067." 17 U.S.C. § 301(c). Shortly thereafter, the Supreme Court unequivocally confirmed the broad power of the states to protect pre-1972 recordings. *Goldstein v. California*, 412 U.S. 546 (1973); *see also*, 6 W.F. Patry, *Patry On Copyright* § 18.55 at 18-198 (2010 ed.) ("States are thus free to extend pre-1972 recordings the full panoply of rights granted original works of authorship by the federal Copyright Act and beyond...")[7]

### A. California Statutory and Common Law Protects Owners of Pre-1972 Recordings From All Unauthorized Uses.

In California, the protections afforded pre-1972 recordings are quite broad and take two distinct forms: statutory and common law. Both the statutory and common law provide protection for all of the rights inherent in recordings, including reproduction and distribution (which Sirius XM does not dispute) and performance (which, as explained below, Sirius XM cannot dispute).

[7] Pre-1972 recordings are to be distinguished from the musical compositions embodied in those recordings. See *e.g.*, *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-1249 (C.D. Cal. 2002). Musical compositions are protected by federal copyright law regardless of their date of creation and are not at issue in this litigation.

California's statutory protection of pre-1972 Recording**s** begins with Civil Code Section 980(a)(2), which provides that:

> The author of an original work of authorship consisting of a
> sound recording initially fixed prior to February 15, 1972, has an
> ***exclusive ownership*** therein until February 15, 2047, ***as against***
> ***all persons*** except one who independently makes or duplicates
> another sound recording that does not directly or indirectly
> recapture the actual sounds fixed in such prior sound recording,
> but consists entirely of an independent fixation of other sounds,
> even though such sounds imitate or simulate the sounds
> contained in the prior sound recording. (emphasis added)

Section 980(a)(2) is explicit in its simplicity.  The use of the terms "exclusive ownership" and "as against all persons" express the clear legislative intent to grant sound recording owners protection from ***all*** unauthorized uses by anyone.  Indeed, exclusive ownership of property (whether tangible or intangible) in California is purposely broad and carries with it the right to exclude all others from using that property.  *See* Civ. Code § 654 (Nature of Property: Ownership Defined: "[t]he ***ownership*** of a thing is the right of one or more persons to possess and *use* it to the exclusion of others") (emphasis added); *see also People* v. *Kwak,* 63 Cal. App. 4th 1236,1251-52 (1998) ("property is something that one has the exclusive right to possess ***and use***"*), citing* Civ. Code § 654 (emphasis added); *Lane v. Whitaker,* 50 Cal. App. 2d 327, 330 (1942) ("[O]wnership is the right of a person to possess and use a thing to the exclusion of others."); see also Cal Civ Code § 655 (property ownership includes "rights created or granted by statute.")

Notably, § 980(a)(2) does not restrict ownership of sound recordings to specific enumerated rights or uses like the federal Copyright Act does.  *See* 17 U.S.C. § 106 (listing exclusive rights of federal copyright owners).  Had the California Legislature wanted to limit the right of a sound recording owner or even

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

11

had it wanted to track the federal Copyright Act, it would have done so.  However, the Legislature specifically did not do that.  Instead, the Legislature identified only one exception to the protection of pre-1972 recordings; namely, as against "one who independently makes or duplicates another sound recording that does not directly or indirectly recapture the actual sounds fixed in such prior sound recording" – and it put that exception right in the statute.  By specifically identifying that one exception, it must now be presumed that there are no other exceptions.  *Geertz* v. *Ausonio,* 4 Cal. App. 4th 1363, 1370 (1992) ("We presume the Legislature included all the exceptions it intended to create."); *Fnb Mortgage Corp.* v. *Pac. General Corp.,* 76 Cal. App. 4th 1116, 1133 (1999) ("where exceptions to a general rule are specified by statute, other exceptions are not to be implied or presumed, absent a discernible and contrary legislative intent."); see also *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (the doctrine of *expressio unius est exclusion alterius* "as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions.")

In addition to the protections provided by § 980(a)(2), California Bus. & Prof. Code § 17200 also protects owners of sound recordings from the unlawful exploitation of their recordings.  That section creates a civil cause of action to redress "any unlawful, unfair or fraudulent business act or practice and covers a wide range of conduct, including "anything that can properly be called a business practice and that at the same time is forbidden by law."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003); *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999).  Not only does § 17200 borrow violations from other laws by making them independently actionable, but any "practice may be deemed unfair even if not specifically proscribed by some other law." *Id.*  Of course, taking the property of another for use in a commercial business is the consummate definition of unfair.

California's common law also protects pre-1972 recordings under the long recognized theories of misappropriation and conversion.  Misappropriation is a form of common law unfair competition and is established where a plaintiff shows that it has invested substantial time and money in the development of property that the defendant appropriated at little or no cost, thereby, injuring the plaintiff.  *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327, 1342 (1990). Conversion, on the other hand, is a strict liability tort and only requires a plaintiff to show (1) ownership or right to possession of the property; (2) conversion by a wrongful act or disposition of property rights; and (3) damages.  *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014).

Misappropriation and conversion have for decades been relied on by the California courts to protect the owners of pre-1972 recordings from unauthorized exploitation.  For example, in *Capitol Records, Inc.* v. *Erickson,* 2 Cal. App. 3d 526 (1969), the defendant was sued for copying plaintiff's pre-1972 recordings and selling tapes of those recordings.  The court had no trouble finding that the defendant's conduct constituted unfair competition and should be enjoined because it appropriated "performances embodied on the records," "the titles of the performances," and "the name of the recording artists."  *Id*. at 538.  Similarly, in *A&M Records, Inc.* v. *Heilman,* 75 Cal. App. 3d 554, 564 (1977), the defendant made and sold records and tapes that contained recorded performances that were owned by the plaintiff.   In affirming the grant of an injunction and an award of damages, the Court held that duplicating pre-1972 recordings and selling them for profit "presents a classic example of the unfair business practice of misappropriation of the valuable efforts of another" and constitutes unfair competition, misappropriation and conversion.  In addition, the District Court in *Capitol Records, LLC v. Bluebeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) held that that reproducing, selling, and publicly performing pre-1972 recordings constituted misappropriation, unfair competition, and conversion under California law.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1      The notion that liability should attach to the conduct of people who attempt to

2  profit off of the property of others was articulated long before *Erickson*, *Heilman*

3  and *Bluebeat*.  Indeed, as far back as 1918, the United States Supreme Court in

4  *International News Service* v. *Associated Press,* 248 U.S. 215, 239-40 (1918) held

5  that the theft of an intangible property interest (in that case, the timely collection and

6  distribution of news) constituted actionable misappropriation:

7          [D]efendant, by its very act, admits that it is taking material that

8          has been acquired by complainant as the result of organization

9          and the expenditure of labor, skill, and money, and which is

10          salable by complainant for money, and ***that defendant in***

11          ***appropriating it and selling it as its own is endeavoring to reap***

12          ***where it has not sown***, and by disposing of it to newspapers that

13          are competitors of complainant's members is appropriating to

14          itself the harvest of those who have sown.  Stripped of all

15          disguises, the process amounts to an unauthorized interference

16          with the normal operation of complainant's legitimate business

17          precisely at the point where the profit is to be reaped, in order to

18          divert a material portion of the profit from those who have

19          earned it to those who have not; with special advantage to

20          defendant in the competition because of the fact that it is not

21          burdened with any part of the expense of gathering the news.

22          ***The transaction speaks for itself, and a court of equity ought***

23          ***not to hesitate long in characterizing it as unfair competition in***

24          ***business***.  (emphasis added) *International News Service*, 248

25          U.S. at 239-40.

26      While *International News Service* was based on federal common law that

27  ceased to exist as a result of *Erie v. Tomkins,* 304 U.S. 64 (1938), California courts

28  nevertheless recognized the soundness and logic of that decision and have routinely

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1  adopted its basic misappropriation principles.  *Balboa Ins. Co.*, supra, 218 Cal. App.

2  3d at 1342 ("Common law misappropriation presents a final legal theory under the

3  broad unfair competition umbrella.  The doctrine originated in the United States

4  Supreme Court's decision of [*International News Service*]."); *Hollywood Screentest*

5  *Of America, Inc.* v. *NBC Universal, Inc.,* 151 Cal. App. 4th 631, 650 (2007)

6  (elements of misappropriation cause of action include "the defendant has

7  appropriated the 'thing' at little or no cost, such that the court can characterize

8  defendant's actions as 'reaping where it has not sown.'"); *Lone Ranger Television,*

9  *Inc.* v. *Program Radio Corp.,* 740 F.2d 718, 725 (9th Cir. 1984) (plaintiff had an

10  "intangible property interest in the performances on its tapes" of scripts broadcast

11  over the radio).

12  **B.     The Protections Afforded Sound Recordings Include the**

13  **Performance Right.**

14  The existence under California law of a performance right in pre-1972

15  recordings should not be a controversial proposition.  What has always been and

16  what continues to be protected in pre-1972 recordings are the recorded artistic

17  performances embodied in those recordings -- in other words, ***the sounds***.  Those

18  sounds are intangible personal property, *Heilman,* 75 Cal. App. 3d at 570, and are

19  entitled to protection regardless of how they are infringed or the technology used to

20  accomplish that infringement.  The California Legislature and the courts have never

21  once said that the exclusive ownership rights in pre-1972 recordings should be

22  defined differently depending on the method of infringement, or that intangible

23  property rights are only protectable in connection with the sale or distribution of

24  physical products.  When it comes to sound recordings, it does not matter from

25  either a factual or legal standpoint whether the sounds are infringed by being copied

26  and distributed as part of bootlegged cassette tapes (*Erickson and Heilman*) or

27  whether the sounds are infringed by being sold as a digital stream (*Bluebeat*).

28

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

No case makes this point clearer than *Bluebeat* where the defendants (owners of two websites) were transmitting and distributing to members of the public by digital download and by digital streaming pre-1972 recordings as well as recordings subject to federal copyright protection.  The defendants were sued by the owners of certain pre-1972 recordings for violation of Civil Code Section 980(a)(2), misappropriation, conversion, and unfair competition.  No less than two different District Court judges in the Central District of California found that the performance right in pre-1972 recordings was entitled to the same level of protection as the reproduction and the distribution right.

*Bluebeat* was initially assigned to the Hon. John Walter who issued both a temporary restraining order and preliminary injunction, finding that "by offering free digital streaming transmissions" of plaintiffs' recordings, defendants' actions can cause irreparable damage to the perceived value of plaintiffs' music and to plaintiffs' digital distribution strategies and relationships." *Capitol Records LLC v. Bluebeat, Inc.*, USDC, Central District of California, Case No. 09-8030 (Order Granting Temporary Restraining Order, Dkt. 13 at p. 6; Order Granting Preliminary Injunction, Dkt. 24 at p. 7).  To remedy this infringement, Judge Walter enjoined the defendant from:

> Directly or indirectly infringing any right in any and all sound recordings originally fixed in a tangible medium of expression prior to February 15, 1972, in which any Plaintiff...owns or controls an exclusive right under state or common law…, including without limitation by directly or indirectly copying, reproducing, downloading, distributing, communicating to the public, uploading, linking to, transmitting, ***publicly performing***, or otherwise exploiting in any manner any of Plaintiffs' Pre-1972 Sound Recordings..." *Id.* (Temporary Restraining Order, Dkt.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

16

1  14, at p. 4; Preliminary Injunction, Dkt. 25 at ¶ l(b)) (emphasis

2  added).[8]

3      Several months later, the *Bluebeat* case was transferred to the Hon. Josephine

4  Tucker who, after the completion of discovery, granted summary judgment to the

5  plaintiffs, holding that the defendants "reproduced, sold, and ***publicly performed*** the

6  pre-72 recordings without proper authorization" (emphasis added), and that "[f]or

7  these actions, [defendants are] liable for misappropriation, unfair competition, and

8  conversion." *Bluebeat,* 765 F. Supp. 2d at 1206.

9      *Bluebeat* makes it very clear that a performance right in pre-1972 recordings

10  exists and is protectable.  It also makes clear that the ownership and protectability of

11  recorded artistic performances does not depend on the method by which those

12  sounds are sold.  The rights that comprise exclusive ownership of a sound recording

13  are not determined by how those rights are infringed.  The ***intangible*** property

14  appropriated and used is the same whether the defendant is selling a pirated CD

15  containing performances or the defendant is selling a digital audio transmission of

16  the same performances -- the harm to the owners of the sound recordings is the

17  same.

18      It is for this reason that the common law is not derailed or made irrelevant by

19  technological changes and developments that create new or better ways to "reap

20  where one has not sown." *See, e.g., Ojala* v. *Bohlin,* 178 Cal. App. 2d 292, 301

21  (1960) ("The legal concept of unfair competition has evolved as a broad and flexible

22  doctrine with a capacity for further growth to meet changing conditions…"); *see*

23  *also Law Offices of Mathew Higbee* v. *Expungement Assistance Services,* 214 Cal.

24  App. 4th 544,551 (2013) ("[w]ith passage of time and accompanying epochal

25  changes in industrial and economic conditions, the legal concept of unfair

26

27  ──────────────

28  [8] **(Geller Decl. ¶ 24, Ex. 26 [Case No. 09-8030, Dkts. 13, 14, 24 and 25])**

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

competition broadened appreciably.")  The advance of technology made it easier for companies like Sirius XM to sell monthly subscriptions to satellite and Internet radio services, but it does not change what it means to own exclusive rights in pre-1972 recordings or that it is unfair for others to take the value belonging to the owner of that property without authorization or compensation.  The precise means by which a defendant appropriates and uses that property interest is not the issue.  Rather, the issue is that (1) the plaintiff has invested "effort, skill and money" in its endeavor, by virtue of which, the plaintiff has created something of value, and (2) the defendant has appropriated and profited from that valuable property. *Erickson,* 2 Cal. App. 3d at 537.  Thus, whether the court is dealing with the cassette tape revolution that started in the 1970s or the digital revolution that started in the late 1990s, the result is the same.

Significantly, in 1995, with the digital revolution in sight, the list of enumerated rights that are granted to authors under the federal Copyright Act was about to fall even further behind the already existing exclusive ownership rights of owners of pre-1972 recordings,  This shortcoming was remedied by Congress when it amended the Copyright Act by enacting the Digital Performance Right in Sound Recordings Act ("DPRA").  The DPRA added to the list of enumerated rights granted to owners of post-1972 recordings an exclusive right to publicly perform these recordings by digital audio transmission (including by satellite transmissions or over the Internet).  This still left a shortcoming under federal law (indeed, the performance right under state law is not limited to digital transmissions) but it was nevertheless significant since it addressed the impending digital marketplace which was expected to be a significant driver of growth.

In enacting the DPRA, Congress was cognizant of the fact that recording artists, record companies, and others whose livelihood depends upon effective copyright protection for sound recordings needed to be protected as new technologies affected the way in which property could be exploited.  Of course, this

18

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1  is the same protection already afforded by both California Civil Code Section 980

2  and California common law.  Contrary to Sirius XM's view, it is not California law

3  that has fallen behind federal law, it is federal law that is finally catching up to

4  California law.

5  **IV.  SIRIUS XM INFRINGES PRE-1972 RECORDINGS BY**

6  **REPRODUCING AND PREFORMING THEM AND DOES NOT**

7  **HAVE ANY DEFENSES TO THAT INFRINGEMENT.**

8  As outlined in Section IIB and IIC above, Sirius XM admitted that it

9  reproduced and performed pre-1972 recordings (including many of The Turtles'

10  recordings owned by Flo & Eddie and identified on Exhibit A to the Complaint) and

11  that it authorized third parties to reproduce and perform all of those same

12  recordings.  Sirius XM also admitted that it engaged in all of this exploitation

13  without licenses **(Geller Decl. ¶ 21, Ex. 23 [Frear Depo. 58:10-16, 66:16-67:2,**

14  **77:20-81:15; 90:11-92:25])** and without paying any royalties **(Geller Decl. ¶ 22,**

15  **Ex. 24 [Frear Depo. 69:10-16)**.[9]  Finally, Sirius XM has admitted that the ***only***

16

17

18

19

20

21

22

---

23  [9] Aside from subjecting it to liability, Frear's testimony regarding Sirius XM's lack

24  of licenses and refusal to pay royalties does away with Sirius XM's Fifth
   Affirmative Defense.  In that defense, Sirius XM alleges that "Plaintiff's claims are

25  barred, in whole or in part, by an implied license conveyed by Plaintiff to Sirius XM
   or because Plaintiff otherwise licensed, authorized, or consented to Sirius XM's

26  alleged conduct."  It is impossible to reconcile this defense with Frear's testimony

27  that Sirius XM had no licenses.

28

1  factor it considered in deciding not obtain licenses was its analysis of the law.

2  **(Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21)**[10]

3       Sirius XM's admissions establish its liability under Civil Code § 980(a)(2)

4  and Cal. Bus. & Prof. Code § 17200 and entitles Flo & Eddie to summary judgment.

5  Indeed, Sirius XM has reproduced and performed pre-1972 recordings owned

6  exclusively by others (including many of The Turtles' recordings owned by Flo &

7  Eddie) without a license.  Nothing more is required to establish liability under those

8  statutes.

9       The same conduct that subjects Sirius XM to liability under Civil Code §

10  980(a)(2) and Cal. Bus. & Prof. Code § 17200 also subjects it to liability under the

11  common law theories of misappropriation (unfair competition) and conversion.

12  There can be no doubt that Flo & Eddie and its principals (Kaylan and Volman)

13  invested substantial time and money in development of their pre-1972 recordings.

14  They not only supplied the artistic performances that are on the recordings, but they

15  waived substantial royalty claims in order to obtain ownership of those recordings,

16  and paid to buy out the interests of the other members of The Turtles in those

17  recordings.  In addition, Flo & Eddie and its principals (Kaylan and Volman) have

18  devoted their time and energy over the last four decades licensing, promoting, and

19  marketing those recordings.  On the other hand, Sirius XM has simply taken those

20  recordings at little or no cost to it and has used them to become the largest radio

21  broadcaster in the United States measured by revenue.

22  ────────────────

23  [10]  Frear was Sirius XM's 30(b)(6) designee on the issue of the "decision or
    decisions by Sirius XM not to license the right to reproduce or copy PRE-72

24  RECORDINGS (including SCHEDULE A RECORDINGS)."  His testimony that
    there were no other factors that went into that decision other than Sirius XM's view

25  of the law forecloses Sirius XM from now contending that there were in fact other

26  factors.  That, of course, does away with Sirius XM affirmative defenses of waiver
    and estoppel which necessarily involve factors other than the law, such as the

27  opposing parties' conduct.

28

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1   Many of the channels to which Sirius XM sells access rely on pre-1972

2   recordings for their breadth and popularity. 40s at 4, 50s at 5 and 60s at 6 would be

3   dead air without pre-1972 recordings.  Sirius XM's jazz stations would have Kenny

4   G, but not Louis Armstrong, and its country stations would have Carrie Underwood,

5   but not Patsy Cline.  And its Classic Vinyl station would not be classic.

6   Sirius XM had no hand in creating the recordings that form the foundation of

7   the music industry, yet it uses the popularity of those recordings to pad its bottom

8   line.  Under *Ericson, Heilman, Bluebeat, Balboa, and Welco*, that is

9   misappropriation and conversion.  By filling its broadcasts with pre-1972

10  recordings, Sirius XM has engaged in precisely the type of "reaping without

11  sowing" conduct that the Supreme Court in *International News Service* found to be

12  unacceptable.  Sirius XM's liability is clear.[11]

13  **V.    CONCLUSION.**

14  Sirius XM's decision that pre-1972 recordings are in the public domain and,

15  therefore, not capable of private ownership or legal protection runs headlong into

16  established California law to the contrary.  Rather than obtaining licenses for the

17  pre-1972 recordings that it is admittedly exploiting, Sirius XM has now aligned

18  itself with the long list of piratical companies who have used the ease and scalability

19  of the digital distribution of music to build businesses that inflict harm on an

20  unprecedented level.

21

22

23

24  [11] To the extent that Sirius XM thinks that its Second Affirmative Defense (Laches)
    helps out its cause, it is wrong about that too.  As the United States Supreme Court

25  made very clear in its recent decision in *Petrella v. MGM*, 188 L.Ed.2d 979 (U.S.
    2014), when a  claim was brought within the limitations period (as the claims in this

26  were), laches is not a defense.  Although *Petrella* involved a claim under the federal

27  Copyright Act, the analysis of that case would apply to any claim brought within a
    limitations period.

28

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1    Pre-1972 recordings are not now – and never have been – in the public

2    domain.  The defendants in *Ericson*, *Heilman*, and *Bluebeat* learned that lesson the

3    hard way.  Rather than spending its time looking for a loophole in the law that does

4    not exist, Sirius XM should have heeded the cautionary tale told by The Crickets in

5    their classic pre-1972 recording: "I fought the law and the law won."

6

7    Dated:  June 9, 2014                    GRADSTEIN & MARZANO, P.C.

8

9                                           By: _____

10                                                  Harvey W. Geller

11                                          Attorneys for Plaintiff
                                            FLO & EDDIE, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on July 28, 2014 at 1:30 p.m. or as soon thereafter as counsel may be heard in Courtroom 880 of the above entitled Court, located at 255 East Temple Street, Los Angeles, CA 90012, before the Honorable Philip S. Gutierrez, plaintiff Flo & Eddie, Inc. ("Flo & Eddie") will and hereby does move for an Order granting summary judgment to Flo & Eddie and against defendant Sirius XM Radio, Inc. ("Sirius XM") as to liability on Flo & Eddie's First Cause of Action for Misappropriation (Cal. Civ. Code § 980(a)(2) and common law), Second Cause of Action for Unfair Competition (Cal. Bus. & Prof. Code § 17200 and common law), and Third Cause of Action for Conversion.

The motion is made pursuant to Fed. R. Civ. P. § 56 and is made on the grounds that there are no triable issues of fact regarding Sirius XM's unlawful reproduction, distribution, and performance of recordings fixed before February 15, 1972 ("pre-1972 recordings"), including the recordings identified on Schedule A attached to the Complaint.  Specifically, Sirius XM's unlicensed reproduction, distribution, and performance of pre-1972 recordings in connection with its satellite and internet radio services violates Cal. Civ. Code § 980(a)(2) and Cal. Bus. & Prof. Code § 17200 and constitutes misappropriation, unfair competition, and conversion under California law.

This motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying declarations of Mark Volman ("Volman Decl.") and Harvey Geller ("Geller Decl.") and exhibits thereto, the depositions of Terrence Smith and David Frear, the court file, any matters of which this Court may properly take judicial notice or may otherwise consider, any reply Flo & Eddie may

1

1  make, and any further evidence and argument that may be presented to the Court

2  prior to or at the hearing on this Motion.

3

Dated:  June 9, 2014                    GRADSTEIN & MARZANO, P.C.

4

5

                                        By: _____
6                                                     Harvey W. Geller

7

                                        Attorneys for Plaintiff
8                                       FLO & EDDIE, INC.

9

10

11

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# TABLE OF CONTENTS

I. INTRODUCTION. .......... 1

II. FACTUAL AND PROCEDURAL BACKGROUND. .......... 3

A. Parties. .......... 4

1. Flo & Eddie (The Turtles) .......... 4

2. Sirius XM .......... 6

B. Sirius XM's Reproductions of Pre-1972 Recordings. .......... 7

C. Sirius XM's Performance of Pre-1972 Recordings. .......... 9

III. PRE-1972 RECORDINGS ARE PROTECTED BY CALIFORNIA LAW AND CANNOT BE REPRODUCED OR PERFORMED WITHOUT A LICENSE. .......... 10

A. California Statutory and Common Law Protects Owners of Pre-1972 Recordings From All Unauthorized Uses. .......... 10

B. The Protections Afforded Sound Recordings Include the Performance Right. .......... 15

IV. SIRIUS XM INFRINGES PRE-1972 RECORDINGS BY REPRODUCING AND PREFORMING THEM AND DOES NOT HAVE ANY DEFENSES TO THAT INFRINGEMENT. .......... 19

V. CONCLUSION. .......... 21

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc.* v. *Heilman,* 75 Cal. App. 3d 554, 564 (1977) .......................................... passim

*Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327, 1342 (1990) ............... 13, 15, 21

*Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 766 fn. 3 (E.D. Pa. 2001) ........................... 9

*Capitol Records, Inc.* v. *Erickson,* 2 Cal. App. 3d 526 (1969) ............................................. passim

*Capitol Records, LLC v. Bluebeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) ................. passim

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) .................. 9

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
     20 Cal.4th 163, 180 (1999)............................................................................................... 12

*Erie v. Tomkins,* 304 U.S. 64 (1938) .......................................................................................... 14

*Fnb Mortgage Corp.* v. *Pac. General Corp.,* 76 Cal. App. 4th 1116, 1133 (1999)...................... 12

*Geertz* v. *Ausonio,* 4 Cal. App. 4th 1363, 1370 (1992) ................................................................ 12

*Goldstein v. California,* 412 U.S. 546 (1973) .............................................................................. 10

*Hollywood Screentest Of America, Inc.* v. *NBC Universal, Inc.*,
     151 Cal. App. 4th 631, 650 (2007) ..................................................................................... 15

*International News Service* v. *Associated Press,* 248 U.S. 215, 239-40 (1918) ..................... 14, 21

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003)............................. 12

*Lane v. Whitaker,* 50 Cal. App. 2d 327, 330 (1942) ................................................................... 11

*Law Offices of Mathew Higbee* v. *Expungement Assistance Services*,
     214 Cal. App. 4th 544,551 (2013).................................................................................... 17

*Lone Ranger Television, Inc.* v. *Program Radio Corp.*, 740 F.2d 718, 725 (9th Cir. 1984) ......... 15

*Newton v. Diamond,* 204 F. Supp. 2d 1244 (C.D. Cal. 2002)...................................................... 10

*Ojala* v. *Bohlin,* 178 Cal. App. 2d 292, 301 (1960) ................................................................... 17

*People* v. *Kwak,* 63 Cal. App. 4th 1236,1251-52 (1998) ............................................................. 11

*Petrella v. MGM*, 188 L.Ed.2d 979 (U.S. 2014) ........................................................................ 21

*Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005)................................... 12

*SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1222 (D.C. Cir. 2009) ..................... 9

*Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014) ............................................ 13, 21

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

<u>Statutes</u>

17 U.S.C. § 106 ................................................................................................ 11

17 U.S.C. § 301(c) ........................................................................................... 10

Business and Professions Code § 17200 ................................................ 1, 4, 12, 20

Civil Code § 654 ............................................................................................. 11

Civil Code § 655 ............................................................................................. 11

Civil Code § 980 ............................................................................................. 19

Civil Code § 980(a)(2) .............................................................................. passim

<u>Other Authorities</u>

6 W.F. Patry, *Patry On Copyright* § 18.55 at 18-198 (2010 ed.) ........................... 10

Digital Performance Right in Sound Recordings Act ......................................... 18

iii

I.     **INTRODUCTION.**

Sirius XM Radio, Inc. ("Sirius XM") has built a massive multi-billion dollar business that provides music on a subscription fee basis to over 25 million subscribers through its satellite and Internet radio systems.  However, Sirius XM made the decision to only obtain licenses to reproduce and perform those recordings that were initially fixed *after* February 15, 1972 ("post-1972 recordings").  With respect to the tens of thousands of recordings that were initially fixed *before* February 15, 1972 ("pre-1972 recordings"), Sirius XM decided that it did not need to get licenses and did not need to pay any royalties to either reproduce or perform those recordings.

Sirius XM rationalizes its failure to license pre-1972 recordings by making the non-controversial point that post-1972 recordings are covered by the federal Copyright Act and pre-1972 recordings are not.  It is, however, the conclusion that Sirius XM draws from this distinction that subjects it to liability.  Indeed, Sirius XM has concluded that because pre-1972 recordings are not protected by the federal Copyright Act, they must be in the "public domain" and, thus, it can do whatever it wants with those recordings *for free*.  But in its haste to toss the artistic creations of older artists into the dustbin of history, Sirius XM ignores the fact that Section 301 of the Copyright Act explicitly leaves to the individual states the right to protect pre-1972 recordings – *and that California has long provided that very protection*.

To be sure, Cal. Civ. Code § 980(a)(2) – which was enacted by the California Legislature in 1981 for the sole purpose of protecting pre-1972 recordings – expressly grants *exclusive ownership* to "the author of an original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972."  That statute, as well as Business and Professions Code § 17200 and the common law of misappropriation and conversion, are all dispositive of Sirius XM's "public domain" argument.  Recognizing the futility of arguing that pre-1972 recordings are in the public domain, Sirius XM is now trying to define "exclusive

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

ownership" to mean "partial ownership" which, according to Sirius XM, does not include ownership of the performance right.  However, exclusive means exclusive and has never meant anything else under California law.  California has never carved out the performance right from the bundle of rights that comprise ownership.  Accordingly, every single time Sirius XM broadcasts or streams a pre-1972 recording, it is violating the law.

But Sirius XM's infringing conduct extends far beyond violating the performance right. Sirius XM is also liable for its reproduction of pre-1972 recordings.  Sirius XM admits that it not only reproduced tens of thousands of pre-1972 recordings to create and populate numerous libraries and databases for itself and third parties, but Sirius XM has also admitted that every single time it broadcasts or streams a recording, it makes at least four (and sometimes more) new copies of those recordings.  Sirius XM does not dispute that the exclusive ownership of a pre-1972 recording includes the reproduction right and it does not dispute that every copy it made of a pre-1972 recordings was unauthorized.  Instead, Sirius XM nonsensically contends that since it believes that exclusive ownership does not include the performance right then it is somehow "fair use" for it to take for free all of the other rights that even it admits fall within the definition of "exclusive ownership," including reproduction.  In other words, in Sirius XM's illogical view of the world, if exclusive ownership of a pre-1972 recording does not include the performance right, then enforcement of the remaining exclusive rights ceases to exist as well.

Sirius XM is wrong and the time has come for it to understand that it is not enough for it to pay only when it reproduces and performs the recordings of artists whose recordings are covered by the Copyright Act.  Iconic artists whose recordings are protected by state law – such as The Turtles, Nat King Cole, Hank Williams, Billie Holliday, and The Beatles – are not only deserving of their place in history, but they are also entitled to be paid for their work.  California law requires Sirius

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

XM to obtain licenses if it wants to reproduce and perform pre-1972 recordings in connection with its satellite and Internet services, ***and California law holds Sirius XM liable for failing to do so***.  Sirius XM does not give music away for free, and it should not expect legendary artists to do so either.

## II.   FACTUAL AND PROCEDURAL BACKGROUND.

Pre-1972 recordings comprise the historical backbone of the music industry and include every sound recording that was fixed prior to February 15, 1972.  Those recordings include plaintiff Flo & Eddie, Inc.'s ("Flo & Eddie") iconic hits when they performed as The Turtles, such as "Happy Together," "It Ain't Me Babe," "She'd Rather Be With Me," "You Baby," "She's My Girl," and "Elenore."

As part of its satellite, internet, and other related services, Sirius XM exploits without a license pre-1972 recordings.  Sirius XM does not dispute that it has not obtained licenses for the pre-1972 recordings that it has exploited, or that it has not paid any royalties or fees in connection with the pre-1972 recordings it has exploited, or that pre-1972 recordings provide significant value to it.  Rather, Sirius XM takes the position that pre-1972 recordings are in the public domain and, thus, no licenses are required to exploit them.

> Q.  Is it Sirius XM's position that pre-1972 recordings are in the
> public domain?
>
> A.  Yes. (**Geller Decl. ¶ 4, Ex. 3 [Frear Depo. 25:19:21]**)[1]
>
> * * *

---

[1]  This testimony was provided by Sirius XM's Executive Vice President, Chief Financial Officer, and Fed. R. Civ. P. 30(b)(6) designee on the issue of Sirius XM's decision not to obtain licenses for pre-1972 recordings.  This was at least the second time that Frear testified this way.  The first time was before the Copyright Royalty Board, a panel of three judges who determine rates and terms for statutory licenses for post-1972 recordings under the federal Copyright Act.  (**Geller Decl. ¶ 5, Ex. 4 [Frear Depo. 35:13-36:12]**)

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

3

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

Q. …At any point in time has Sirius XM ever entered into any license which granted it the right to copy any of the recordings on Schedule A?

A. To my knowledge, we've never entered into discussions with The Turtles with respect to their songs.  That -- my understanding is that they're in the public domain and so we simply are using them under that theory.  **(Geller Decl. ¶ 4, Ex. 3 [Frear Depo. 75:13-76:2])**

In light of Sirius XM's unlicensed and unlawful use of pre-1972 recordings, on August 1, 2013, Flo & Eddie filed suit against it in Los Angeles Superior Court, alleging on behalf of itself and a class of owners of pre-1972 recordings claims for violation of Cal. Civ. Code § 980(a)(2), misappropriation, unfair competition under Cal. Bus. & Prof. Code § 17200, and conversion.  On August 8, 2013, Sirius XM removed this case to federal court.[2]

**A.    Parties.**

**1.    Flo & Eddie (The Turtles)**

The Turtles were formed by teenagers Howard Kaylan, Mark Volman, Don Murray, Al Nichol, Charles Portz, and Jim Tucker in 1965.  As with many bands that began their career in Southern California, The Turtles started out playing surf-rock music. Their enormous talent was immediately recognized by the independent record label White Whale Record Co., Inc. ("White Whale").  White Whale signed The Turtles to a recording agreement on May 24, 1965.  Murray and Portz left the

---

[2] Because pre-1972 recordings are governed on a state-by-state basis, aside from this case, Flo & Eddie also filed two additional federal class actions:  one in New York on August 16, 2013, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, Southern District of New York, 13-CIV-5784(CM) (the "New York Action"), and one in Florida on September 3, 2013, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, Southern District of Florida, Case No. 13-CV-23182 (KMM) (the "Florida Action").

group in 1966 and were subsequently replaced by John Barbata and James Pons. In 1969, John Seiter replaced Barbata.  **(Volman Decl. ¶ 2)**

In the late summer of 1965, The Turtles achieved breakthrough success with their cover of the Bob Dylan song "It Ain't Me Babe," which reached the Billboard Top Ten.  The Turtles had another hit with "You Baby," in 1966.  Thereafter, in 1967, The Turtles released "Happy Together."  That song not only became their biggest hit, and No. 1 on the Billboard chart, but it is widely recognized as one of the great iconic recordings of 1960s, and, in particular, the 1967 social phenomenon known as the "Summer of Love."  The hits continued with "She'd Rather Be With Me," also in 1967, "Elenore" in 1968 and "You Showed Me" in 1969. **(Volman Decl. ¶ 3)**

In 1970, a dispute arose between The Turtles and White Whale regarding, among other things, royalties that were owed to The Turtles.  On April 27, 1970, this dispute led to the filing of a complaint by the then-current members of The Turtles against White Whale in Los Angeles Superior Court.  In that suit, The Turtles claimed that White Whale had systematically underpaid them royalties that they were owed from the exploitation of The Turtles' recordings.  Subsequently, the parties agreed to a settlement of the litigation.  As part of that settlement and in exchange for a release and waiver of claims by The Turtles (including a waiver of the large amount of underpaid royalties owed to The Turtles), White Whale transferred to Kaylan, Volman, Nichol, Seiter, and Pons all right, title and interest in and to the original master recordings of The Turtles.  This transfer included the 100 master recordings listed on Exhibit A to the Complaint in the instant case. Thereafter, in exchange for payments from Kaylan and Volman, on May 1, 1971, Nichol, Seiter, and Pons transferred all of their right, title, and interest in and to The Turtles' master recordings and the name The Turtles to Kaylan and Volman. **(Volman Decl. ¶¶ 4-6)**

Ultimately, Kaylan and Volman transferred all of the rights to The Turtles' master recordings to Flo & Eddie, a corporation created in 1971 and owned and controlled exclusively by them. For the last four decades, Flo & Eddie has been exploiting the Turtles master recordings by, among other things, licensing the rights to make and sell records and licensing the rights for The Turtles recordings to be used in movies, TV shows, and commercials. More recently, Flo & Eddie has licensed the Turtles recordings to The Orchard to be exploited digitally, including through the iTunes and Amazon stores. In addition, Kaylan and Volman continue to devote their time and effort to promoting The Turtles and their music, and have been the main act on annual summer tours, such as the "Happy Together Tour," which features The Turtles and other musical groups from the 1960s. **(Volman Decl. ¶ 7)**

### 2.    Sirius XM

Sirius XM claims to be the ***largest radio broadcaster in the United States measured by revenue*** and is the result of the 2008 merger of Sirius Satellite Radio and XM Satellite Radio. Sirius XM operates both a subscription based nationwide satellite radio service as well as a subscription based internet radio service. Sirius XM claims to have ***25.8 million paying subscribers***. **(Geller Decl. ¶ 6, Ex. 5.)** In exchange for monthly subscription fees which range from $9.99-$18.99, a subscriber can get access to, among other things, Sirius XM's broadcasts of commercial-free music. **(Geller Decl. ¶ 6, Ex. 6.)**

Through its network of satellites, ground based terrestrial repeaters, and command and control earth stations, Sirius XM's satellite radio service broadcasts on hundreds of channels, including a number of channels devoted solely to playing pre-1972 Recordings, such as "40s on 4," "50s on 5," and "60s on 6." **(Geller Decl. ¶ 6, Ex. 7.)** In addition to its satellite radio service, Sirius XM also streams and distributes music over the Internet. Sirius XM's internet radio service includes most of the same channels offered by Sirius XM as part of its satellite service. However, the Internet radio service also offers channels, features, and mobile and

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1    smart phones applications that are not available through the satellite radio service.

2    Two of the features that Sirius XM offers through its Internet service are Sirius XM

3    On Demand (which allows subscribers the ability to download certain broadcasts

4    from a catalog of content to listen to whenever they want) and MySXM (which

5    permits subscribers to personalize their music listening experience). **(Geller Decl. ¶**

6    **6, Ex. 8.)**

7         **B.    Sirius XM's Reproductions of Pre-1972 Recordings.**

8         In virtually every step of the process of operating its satellite and Internet

9    radio services, Sirius XM makes reproductions of pre-1972 recordings (including

10   many of The Turtles recordings identified on Exhibit A to the complaint).  Those

11   reproductions start with Sirius XM's creation of vast music libraries and databases,

12   of which there are three -- Prophet, Dalet 5.1, and Dalet Plus.  **(Geller Decl. ¶ 7, Ex.**

13   **9 [Smith 2/11/14 Depo. 154:2-8])**[3]  In creating these music libraries and databases,

14   Sirius XM copied tens of thousands of pre-1972 Recordings, including many of The

15   Turtles recordings. **(Geller Decl. ¶ 9, Ex. 11 [Smith 3/12/14 Depo. 38:6-44:19])**[4]

16        From there, Sirius XM copied its entire Prophet, Dalet 5.1, and Dalet Plus

17   music libraries and databases to create backup libraries and databases and then

18   copied them again to create disaster recovery libraries and databases.  **(Geller Decl.**

19   **¶ 11, Ex. 13 [Smith 2/11/14 Depo. 154:13-157:7, 73:3-77:19])**  In addition, Sirius

20   _____

21   [3] Sirius XM testified that it maintains information that identifies which recordings
     within the Prophet, Dalet 5.1, and Dalet Plus databases are pre-1972 recordings.

22   **(Geller Decl. ¶ 8, Ex. 10 [Smith 3/12/14 Depo. 12:10-13:6, 17:3-5, 19:24-20:10])**

23

24   [4] Sirius XM testified that it copied at least 18,000 pre-1972 recordings to the
     Prophet database and 24,000 pre-1972 recordings to the Dalet 5.1 and Dalet Plus

25   databases.  However, it also admitted that it probably copied many more than that.

26   **(Geller Decl. ¶ 10, Ex. 12 [Smith 3/12/14 Depo. 60:8-62:11])**

27

28

XM did not just make copies of its music libraries and databases for itself, it created additional copies of those libraries and databases (including pre-1972 recordings) to give to third parties, such as Omnifone, Rock and Roll Hall of Fame, Graceland Estate, and Margaritaville. **(Geller Decl. ¶ 12, Ex. 14 [Smith 2/11/14 Depo. 158:2-165:15], [Smith 3/12/14 Depo. 51:11-55:14])**

Creating music libraries and databases, however, was only the beginning of Sirius XM's copying activities. In connection with its broadcasting of songs, Sirius XM creates many additional copies of pre-1972 recordings (including The Turtles recordings), starting with what it refers to as "tips and tails." "Tips and tails" are the beginnings and endings of recordings that are used by Sirius XM's programmers to bracket the voice transitions that it broadcasts between songs. The "tip and tails" are first copied to workstations by Sirius XM's programmers who then insert the voice transitions in between the "tips" and the "tails." A copy of the entire sequence (tips, tails, and voice transition) is then transferred from the workstation back to Sirius XM's music libraries and databases and stored for later use. **(Geller Decl. ¶ 13, Ex. 15 [Smith 2/11/14 Depo. 18:6-25, 52:20-56:17], [Smith 3/12/14 Depo. 80:2-84:21])** Thereafter, because Sirius XM broadcasts songs from a "play out" server instead of from one of its libraries, Sirius XM transfers a new copy of each song to one of its "play out" servers each time it broadcasts that song to Sirius XM's subscribers. **(Geller Decl. ¶ 14, Ex. 16 [Smith 2/11/14 Depo. 19:2-16, 114:15-117:11], [Smith 3/12/14 Depo. 88:2-91:16])**[5] In addition, in order to create redundancies in its broadcasting, after a song is transmitted from the "play out" server but before that song is perceived by Sirius XM's subscribers, Sirius XM makes additional copies (such as buffer copies). **(Geller Decl. ¶ 15, Ex. 17 [Smith 2/11/14 Depo. 92:7-97:7, 111:15-112:10, 118:22-120:2, 135:18-137:18, 138:7-13])**

---

[5] By way of example, if a particular song is broadcast one hundred times, it will be copied to the play out server one hundred times. *Id*.

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

Finally, Sirius XM has authorized a third party company, Quickplay Media, to copy all of Sirius XM's broadcasts in order to maintain a five hour cache so that the broadcasts can be repackaged for later on demand delivery to mobile devices. (**Geller Decl. ¶ 16, Ex. 15 [Smith  2/11/14 Depo. 178:16-179:17, 193:16-19; 214:9-19])**

## C.    Sirius XM's Performance of Pre-1972 Recordings.[6]

As part of its satellite and internet radio services, Sirius XM performs pre-1972 recordings (including The Turtles recordings) by broadcasting and streaming those recordings to delivery partners who operate content delivery networks **(Geller Decl. ¶ 17, Ex. 19 [Smith  Depo (2/11/14) 176:5-179:17,]; [Smith 3/11/14 Depo. 46:5-20, 96:21-97:25, 104:8-108:21]),** by broadcasting and streaming those recordings directly to its own subscribers **(Answer Dkt. 38 ¶ 3, Geller Decl. ¶ 18, Ex. 20 [Sirius XM 12/31/13 10-K pp. 1-5], [Smith 2/11/14 Depo. 194:22-25]),** and by broadcasting and streaming those recordings to the end users of the Dish Network **(Geller Decl. ¶ 19, Ex. 21 [Smith 2/11/14 Depo. 224:22-226:18])**  In addition, Sirius XM has authorized third parties to broadcast and stream recordings to Sirius XM's end users.  **(Geller Decl. ¶ 20, Ex. 22 [Smith 2/11/14 Depo. 33:25-35:25; 176:5-18])**

---

[6] The broadcast of a song (whether recorded or performed live) over terrestrial or satellite radio constitutes a performance. *SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1222 (D.C. Cir. 2009).  The same is true for transmissions over the Internet.  *Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 766 fn. 3 (E.D. Pa. 2001) ("A 'public performance' of a recording includes the transmission of a recording."); see also, *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) ("[A] transmission of a performance is itself a performance.")

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

## III. PRE-1972 RECORDINGS ARE PROTECTED BY CALIFORNIA LAW AND CANNOT BE REPRODUCED OR PERFORMED WITHOUT A LICENSE.

Unlike recordings made after February 15, 1972, recordings made prior to that date are not covered by federal copyright law and are protected by the laws of the individual states. While this has always been the rule, it was initially codified by Congress in 1971 when it passed the Sound Recording Amendment which for the first time granted federal copyright protection to post-1972 recordings. In so doing, Congress made it very clear that with respect to pre-1972 recordings "any rights or remedies under the common law or statutes of any state shall not be annulled or limited by this title until February 15, 2067." 17 U.S.C. § 301(c). Shortly thereafter, the Supreme Court unequivocally confirmed the broad power of the states to protect pre-1972 recordings. *Goldstein v. California*, 412 U.S. 546 (1973); *see also*, 6 W.F. Patry, *Patry On Copyright* § 18.55 at 18-198 (2010 ed.) ("States are thus free to extend pre-1972 recordings the full panoply of rights granted original works of authorship by the federal Copyright Act and beyond...")[7]

### A. California Statutory and Common Law Protects Owners of Pre-1972 Recordings From All Unauthorized Uses.

In California, the protections afforded pre-1972 recordings are quite broad and take two distinct forms: statutory and common law. Both the statutory and common law provide protection for all of the rights inherent in recordings, including reproduction and distribution (which Sirius XM does not dispute) and performance (which, as explained below, Sirius XM cannot dispute).

---

[7] Pre-1972 recordings are to be distinguished from the musical compositions embodied in those recordings. See *e.g.*, *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-1249 (C.D. Cal. 2002). Musical compositions are protected by federal copyright law regardless of their date of creation and are not at issue in this litigation.

California's statutory protection of pre-1972 Recording**s** begins with Civil Code Section 980(a)(2), which provides that:

> The author of an original work of authorship consisting of a
> sound recording initially fixed prior to February 15, 1972, has an
> ***exclusive ownership*** therein until February 15, 2047, ***as against***
> ***all persons*** except one who independently makes or duplicates
> another sound recording that does not directly or indirectly
> recapture the actual sounds fixed in such prior sound recording,
> but consists entirely of an independent fixation of other sounds,
> even though such sounds imitate or simulate the sounds
> contained in the prior sound recording. (emphasis added)

Section 980(a)(2) is explicit in its simplicity. The use of the terms "exclusive ownership" and "as against all persons" express the clear legislative intent to grant sound recording owners protection from ***all*** unauthorized uses by anyone. Indeed, exclusive ownership of property (whether tangible or intangible) in California is purposely broad and carries with it the right to exclude all others from using that property. *See* Civ. Code § 654 (Nature of Property: Ownership Defined: "[t]he ***ownership*** of a thing is the right of one or more persons to possess and *use* it to the exclusion of others") (emphasis added); *see also People* v. *Kwak,* 63 Cal. App. 4th 1236,1251-52 (1998) ("property is something that one has the exclusive right to possess ***and use***"*), citing* Civ. Code § 654 (emphasis added); *Lane v. Whitaker,* 50 Cal. App. 2d 327, 330 (1942) ("[O]wnership is the right of a person to possess and use a thing to the exclusion of others."); see also Cal Civ Code § 655 (property ownership includes "rights created or granted by statute.")

Notably, § 980(a)(2) does not restrict ownership of sound recordings to specific enumerated rights or uses like the federal Copyright Act does. *See* 17 U.S.C. § 106 (listing exclusive rights of federal copyright owners). Had the California Legislature wanted to limit the right of a sound recording owner or even

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1   had it wanted to track the federal Copyright Act, it would have done so.  However,

2   the Legislature specifically did not do that.  Instead, the Legislature identified only

3   one exception to the protection of pre-1972 recordings; namely, as against "one who

4   independently makes or duplicates another sound recording that does not directly or

5   indirectly recapture the actual sounds fixed in such prior sound recording" – and it

6   put that exception right in the statute.  By specifically identifying that one exception,

7   it must now be presumed that there are no other exceptions.  *Geertz* v. *Ausonio,* 4

8   Cal. App. 4th 1363, 1370 (1992) ("We presume the Legislature included all the

9   exceptions it intended to create."); *Fnb Mortgage Corp.* v. *Pac. General Corp.,* 76

10   Cal. App. 4th 1116, 1133 (1999) ("where exceptions to a general rule are specified

11   by statute, other exceptions are not to be implied or presumed, absent a discernible

12   and contrary legislative intent."); see also *Silvers v. Sony Pictures Entm't, Inc.*, 402

13   F.3d 881, 885 (9th Cir. 2005) (the doctrine of *expressio unius est exclusion alterius*

14   "as applied to statutory interpretation creates a presumption that when a statute

15   designates certain persons, things, or manners of operation, all omissions should be

16   understood as exclusions.")

17        In addition to the protections provided by § 980(a)(2), California Bus. & Prof.

18   Code § 17200 also protects owners of sound recordings from the unlawful

19   exploitation of their recordings.  That section creates a civil cause of action to

20   redress "any unlawful, unfair or fraudulent business act or practice and covers a

21   wide range of conduct, including "anything that can properly be called a business

22   practice and that at the same time is forbidden by law."  *Korea Supply Co. v.*

23   *Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003); *Cel-Tech Communications,*

24   *Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999).  Not only

25   does § 17200 borrow violations from other laws by making them independently

26   actionable, but any "practice may be deemed unfair even if not specifically

27   proscribed by some other law." *Id.*  Of course, taking the property of another for use

28   in a commercial business is the consummate definition of unfair.

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

California's common law also protects pre-1972 recordings under the long recognized theories of misappropriation and conversion. Misappropriation is a form of common law unfair competition and is established where a plaintiff shows that it has invested substantial time and money in the development of property that the defendant appropriated at little or no cost, thereby, injuring the plaintiff. *Balboa Ins. Co. v. Trans Global Equities*, 218 Cal. App. 3d 1327, 1342 (1990). Conversion, on the other hand, is a strict liability tort and only requires a plaintiff to show (1) ownership or right to possession of the property; (2) conversion by a wrongful act or disposition of property rights; and (3) damages. *Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014).

Misappropriation and conversion have for decades been relied on by the California courts to protect the owners of pre-1972 recordings from unauthorized exploitation. For example, in *Capitol Records, Inc.* v. *Erickson,* 2 Cal. App. 3d 526 (1969), the defendant was sued for copying plaintiff's pre-1972 recordings and selling tapes of those recordings. The court had no trouble finding that the defendant's conduct constituted unfair competition and should be enjoined because it appropriated "performances embodied on the records," "the titles of the performances," and "the name of the recording artists." *Id.* at 538. Similarly, in *A&M Records, Inc.* v. *Heilman,* 75 Cal. App. 3d 554, 564 (1977), the defendant made and sold records and tapes that contained recorded performances that were owned by the plaintiff. In affirming the grant of an injunction and an award of damages, the Court held that duplicating pre-1972 recordings and selling them for profit "presents a classic example of the unfair business practice of misappropriation of the valuable efforts of another" and constitutes unfair competition, misappropriation and conversion. In addition, the District Court in *Capitol Records, LLC v. Bluebeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) held that that reproducing, selling, and publicly performing pre-1972 recordings constituted misappropriation, unfair competition, and conversion under California law.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1    The notion that liability should attach to the conduct of people who attempt to

2    profit off of the property of others was articulated long before *Erickson*, *Heilman*

3    and *Bluebeat*.  Indeed, as far back as 1918, the United States Supreme Court in

4    *International News Service* v. *Associated Press,* 248 U.S. 215, 239-40 (1918) held

5    that the theft of an intangible property interest (in that case, the timely collection and

6    distribution of news) constituted actionable misappropriation:

7            [D]efendant, by its very act, admits that it is taking material that

8            has been acquired by complainant as the result of organization

9            and the expenditure of labor, skill, and money, and which is

10           salable by complainant for money, and ***that defendant in***

11           ***appropriating it and selling it as its own is endeavoring to reap***

12           ***where it has not sown***, and by disposing of it to newspapers that

13           are competitors of complainant's members is appropriating to

14           itself the harvest of those who have sown.  Stripped of all

15           disguises, the process amounts to an unauthorized interference

16           with the normal operation of complainant's legitimate business

17           precisely at the point where the profit is to be reaped, in order to

18           divert a material portion of the profit from those who have

19           earned it to those who have not; with special advantage to

20           defendant in the competition because of the fact that it is not

21           burdened with any part of the expense of gathering the news.

22           ***The transaction speaks for itself, and a court of equity ought***

23           ***not to hesitate long in characterizing it as unfair competition in***

24           ***business***.  (emphasis added) *International News Service*, 248

25           U.S. at 239-40.

26   While *International News Service* was based on federal common law that

27   ceased to exist as a result of *Erie v. Tomkins,* 304 U.S. 64 (1938), California courts

28   nevertheless recognized the soundness and logic of that decision and have routinely

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1   adopted its basic misappropriation principles.  *Balboa Ins. Co.*, supra, 218 Cal. App.

2   3d at 1342 ("Common law misappropriation presents a final legal theory under the

3   broad unfair competition umbrella.  The doctrine originated in the United States

4   Supreme Court's decision of [*International News Service*].");  *Hollywood Screentest*

5   *Of America, Inc.* v. *NBC Universal, Inc.,* 151 Cal. App. 4th 631, 650 (2007)

6   (elements of misappropriation cause of action include "the defendant has

7   appropriated the 'thing' at little or no cost, such that the court can characterize

8   defendant's actions as 'reaping where it has not sown.'");  *Lone Ranger Television,*

9   *Inc.* v. *Program Radio Corp.,* 740 F.2d 718, 725 (9th Cir. 1984) (plaintiff had an

10   "intangible property interest in the performances on its tapes" of scripts broadcast

11   over the radio).

12       **B.     The Protections Afforded Sound Recordings Include the**

13                **Performance Right.**

14       The existence under California law of a performance right in pre-1972

15   recordings should not be a controversial proposition.  What has always been and

16   what continues to be protected in pre-1972 recordings are the recorded artistic

17   performances embodied in those recordings -- in other words, ***the sounds***.  Those

18   sounds are intangible personal property, *Heilman,* 75 Cal. App. 3d at 570, and are

19   entitled to protection regardless of how they are infringed or the technology used to

20   accomplish that infringement.  The California Legislature and the courts have never

21   once said that the exclusive ownership rights in pre-1972 recordings should be

22   defined differently depending on the method of infringement, or that intangible

23   property rights are only protectable in connection with the sale or distribution of

24   physical products.  When it comes to sound recordings, it does not matter from

25   either a factual or legal standpoint whether the sounds are infringed by being copied

26   and distributed as part of bootlegged cassette tapes (*Erickson and Heilman*) or

27   whether the sounds are infringed by being sold as a digital stream (*Bluebeat*).

28

15

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

No case makes this point clearer than *Bluebeat* where the defendants (owners of two websites) were transmitting and distributing to members of the public by digital download and by digital streaming pre-1972 recordings as well as recordings subject to federal copyright protection. The defendants were sued by the owners of certain pre-1972 recordings for violation of Civil Code Section 980(a)(2), misappropriation, conversion, and unfair competition. No less than two different District Court judges in the Central District of California found that the performance right in pre-1972 recordings was entitled to the same level of protection as the reproduction and the distribution right.

*Bluebeat* was initially assigned to the Hon. John Walter who issued both a temporary restraining order and preliminary injunction, finding that "by offering free digital streaming transmissions" of plaintiffs' recordings, defendants' actions can cause irreparable damage to the perceived value of plaintiffs' music and to plaintiffs' digital distribution strategies and relationships." *Capitol Records LLC v. Bluebeat, Inc.*, USDC, Central District of California, Case No. 09-8030 (Order Granting Temporary Restraining Order, Dkt. 13 at p. 6; Order Granting Preliminary Injunction, Dkt. 24 at p. 7). To remedy this infringement, Judge Walter enjoined the defendant from:

> Directly or indirectly infringing any right in any and all sound recordings originally fixed in a tangible medium of expression prior to February 15, 1972, in which any Plaintiff...owns or controls an exclusive right under state or common law…, including without limitation by directly or indirectly copying, reproducing, downloading, distributing, communicating to the public, uploading, linking to, transmitting, ***publicly performing***, or otherwise exploiting in any manner any of Plaintiffs' Pre-1972 Sound Recordings..." *Id.* (Temporary Restraining Order, Dkt.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1   14, at p. 4; Preliminary Injunction, Dkt. 25 at ¶ l(b)) (emphasis

2   added).[8]

3   Several months later, the *Bluebeat* case was transferred to the Hon. Josephine

4   Tucker who, after the completion of discovery, granted summary judgment to the

5   plaintiffs, holding that the defendants "reproduced, sold, and ***publicly performed*** the

6   pre-72 recordings without proper authorization" (emphasis added), and that "[f]or

7   these actions, [defendants are] liable for misappropriation, unfair competition, and

8   conversion." *Bluebeat,* 765 F. Supp. 2d at 1206.

9   *Bluebeat* makes it very clear that a performance right in pre-1972 recordings

10  exists and is protectable.  It also makes clear that the ownership and protectability of

11  recorded artistic performances does not depend on the method by which those

12  sounds are sold.  The rights that comprise exclusive ownership of a sound recording

13  are not determined by how those rights are infringed.  The ***intangible*** property

14  appropriated and used is the same whether the defendant is selling a pirated CD

15  containing performances or the defendant is selling a digital audio transmission of

16  the same performances -- the harm to the owners of the sound recordings is the

17  same.

18  It is for this reason that the common law is not derailed or made irrelevant by

19  technological changes and developments that create new or better ways to "reap

20  where one has not sown." *See, e.g., Ojala* v. *Bohlin,* 178 Cal. App. 2d 292, 301

21  (1960) ("The legal concept of unfair competition has evolved as a broad and flexible

22  doctrine with a capacity for further growth to meet changing conditions…"); *see*

23  *also Law Offices of Mathew Higbee* v. *Expungement Assistance Services,* 214 Cal.

24  App. 4th 544,551 (2013) ("[w]ith passage of time and accompanying epochal

25  changes in industrial and economic conditions, the legal concept of unfair

26

27  _____

28  [8] **(Geller Decl. ¶ 24, Ex. 26 [Case No. 09-8030, Dkts. 13, 14, 24 and 25])**

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

competition broadened appreciably.")  The advance of technology made it easier for companies like Sirius XM to sell monthly subscriptions to satellite and Internet radio services, but it does not change what it means to own exclusive rights in pre-1972 recordings or that it is unfair for others to take the value belonging to the owner of that property without authorization or compensation.  The precise means by which a defendant appropriates and uses that property interest is not the issue.  Rather, the issue is that (1) the plaintiff has invested "effort, skill and money" in its endeavor, by virtue of which, the plaintiff has created something of value, and (2) the defendant has appropriated and profited from that valuable property. *Erickson,* 2 Cal. App. 3d at 537.  Thus, whether the court is dealing with the cassette tape revolution that started in the 1970s or the digital revolution that started in the late 1990s, the result is the same.

Significantly, in 1995, with the digital revolution in sight, the list of enumerated rights that are granted to authors under the federal Copyright Act was about to fall even further behind the already existing exclusive ownership rights of owners of pre-1972 recordings,  This shortcoming was remedied by Congress when it amended the Copyright Act by enacting the Digital Performance Right in Sound Recordings Act ("DPRA").  The DPRA added to the list of enumerated rights granted to owners of post-1972 recordings an exclusive right to publicly perform these recordings by digital audio transmission (including by satellite transmissions or over the Internet).  This still left a shortcoming under federal law (indeed, the performance right under state law is not limited to digital transmissions) but it was nevertheless significant since it addressed the impending digital marketplace which was expected to be a significant driver of growth.

In enacting the DPRA, Congress was cognizant of the fact that recording artists, record companies, and others whose livelihood depends upon effective copyright protection for sound recordings needed to be protected as new technologies affected the way in which property could be exploited.  Of course, this

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

18

1  is the same protection already afforded by both California Civil Code Section 980

2  and California common law.  Contrary to Sirius XM's view, it is not California law

3  that has fallen behind federal law, it is federal law that is finally catching up to

4  California law.

5  **IV.   SIRIUS XM INFRINGES PRE-1972 RECORDINGS BY**

6  **REPRODUCING AND PREFORMING THEM AND DOES NOT**

7  **HAVE ANY DEFENSES TO THAT INFRINGEMENT.**

8          As outlined in Section IIB and IIC above, Sirius XM admitted that it

9  reproduced and performed pre-1972 recordings (including many of The Turtles'

10  recordings owned by Flo & Eddie and identified on Exhibit A to the Complaint) and

11  that it authorized third parties to reproduce and perform all of those same

12  recordings.  Sirius XM also admitted that it engaged in all of this exploitation

13  without licenses **(Geller Decl. ¶ 21, Ex. 23 [Frear Depo. 58:10-16, 66:16-67:2,**

14  **77:20-81:15; 90:11-92:25])** and without paying any royalties **(Geller Decl. ¶ 22,**

15  **Ex. 24 [Frear Depo. 69:10-16)**.[9]  Finally, Sirius XM has admitted that the ***only***

16

17

18

19

20

21

22

---

23  [9] Aside from subjecting it to liability, Frear's testimony regarding Sirius XM's lack
of licenses and refusal to pay royalties does away with Sirius XM's Fifth
24  Affirmative Defense.  In that defense, Sirius XM alleges that "Plaintiff's claims are
barred, in whole or in part, by an implied license conveyed by Plaintiff to Sirius XM
25  or because Plaintiff otherwise licensed, authorized, or consented to Sirius XM's
alleged conduct."  It is impossible to reconcile this defense with Frear's testimony
26  that Sirius XM had no licenses.

27

28

GRADSTEIN & MARZANO, P.C.
6310 SAN VICENTE BLVD, SUITE 510
LOS ANGELES, CALIFORNIA 90048
TELEPHONE: 323-776-3100

1  factor it considered in deciding not obtain licenses was its analysis of the law.

2  **(Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21)** [10]

3      Sirius XM's admissions establish its liability under Civil Code § 980(a)(2)

4  and Cal. Bus. & Prof. Code § 17200 and entitles Flo & Eddie to summary judgment.

5  Indeed, Sirius XM has reproduced and performed pre-1972 recordings owned

6  exclusively by others (including many of The Turtles' recordings owned by Flo &

7  Eddie) without a license.  Nothing more is required to establish liability under those

8  statutes.

9      The same conduct that subjects Sirius XM to liability under Civil Code §

10  980(a)(2) and Cal. Bus. & Prof. Code § 17200 also subjects it to liability under the

11  common law theories of misappropriation (unfair competition) and conversion.

12  There can be no doubt that Flo & Eddie and its principals (Kaylan and Volman)

13  invested substantial time and money in development of their pre-1972 recordings.

14  They not only supplied the artistic performances that are on the recordings, but they

15  waived substantial royalty claims in order to obtain ownership of those recordings,

16  and paid to buy out the interests of the other members of The Turtles in those

17  recordings.  In addition, Flo & Eddie and its principals (Kaylan and Volman) have

18  devoted their time and energy over the last four decades licensing, promoting, and

19  marketing those recordings.  On the other hand, Sirius XM has simply taken those

20  recordings at little or no cost to it and has used them to become the largest radio

21  broadcaster in the United States measured by revenue.

---

23  [10]  Frear was Sirius XM's 30(b)(6) designee on the issue of the "decision or
24  decisions by Sirius XM not to license the right to reproduce or copy PRE-72
    RECORDINGS (including SCHEDULE A RECORDINGS)."  His testimony that
25  there were no other factors that went into that decision other than Sirius XM's view
    of the law forecloses Sirius XM from now contending that there were in fact other
26  factors.  That, of course, does away with Sirius XM affirmative defenses of waiver
27  and estoppel which necessarily involve factors other than the law, such as the
    opposing parties' conduct.

28

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1 | Many of the channels to which Sirius XM sells access rely on pre-1972

2 | recordings for their breadth and popularity. 40s at 4, 50s at 5 and 60s at 6 would be

3 | dead air without pre-1972 recordings.  Sirius XM's jazz stations would have Kenny

4 | G, but not Louis Armstrong, and its country stations would have Carrie Underwood,

5 | but not Patsy Cline.  And its Classic Vinyl station would not be classic.

6 | Sirius XM had no hand in creating the recordings that form the foundation of

7 | the music industry, yet it uses the popularity of those recordings to pad its bottom

8 | line.  Under *Ericson, Heilman, Bluebeat, Balboa, and Welco*, that is

9 | misappropriation and conversion.  By filling its broadcasts with pre-1972

10 | recordings, Sirius XM has engaged in precisely the type of "reaping without

11 | sowing" conduct that the Supreme Court in *International News Service* found to be

12 | unacceptable.  Sirius XM's liability is clear.[11]

13 | **V.    CONCLUSION.**

14 | Sirius XM's decision that pre-1972 recordings are in the public domain and,

15 | therefore, not capable of private ownership or legal protection runs headlong into

16 | established California law to the contrary.  Rather than obtaining licenses for the

17 | pre-1972 recordings that it is admittedly exploiting, Sirius XM has now aligned

18 | itself with the long list of piratical companies who have used the ease and scalability

19 | of the digital distribution of music to build businesses that inflict harm on an

20 | unprecedented level.

21

22

23

24

25

26

27

28

---

[11] To the extent that Sirius XM thinks that its Second Affirmative Defense (Laches) helps out its cause, it is wrong about that too.  As the United States Supreme Court made very clear in its recent decision in *Petrella v. MGM*, 188 L.Ed.2d 979 (U.S. 2014), when a  claim was brought within the limitations period (as the claims in this were), laches is not a defense.  Although *Petrella* involved a claim under the federal Copyright Act, the analysis of that case would apply to any claim brought within a limitations period.

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100

1    Pre-1972 recordings are not now – and never have been – in the public
2 domain.  The defendants in *Ericson*, *Heilman*, and *Bluebeat* learned that lesson the
3 hard way.  Rather than spending its time looking for a loophole in the law that does
4 not exist, Sirius XM should have heeded the cautionary tale told by The Crickets in
5 their classic pre-1972 recording: "I fought the law and the law won."

6

7 Dated: June 9, 2014                    GRADSTEIN & MARZANO, P.C.

8

9                                        By: _____
                                              Harvey W. Geller
10

11                                       Attorneys for Plaintiff
                                         FLO & EDDIE, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
Telephone: 323-776-3100