WEIL, GOTSHAL & MANGES LLP
R. BRUCE RICH (admitted *pro hac vice*)
bruce.rich@weil.com
BENJAMIN E. MARKS (admitted *pro hac vice*)
benjamin.marks@weil.com
TODD LARSON (admitted *pro hac vice*)
todd.larson@weil.com
767 Fifth Avenue
New York, New York 10153
Telephone:  212.310.8000
Facsimile:   212.310.8007

KRAMER LEVIN NAFTALIS & FRANKEL LLP
MICHAEL S. OBERMAN, Cal. Bar. No. 101857
MOberman@KRAMERLEVIN.com
1177 Avenue of the Americas
New York, New York 10036
Telephone:  212.715.9294
Facsimile:   212.715.8294

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
FRED R. PUGLISI, Cal. Bar No. 121822
fpuglisi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:   310.228.3701

Attorneys for Defendant
SIRIUS XM RADIO INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLO & EDDIE, INC., individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>        v.<br><br>SIRIUS XM RADIO INC., and DOES 1 through 100,<br><br>                Defendants. | Case No. 13-CV-5693 PSG (RZx)<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Declarations of Terrence Smith, David Frear, and Fred Puglisi and Defendant's Statement of Genuine Issues of Material Fact filed concurrently herewith] |

1

## <u>TABLE OF CONTENTS</u>

2  PRELIMINARY STATEMENT ......................................................................... 1

3  FACTUAL BACKGROUND................................................................................3

4        A.    The Parties ............................................................................... 3

5        B.    Plaintiff's Decades Of Acquiescence In The Unlicensed
   Public Performance Of Its Sound Recordings And The
6             Limited Scope Of Its Licensing Activities ..................................4

7  ARGUMENT .....................................................................................................5

8     I.   California Law Does Not Provide A Right Of Public
   Performance In Pre-1972 Recordings.................................................6
9

         A.    Section 980(a)(2) Does Not Provide An Exclusive Right
10            of Public Performance In Pre-1972 Recordings .........................6

11       B.    California Common Law Has Never Provided Copyright
              Owners With An Exclusive Right Of Public Performance ..........9
12

13       C.    Plaintiff's Claimed Entitlement To A Performance Right
   Is Undermined By the History of Failed Legislative
14            Efforts To Secure Such A Right And The Essentially
   Legislative Policy Considerations That Are Entailed in
15            Consideration of Such Expansion of Law...... ..........................15

16       D.    State Regulation Of Performances By A Nationwide
              Broadcaster Like Sirius XM Would Violate The
17            Commerce Clause .................................................................. 20

18    II.   Copies Of Pre-1972 Recordings Made By Sirius XM In Aid Of
   Public Performances Are Not Actionable...........................................23

19 CONCLUSION..................................................................................................25

20

21

22

23

24

25

26

27

28

-i-

1

## __TABLE OF AUTHORITIES__

2

**Page(s)**

3

**Cases**

4

*A&M Records, Inc. v. Heilman,*

5
    75 Cal. App. 3d 554, 142 Cal. Rptr. 390 (1977) .........................................*passim*

6

*Allergan, Inc. v. Athena Cosmetics, Inc.,*

7
    738 F.3d 1350 (Fed. Cir. 2013) ..........................................................................20

8

*Am. Booksellers Found. v. Dean,*

9
    342 F.3d 96 (2d Cir. 2003) .................................................................................21

10

*Am. Civil Liberties Union v. Johnson,*

11
    194 F.3d 1149 (10th Cir. 1999) .........................................................................21

12

*Arista Records, LLC v. Launch Media, Inc.,*

13
    578 F.3d 148 (2d Cir. 2009) ..............................................................................15

14

*Authors Guild, Inc. v. HathiTrust,*

15
    2014 WL 2576342 (2d Cir. June 10, 2014)......................................................24

16

*Balboa Ins. Co. v. TransGlobal Equities,*
    218 Cal. App. 3d 1327, 1267 Cal. Rptr. 787 (1990) .........................................12

17

*Baldwin v. Marina City Props., Inc.,*

18
    79 Cal. App. 3d 393, 145 Cal. Rptr. 406 (1978) ..............................................13

19

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.,*

20
    650 F.3d 876 (2d Cir. 2011) ..............................................................................12

21

*Bill Graham Archives v. Dorling Kindersley Ltd.,*

22
    448 F.3d 605 (2d Cir. 2006) ..............................................................................25

23

*Bower v. AT&T Mobility, LLC,*
    196 Cal. App. 4th 1545 (2011) .........................................................................15

24

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*

25
    476 U.S. 573, 106 S. Ct. 2080 (1986) .........................................................21, 22

26

*Burlesci v. Petersen,*

27
    68 Cal. App. 4th 1062, 80 Cal. Rptr. 2d 704 (1998) .........................................13

28

-ii-

*Capitol Records Inc. v. Erickson,*
    2 Cal. App. 3d 526, 82 Cal. Rptr. 798 (1969) ......................................7, 9, 10, 24

*Capitol Records, LLC v. BlueBeat, Inc.,*
    765 F. Supp. 2d 1198 (C.D. Cal. 2010)..........................................................9, 10

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,*
    150 F.3d 132 (2d Cir. 1998) ...............................................................................25

*Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs., LLC,*
    748 F. Supp. 2d 1145 (C.D. Cal. 2010)...............................................................13

*Dillon v. NBCUniversal Media LLC,*
    No. CV 12-09728 SJO AJWX, 2013 WL 3581938 (C.D. Cal. June 18, 2013).14

*Eldred v. Ashcroft,*
    537 U.S. 186, 123 S. Ct. 769 (2003) .....................................................................9

*Erie Railroad Co. v Tompkins,*
    304 U.S. 64, 58 S. Ct. 817 (1938) .......................................................................11

*Feist Publ'ns v. Rural Tel Serv. Co.,*
    499 U.S. 340, 111 S. Ct. 1282 (1991) .................................................................19

*Field v. Google Inc.,*
    412 F. Supp. 2d 1106 (D. Nev. 2006) .................................................................25

*Goldstein v. California,*
    412 U.S. 546, 93 S. Ct. 2303 (1973) .......................................................19, 22, 23

*Gomez v. Rossi Concrete Inc.,*
    No. 08cv1442 BTM (CAB), 2011 WL 666888 (S.D. Cal. Feb. 17, 2011)..........5

*H.L. Hayden Co. of N.Y. v. Siemens Medical Sys., Inc.,*
    879 F.2d 1005 (2d Cir. 1989) .............................................................................18

*Halstead v. Grinnan,*
    152 U.S. 412, 14 S. Ct. 641 (1894) .....................................................................11

*Healy v. Beer Inst., Inc.,*
    491 U.S. 324, 109 S. Ct. 2491 (1989) .........................................................20, 21

*Informix Software, Inc v. Oracle Corp.,*
    927 F. Supp. 2d 1283 (N.D. Cal. 1996)...............................................................14

-iii-

*Int'l News. Serv. v. Associated Press,*
  248 U.S. 215, 39 S. Ct. 68 (1918) ................................................................ 11, 12

*Kelly v. Arriba Soft Corp.,*
  336 F.3d 811 (9th Cir. 2003) .............................................................................. 25

*Kramer v. Thomas,*
  No. CV 05-8381AGCTX, 2006 WL 4729242 (C.D. Cal. Sept. 28, 2006) .... 9, 24

*Kwikset Corp. v. Superior Court,*
  51 Cal. 4th 310, 120 Cal. Rptr. 3d 741 (2011) ................................................ 14

*Lone Ranger Television, Inc. v. Program Radio Corp.,*
  740 F.2d 718 (9th Cir. 1985) .............................................................................. 14

*Miles, Inc. v. Scripps Clinic & Research Found.,*
  810 F. Supp. 1091 (S.D. Cal. 1993) ................................................................ 14

*Morris Commc'ns Corp. v. PGA Tour, Inc.,*
  117 F. Supp. 2d 1322 (M.D. Fla. 2000) .......................................................... 12

*NCAA v. Miller,*
  10 F.3d 633 (9th Cir. 1993) ................................................................................ 21

*Pagliero v. Wallace China Co.,*
  198 F.2d 339 (9th Cir. 1952) .............................................................................. 12

*Petrella v. MGM,*
  __ U.S. __, 134 S. Ct. 1962 (2014) .................................................................... 6

*Princeton Univ. Press v. Mich. Document Servs.,*
  99 F.3d 1381 (6th Cir. 1996) .............................................................................. 25

*Pruneyard Shopping Center v. Robins,*
  447 U.S. 74, 100 S. Ct. 2035 (1980) .................................................................. 8

*Partee v. San Diego Chargers Football Co.,*
  34 Cal. 3d 378, 194 Cal. Rptr. 367 (1983) ...................................................... 21

*SkinMedica, Inc. v. Histogen Inc.,*
  869 F. Supp. 2d 1176 (S.D. Cal. 2012) ............................................................ 13

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417, 104 S. Ct. 774 (1984) ................................................................ 25

-iv-

*Tidler v. Eli Lilly & Co.*,
     851 F.2d 418 (D.C. Cir. 1988)...................................................................18

*Trovan, Ltd. v. Pfizer, Inc.*,
     No. CV-98-00094 LGB MCX, 2000 WL 709149 (C.D. Cal. May 24, 2000)...12,
     13

*Tyrone Pac. Intern., Inc. v. MV Eurychili*,
     658 F.2d 664 (9th Cir. 1981) ....................................................................13

*United States v. Causby*,
     328 U.S. 256, 66 S. Ct. 1062 (1946) ..........................................................8

*Warsaw v. Chicago Metallic Ceilings, Inc.*,
     35 Cal. 3d 564, 199 Cal. Rptr. 773 (1984) .................................................8

*WCVB-TV v. Boston Athletic Ass'n*,
     926 F.2d 42 (1st Cir. 1991) (Breyer, J.) ...................................................12

*Weir v. Joly*,
     No. CV-10-898-HZ, 2011 WL 6043024 (D. Or. Dec. 2, 2011)......................5

*Wyoming v. Oklahoma*,
     502 U.S. 437 (1992) ................................................................................22

**Statutes**

17 U.S.C. § 106..............................................................................................16

17 U.S.C. § 107..........................................................................................9, 24

17 U.S.C. § 114.........................................................................................16, 17

17 U.S.C. § 301.........................................................................................16, 22

17 U.S.C. § 801..............................................................................................17

17 U.S.C. § 802..............................................................................................17

17 U.S.C. § 803..............................................................................................17

17 U.S.C. § 804..............................................................................................17

17 U.S.C. § 805..............................................................................................17

Act of Feb. 3, 1831, ch. 16, 4 Stat. 436 .........................................................15

-v-

Cal. Bus. & Prof. Code § 17200 ....................................................................... 11, 14

Cal. Civ. Code § 980(a)(2) ........................................................................ 5, 6, 7, 8

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 ................... 15, 16

**Other Authorities**

117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) ................................................... 15

Assemb. Comm. on Judiciary, *AB 3483 (Katz) As introduced 3/12/82* (Cal. Comm.
   Print 1982). ..................................................................................................... 7

Assemb. Judiciary Comm. - Minority, *Comments on AB 3483* (Cal. Comm. Print) 7

*Copyright Law Revision: Hearings Before the Subcomm. on Courts, Civil Liberties,
   and the Administration of Justice of the H. Comm. on the Judiciary on H.R. 2223*
   (Comm. Print 1975) ....................................................................................... 22

Defs.' Mem. of P. & A. in Opp'n to Pls.' Mot. for Partial Summ. J., *Capitol
   Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) (No. 09-
   8030) ............................................................................................................. 10

H.R. Rep. No. 92-487 (1971) ............................................................................. 16

H.R. Rep. No. 104-274 (1995) ..................................................................... 17, 20

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (Lexis 2013) .......... 7

Pls.' Mem. of P. & A. in Supp. of Mot. for Partial Summ. J., *Capitol Records, LLC
   v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) (No. 09-8030) ......... 10

S. Comm. on Judiciary, *AB 3483 (Katz) as introduced Civil Code/Bus. &
   Professions Code RT, Copyright Conformity to Federal Law*, Reg. Sess. (Cal.
   Comm. Print 1981-82) ..................................................................................... 7

S. Comm. on Judiciary, *Background Information AB 3483* (Cal. Comm. Print),
   attaching Letter from Executive Comm. of the Patent, Trademark and Copyright
   Section, to Members, Board of Governors (Oct. 27, 1981) ................................. 7

S. Rep. No. 104-128, at 14-15 (1995) ............................................................... 20

U.S. Copyright Office, *Federal Copyright Protection for Pre-1972 Sound
   Recordings* (2011) ................................................................................... 17, 18

**PRELIMINARY STATEMENT**

By this lawsuit, Plaintiff seeks to overturn decades of settled law and industry practice concerning public performances of sound recordings created prior to February 15, 1972 ("Pre-1972 Recordings").  Although Plaintiff's recordings were made more than 40 years ago, Plaintiff never before claimed that the rights it accuses Sirius XM of infringing so much as exist, let alone sought to enforce such asserted rights against any entity amongst the countless thousands of radio broadcasters and others that have performed its works in and outside of California. Nothing has changed by way of the governing law to validate its claims here. Plaintiff's principals' grievance, without more, is that they are not paid royalties on account of performances of Pre-1972 Recordings.

Stripped of its zippy one-liners and musical lyric metaphors, Plaintiff's motion reduces to the assertions that one thirty-year-old subsection of the California Civil Code never construed by a state court to encompass a performance right, together with one federal court case that erroneously interpreted the one state law precedent it cited, sprinkled with a dollop of ill-suited tort law doctrines never applied to the issue presented, afford Plaintiff sweepingly broad, unprecedented, and market-destabilizing legal remedies.  Plaintiff is wrong.

Plaintiff concedes that its interpretation of California law is not dependent on evolving technology or the medium of distribution: "the result is the same" whether the Court is dealing with "cassette tape" or "the digital revolution." Pl. Mem. 18. This concession serves only to widen the credibility chasm over which this lawsuit tries in vain to leap.  If California has long provided an exclusive right of public performance applicable across all media, why has Plaintiff waited more than four decades to enforce it?  Why has Plaintiff now asserted that claimed right against just one broadcaster out of the many thousands of music users engaging in the same conduct—and why did it wait more than a decade after Sirius XM's launch to do so?

-1-

1   The answer is straightforward.  The relief Plaintiff seeks is anything but the
2   uncontroversial application of settled California law Plaintiff claims it to be.  It
3   entails instead a radical expansion of the scope of intellectual property rights
4   accorded the record industry, implicating not only significant consequences for
5   thousands of California businesses, but also issues of constitutional dimension
6   insofar as it would regulate the interstate commerce of entities such as Sirius XM.
7   With such consequences in mind, generations of record industry advocates,
8   broadcasters, Copyright Office spokespersons and members of Congress have
9   debated the merits and demerits of expanding *federal* copyright law expressly in
10  recognition that state law does *not* protect performances of Pre-1972 Recordings.
11  Indeed, the record industry is pushing Congress for such legislation at this very
12  moment.  Congress is the proper forum for resolution of this issue, involving as it
13  does interstate commerce, complex public policy issues, and many interested parties
14  not before this Court.

15  As a tag along to its meritless performance-based claims, Plaintiff contends
16  that the server copies and other incidental copies of Pre-1972 Recordings made by
17  Sirius XM in aid of its lawful broadcast activities violate Plaintiff's right of
18  reproduction under California law.  This effort to evade the consequences of a non-
19  existent performance right fails for at least two reasons.  First, with truly *de minimis*
20  exception, all of the copying activity cited has taken place *outside of California* and
21  therefore is beyond the reach of California law.  As Plaintiff has only asserted
22  claims under California law, those claims must be dismissed.  Second, California
23  law does not entitle record companies to condition lawful performances of their
24  works by entities that are not engaged in competing sales of sound recordings upon
25  payment of a royalty arising out of acts of incidental copying necessary to enable
26  such performances to be made in the first place.  Allowing Plaintiff to extract
27  payments for such copying would be tantamount to permitting the record industry to
28  regulate those very performances.

-2-

1    For the foregoing reasons, as amplified herein, Plaintiff's motion for

2    summary judgment should be denied, and the Complaint should be dismissed.

3                           **FACTUAL BACKGROUND**

4    **A.    The Parties**

5        Plaintiff purports to own certain sound recordings of songs by The Turtles,

6    each of which was created prior to February 15, 1972.  Mark Volman and Howard

7    Kaylan are Plaintiff's sole owners, officers, directors, and employees.  Sirius XM's

8    Statement of Genuine Issues of Material Fact ¶¶ 5-7, 27 ("SXM 56-2").

9        Defendant Sirius XM is a satellite radio provider that operates a nationwide

10   broadcast service.  Sirius XM is the result of the July 2008 merger between Sirius

11   Satellite Radio Inc. ("Sirius") and XM Satellite Radio Inc. ("XM"), which began

12   operations in February 2002 and September 2001 respectively.  Sirius XM has

13   continued to operate both services since the merger.  SXM 56-2 ¶¶ 11, 42, 43.

14       Sirius XM broadcasts over 135 channels of music, sports, news, talk, and

15   other entertainment content nationwide.  Sirius XM delivers its broadcasts via

16   satellite radio and, with the assistance of certain third parties, by streaming over the

17   Internet.  By federal law and technological necessity, Sirius XM's satellite radio

18   broadcasts in California are identical to those transmitted to and received by

19   subscribers in every other state.  Sirius XM offers certain limited content "on

20   demand," some of which may be stored temporarily by subscribers for later

21   listening, but that content does not include any of Plaintiff's recordings (or any other

22   unlicensed music).  SXM 56-2 ¶¶ 13, 15, 29, 31, 33-35, 56, 57.

23       As a necessary incident to broadcasting and streaming sound recordings,

24   Sirius XM (and certain third parties assisting in the delivery of its Internet service)

25   make a limited number of copies of those recordings.  These take the form of digital

26   copies stored on the computer servers that house Sirius XM's library of recordings,

27   as well as certain copies "cached" temporarily on a "playout server" in the course of

28   the broadcast transmission.  None of these server or cache copies is ever accessible

-3-

to the public.  Moreover, *none of these copies was made in California*.  SXM 56-2 ¶¶ 20-22, 50, 56-59.  In addition, Sirius XM producers sometimes utilize "tips and tails," *i.e.*, very short portions of the beginnings and ends of songs, when recording voiceovers to be inserted during the transitions between songs in a program.  The complete extent of Sirius XM's copying of Plaintiff's recordings within California consists of (a) a permanent copy of the tip and tail of *one recording* made in 2012 and (b) tips and tails of a few others temporarily cached in producer workstations during the production process.  SXM 56-2 ¶¶ 19, 24, 60, 65.

**B.      Plaintiff's Decades Of Acquiescence In The Unlicensed Public Performance Of Its Sound Recordings And The Limited Scope Of Its Licensing Activities**

Plaintiff has been aware of the Sirius and XM services for at least ten years and has long known that Sirius XM was playing certain of its Pre-1972 Recordings. Prior to filing this lawsuit, Plaintiff never communicated to Sirius XM that it believed Sirius XM was infringing its rights nor sought compensation of any kind from Sirius XM.  The sole stated rationale for this lawsuit was that Plaintiff was not being paid royalties by Sirius XM on account of its performances of Pre-1972 Recordings and wanted to "raise awareness" of that.  SXM 56-2 ¶¶ 75-78, 81.

The same Turtles' recordings at issue in this lawsuit have been played on radio stations since those songs were recorded in the 1960s and early 1970s, and on Internet radio since the 1990s.  Retail stores, bars, restaurants, fitness centers, and many other physical establishments publicly perform sound recordings, including those by the Turtles.  Plaintiff has never licensed, tried to license, or sued any of the radio stations, webcasters, or physical establishments that publicly perform (as well as make server or other incidental copies of) Plaintiff's recordings without a license. SXM 56-2 ¶¶ 86-90, 92, 94-98.

Plaintiff licenses certain digital uses of its recordings through The Orchard ("Orchard"), a distributor of music and video content that aggregates the rights to recordings from tens of thousands of independent labels, and then licenses those

-4-



1    recordings, on a catalog-wide basis, to music users around the world. ▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Although broadcast radio stations

7    commonly perform Pre-1972 Recordings, Orchard has never licensed a radio

8    station.  SXM 56-2 ¶ 88 (Pascal Tr. 44:5-45:21) ("They don't distribute our music.

9    They may play our music, but [] they aren't required by law to pay us for it, so

10   we've not sought to license them in any way.").  No music provider has ever refused

11   to take a license from Plaintiff or Orchard, or sought a lower royalty rate, because

12   Sirius XM plays Pre-1972 Recordings without a license.  Sirius XM has never even

13   come up in such discussions.  SXM 56-2 ¶ 80.

14                              **ARGUMENT**[1]

15         To the extent based on Sirius XM's performances of Plaintiff's Pre-1972

16   Recordings to subscribers in California, Plaintiff's claims fail as a matter of law.

17   Neither Civil Code Section 980(a)(2) nor the cases and tort doctrines cited by

18   Plaintiff remotely support its performance rights claim.  *See* Points I.A-B.  This

19   conclusion is powerfully supported by the multi-decade record of efforts by the

20   record industry to secure such protections as a matter of federal copyright law, a

21   record that is replete with admissions that undercut Plaintiff's case, and that reveals

22   the significant public policy issues that are implicated by such a proposed expansion

23   

24   [1] Plaintiff's moving brief is replete with references to recordings it does not own,
     but the claims of putative class members are not before the Court on this motion.  In
25   leap-frogging its summary judgment filing ahead of class determination or a motion
     by Sirius XM, Plaintiff has disregarded the "one-way intervention doctrine," which,
26   absent extraordinary circumstances or a waiver not present here, calls for resolution
     of class status prior to the plaintiff's filing of such a motion.  *See, e.g.*, *Gomez v.*
27   *Rossi Concrete Inc.*, No. 08cv1442 BTM (CAB), 2011 WL 666888, at *1 (S.D. Cal.
     Feb. 17, 2011); *Weir v. Joly*, No. CV-10-898-HZ, 2011 WL 6043024, at *1 (D. Or.
28   Dec. 2, 2011).

                                           -5-

of the law.  *See* Point I.C.  Even were such a claim cognizable under state law, given the nature of Sirius XM's nationwide broadcast service, it would constitute an impermissible regulation of interstate commerce barred by the Commerce Clause of the U.S. Constitution.  *See* Point I.D.

To the extent that Plaintiff's claims are based on alleged distribution of copies of Plaintiff's recordings to subscribers, they fail for lack of proof.  There has been no such distribution.  *See* Point II.  To the extent that Plaintiff's claims are based on copies necessary to facilitate Sirius XM's broadcast and streaming activities, they fail as well.  With *de minimis* exception, such copying activity does not take place in California and therefore is not subject to California law.  Even were it otherwise, such incidental copying activity strictly in aid of Sirius XM's lawful public performances is not actionable under California law.  *See id.*[2]

## I.  CALIFORNIA LAW DOES NOT PROVIDE A RIGHT OF PUBLIC PERFORMANCE IN PRE-1972 RECORDINGS

Plaintiff claims infringements of 100 of its Pre-1972 Recordings. *See* Compl., ¶¶ 2-4, 6, 20, 25, 31.  85 of these recordings have never been broadcast by Sirius XM, SXM 56-2 ¶¶ 23, 49, and Plaintiff's claims as to the remaining 15 fail because Plaintiff's blithe assertion that "California law has long provided" a right of public performance in Pre-1972 Recordings, Pl. Mem. 1, is flatly incorrect.

### A.  Section 980(a)(2) Does Not Provide An Exclusive Right of Public Performance In Pre-1972 Recordings

Plaintiff attempts to locate an exclusive right of public performance in Section

---

[2] Plaintiff's motion all but ignores Sirius XM's affirmative defenses. In a trio of footnotes, Plaintiff glancingly addresses several of them without any discussion of the relevant law, and it completely mischaracterizes the only case it cites. *Petrella v. MGM*, ___ U.S. ___, 134 S. Ct. 1962 (2014) does not defeat application of laches here, as Plaintiff incorrectly argues. Pl. Mem. 21 n.11.  *Petrella* merely stands for the proposition that if a *federal copyright claim* is brought within the Copyright Act's statute of limitations, laches does not operate to bar consideration of the claim entirely. 134 S. Ct. at 1978. Even as to federal copyright claims, the Court acknowledged that laches could nonetheless play an important role in limiting the relief to be awarded. *Id.* at 1978-79.  Sirius XM reserves the right to address its affirmative defenses, none of which is raised in the body of Plaintiff's motion and several of which are not addressed at all, by separate motion.

1    980(a)(2) of the California Civil Code, arguing hyperbolically that the "exclusive

2    ownership" language of that provision pertaining to Pre-1972 Recordings sweeps

3    within it "*all* unauthorized uses by anyone." Pl. Mem. 11. In the 32 years that

4    provision has been on the books, no court has so held and, more to the immediate

5    point, no state court has ever construed that statutory language as extending to

6    public performances of Pre-1972 Recordings.

7          As the legislative history of Section 980(a)(2) makes plain, the statute was

8    intended merely to "maintain" the rights and remedies in Pre-1972 Recordings that

9    existed at common law *prior* to enactment of the statute. *See* S. Comm. on

10   Judiciary, *AB 3483 (Katz) as introduced Civil Code/Bus. & Professions Code RT*,

11   *Copyright Conformity to Federal Law*, Reg. Sess., at p. 2 (Cal. Comm. Print 1981-

12   82) (bill would "maintain rights and remedies in sound recordings fixed prior to

13   February 15, 1972").[3]   Such rights and remedies were limited by California

14   jurisprudence to protecting sound recording owners solely against unauthorized acts

15   of *duplication* and *distribution* by record bootleggers.[4]   *See* Point I.B *infra*. At the

16

17   [3] The legislative history (entitled "Copyright Conformity to Federal Law") makes
     abundantly clear that the 1982 revision to Section 980 was primarily motivated by
18   the fact that because the preemption provisions of Section 301(c) of the Copyright
     Act had made much of Section 980 "obsolete," the law needed amendment to clarify
19   what state-level protections remained—chiefly for unfixed and unpublished works.
     The specification of Pre-1972 Recordings as another state-protected category
20   surviving federal preemption appears merely to have flowed from the statute's
     conforming purpose—far from the conscious effort to codify a public performance
21   right that Plaintiff invents out of whole cloth. *Id.*; Assemb. Comm. on Judiciary, *AB
     3483 (Katz) As introduced 3/12/82*, at pp. 1-2 (Cal. Comm. Print 1982); Assemb.
22   Judiciary Comm. - Minority, *Comments on AB 3483* (Cal. Comm. Print); S. Comm.
     on Judiciary, *Background Information AB 3483*, at p. 1 & Attach. at p. 106 (Cal.
23   Comm. Print), attaching Letter from Executive Comm. of the Patent, Trademark and
     Copyright Section, to Members, Board of Governors (Oct. 27, 1981). The federal
24   copyright law to which Section 980(a)(2) "conformed" did not include any
     performance right for sound recordings at all. *See* Point I.A *supra*.
25

26   [4] *See A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 564, 142 Cal. Rptr. 390,
27   396 (1977); *Capitol Records Inc. v. Erickson*, 2 Cal. App. 3d 526, 527-28, 538, 82
     Cal. Rptr. 798, 799-800, 806 (1969); 2 Melville B. Nimmer & David Nimmer,
28   *Nimmer on Copyright* § 8C.03[C] (Lexis 2013) (explaining that prior to enactment

time of its 1982 revision, Section 980's protection for Pre-1972 Recordings
paralleled precisely the scope of rights that federal copyright law then afforded Post-
1972 Recordings: protection solely against unauthorized reproduction and
distribution.  *See* Point 1.C *infra*.  It is not only contrary to the historical record, but
also counterintuitive, for Plaintiff to contend that revised Section 980 was intended
to encompass a public performance right that would have expanded the scope of
pre-existing California law and exceeded the scope of rights conferred by Congress
on sound recordings created on or after February 15, 1992 ("Post-1972 Recordings")
without so much as a legislative mention of that intent.  Unsurprisingly, Plaintiff
cites nothing to support this contention.

What is more, the premise that an otherwise unspecified conferral of
ownership rights necessarily bestows on the beneficiary unlimited dominion over
the property involved is contrary to basic property rights precepts.[5]  Plaintiff's
sweeping claims as to the unlimited scope of Section of 980(a)(2)'s "exclusive
ownership" language would invite all sorts of anomalous results.  To name but a
few, Plaintiff's overreaching interpretation of Section 980 would bar *private*
performances by consumers in their homes no less than the public performances of
the type Plaintiff challenges here, turn every radio station in California that

---

of Section 980(a)(2), "California courts protected against *duplication and
distribution* of sound recordings on a conversion theory") (emphasis added).
[5] The "bundle of sticks" comprising a property owner's entitlements are neither
absolute nor foreordained, but offset by a variety of privileges—long recognized and
shaped by courts and legislatures alike—allowing others to make use of that
property without the owner's permission.  *See, e.g., Warsaw v. Chicago Metallic
Ceilings, Inc.*, 35 Cal. 3d 564, 570-72, 199 Cal. Rptr. 773, 776-78 (1984)
(recognizing that property owners in California can become subject to prescriptive
easements where someone uses their property in a continuous, open, and
uninterrupted fashion for a period of five years without express permission);
*Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 84, 88, 100 S. Ct. 2035 (1980)
(affirming privilege under California law to enter private property for political
protest); *United States v. Causby*, 328 U.S. 256, 260-61, 66 S. Ct. 1062 (1946)
(affirming privilege of airplanes to enter landowner's airspace at a reasonable
height).

-8-

1   broadcasts "oldies" into serial infringers, and require rejection of equitable defenses

2   such as fair use—a result that would conflict with the First Amendment.  *See Eldred*

3   *v. Ashcroft*, 537 U.S. 186, 219, 123 S. Ct. 769 (2003).[6]

4           In sum, the sole California statutory authority cited by Plaintiff in support of

5   its performance right claims affords no support for the dramatic expansion of the

6   law Plaintiff seeks.

7       **B.    California Common Law Has Never Provided Copyright Owners
               With An Exclusive Right Of Public Performance**

8           Plaintiff's claimed alternative support for locating a state public performance

9   right in Pre-1972 Recordings rests principally on a solitary federal case that

10  erroneously relied for the snippet of its ruling on which Plaintiff depends on

11  misrepresentations by counsel there as to the holdings of two state law cases, on

12  which Plaintiff here also relies.  Plaintiff's glib argumentation cannot obscure the

13  glaring absence of California state court precedent recognizing the purported

14  performance right on which Plaintiff's case is founded.  The two state cases Plaintiff

15  cites dealt with record piracy.  *See Heilman*, 75 Cal. App. 3d at 564; *Erickson,* 2

16  Cal. App. 3d at 527-28, 538.  The claims for relief in both cases arose out of the

17  defendants' unlawful acts of reproduction and distribution *in competition with the*

18  *plaintiffs' own sales*.  Neither plaintiff sought relief for public performances by the

19  defendants, and no aspect of the rulings addressed that issue.  Both rulings are thus

20  plainly inapposite.

21          Plaintiff's extensive reliance on *Capitol Records, LLC v. BlueBeat, Inc.*, 765

22  F. Supp. 2d 1198 (C.D. Cal. 2010), which mistakenly interpreted *Heilman* as

23  identifying a California performance right, also is futile.  *BlueBeat* involved a

24  service that sold unlicensed downloads of sound recordings—*i.e.,* pirated copies—in

25  _____

26  [6] Unsurprisingly, courts have rejected so sweeping a view.  *See, e.g.*, *Kramer v.
    Thomas*, No. CV 05-8381AGCTX, 2006 WL 4729242, at *12 (C.D. Cal. Sept. 28,

27  2006) (granting summary judgment to defendants accused of infringing Pre-1972
    Recording on the basis of fair use and applying same test codified in 17 U.S.C. §

28  107 used to determine fair use under federal copyright law).

1   competition with the plaintiffs; it also allowed users to stream certain tracks on

2   demand.  765 F. Supp. 2d at 1200-01.  In addition to alleging that BlueBeat

3   infringed their copyrights in Post-1972 Recordings (the subject to which the bulk of

4   the opinion is devoted), the plaintiffs alleged misappropriation, unfair competition,

5   and conversion with respect to BlueBeat's exploitation of their Pre-1972

6   Recordings.  *Id.* at 1205-06.  Without undertaking any separate analysis or

7   application of the three causes of action, and without distinguishing between

8   BlueBeat's unauthorized sales of downloads and its streaming activities, the court

9   summarily concluded that BlueBeat's "actions" across the board rendered it liable

10  for misappropriation, unfair competition, and conversion under California law.  *Id.*

11  In concluding that "when a defendant duplicates, sells, and performs" sound

12  recordings without authorization, it violates California law, the court relied solely on

13  *Heilman* for supporting precedent.  *Id.*  But, as discussed, *Heilman* did not address,

14  let alone opine on, whether public performances, separate and apart from

15  unauthorized copying and distribution, require a license.  *Heilman*, 75 Cal. App. 3d

16  at 564.  *BlueBeat* is mistaken in suggesting otherwise and thus does not advance

17  Plaintiff's argument.[7]

18          The complete absence of supporting precedent for Plaintiff's claims not only

19  undermines its case; it also explains Plaintiff's silence as to its—indeed, the entire

20  record industry's—record of inaction over many decades in enforcing a supposed

21  _____

22  [7] The *BlueBeat* plaintiffs' brief contended that BlueBeat's "duplication, distribution, and public performance of the Pre-1972 Recordings constitutes misappropriation and unfair competition," citing solely to *Erickson* and *Heilman* for support.  Pls.'

23  Mem. of P. & A. in Supp. of Mot. for Partial Summ. J. at 12, *BlueBeat*, 765 F. Supp. 2d 1198 (No. 09-8030), Puglisi Decl. Ex. 39.  Although neither *Erickson* nor

24  *Heilman* addressed the public performance issue, BlueBeat did not contest (or even

25  address) the plaintiffs' mischaracterization in its responsive briefing, arguing only that it had not actually made copies of the plaintiffs' Pre-1972 Recordings.  Defs.'

26  Mem. of  P. & A. in Opp'n to Pls.' Mot. for Partial Summ. J. at 21-23, *BlueBeat*, 765 F. Supp. 2d 1198 (No. 09-8030), Puglisi Decl. Ex. 40.  Given the lack of issue

27  joinder by the defendant, and the centrality of digital downloads, as opposed to performances rendered by streaming, to the case, it is easy to envision how the court

28  could have included the passing mention of the word performance.

California public performance right in Pre-1972 Recordings in relation to the countless millions of performances of such works by a multitude of California entities.  Plaintiff concedes that its conception of a California performance right is entity - and technology - agnostic, such that "the result is the same" across media and distribution platforms.  Pl. Mem. 18.  Why, then, have assumedly economically rational artists and record companies failed to seek royalties from generations of radio broadcasters, bars, restaurants and myriad other users making performances of their Pre-1972 Recordings?[8]  The absence of such efforts simply reinforces what California precedent already confirms: the absence of any such right.[9]

Plaintiff lamely tries to fill this legal void by scattershot reference, in barely two pages of briefing, to a variety of California common law tort doctrines, as well as to Section 17200 of the Cal. Bus. & Prof. Code.  It neither fully and accurately identifies the requisite elements of each, nor makes the slightest effort to tie those elements to the fact record presented by this case.   Illustrative is its bromide that Sirius XM is "endeavoring to reap where it has not sown," Pl. Mem. 14, quoting *Int'l News. Serv. v. Associated Press*, 248 U.S. 215, 239-40, 39 S. Ct. 68, 63 (1918) ("*INS*"), a case decided as a matter of federal common law pre-*Erie Railroad Co. v*

---

[8] By comparison, the American Society of Composers, Authors & Publishers ("ASCAP"), an organization that licenses performing rights in *musical compositions* contained within sound recordings (which, as Plaintiff acknowledges, are distinct works for copyright purposes and are protected by federal law (Pl. Mem. 10 n.7)) has licenses in place with more than 14,000 California entities, including nearly 900 radio stations, more than 6000 bars and restaurants, and over 2000 retailers.  SXM 56-2 ¶ 99.  The notion that Plaintiff and other labels have long possessed an equivalent performance right but not bothered to pursue comparable licensing simply lacks credibility.

[9] As the Supreme Court has aptly observed: "So strong is the desire of every man to have the full enjoyment of all that is his, when a party comes into court and asserts that he has been for many years the owner of certain rights, of whose existence he has had full knowledge, and yet has never attempted to enforce them, there is a strong persuasion that, if all the facts were known it would be found his alleged rights either never  existed or had long since ceased." *Halstead v. Grinnan*, 152 U.S. 412, 416, 14 S. Ct. 641 (1894).

-11-

*Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938), that is no longer good law. *See*

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 894 (2d. Cir.

2011) ("[A]fter its death under *Erie*, *INS* thus maintains a ghostly presence as a

description of a tort theory, not as precedential establishment of a tort cause of

action."). With respect to the misappropriation tort more generally, courts

repeatedly have cautioned against indiscriminating application of so loose a

conception of property rights as the one Plaintiff presses here.[10]  Broadcasting sound

recordings has never been considered "reaping where one has not sown" as a matter

of California law, policy or industry practice. The generic principle Plaintiff seeks

to extract from *INS* cannot be divorced from its context: an action between

competitors and a demonstration of competitive harm through time-sensitive activity

(breaking news stories) that, if permitted to continue, would have deprived the

plaintiff of sufficient financial incentive to continue its activities and driven it out of

business. *INS*, 248 U.S. at 235, 241. None of the record facts presented in this case

aligns with those key elements. Plaintiff has failed to show that it competes with

Sirius XM; that radio broadcasts (however transmitted) usurp Plaintiff's record

sales; or that there could be any threat to its incentive to create Pre-1972 Recordings

arising out of Sirius XM's performances. SXM 56-2 ¶¶ 100-108.  The absence of

this type of injury is fatal to Plaintiff's misappropriation and unfair competition

claims. *See, e.g., Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-00094 LGB MCX, 2000

---

[10] *See, e.g., WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 45 (1st Cir. 1991)
(Breyer, J.) (rejecting claim that defendant had violated the law by reaping where it
had not sown and noting that "the law *sometimes* protects investors from the 'free
riding' of others; and *sometimes* it does not"); *Pagliero v. Wallace China Co.*, 198
F.2d 339, 343 (9th Cir. 1952) (noting limited application of *INS* to other facts);
*Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d 1322, 1328-29 (M.D.
Fla. 2000) ("[F]ree riding only becomes detrimental to competition when the ability
of other parties to free-ride on the efforts of the [plaintiff] would so reduce the
incentive to produce the product or service that its existence or quality would be
substantially threatened.") (quotation omitted) *Balboa Ins. Co. v. TransGlobal
Equities*, 218 Cal. App. 3d 1327, 1353, 1267 Cal. Rptr. 787, 803 (1990) (noting
"vagueness" of common law misappropriation claim).

WL 709149, at *6 (C.D. Cal. May 24, 2000) ("Although the California courts may have recognized a [common law unfair competition] cause of action lacking evidence of palming off, they have done so in the context of competing businesses."); *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1188 (S.D. Cal. 2012) (observing that California "common law tort of unfair competition … is rooted in preventing conduct that harms competitors by deceiving customers").[11]

Plaintiff likewise makes no serious effort, nor could it, to prove out the elements of a conversion claim, which requires "the wrongful exercise of dominion over the property of another" and proof of "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages," *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066, 80 Cal. Rptr. 2d 704, 706 (1998).  Sirius XM's public performances of Plaintiff's sound recordings neither dispossess the Plaintiff of those recordings nor cause any injury or lost sale that could be said to "interfere" with its possessory interest.[12]  Plaintiff admits that it cannot identify a single lost sale, lost license, or diminished license fee it has suffered as a result of Sirius XM.[13]  SXM 56-2 ¶¶ 100,

---

[11] Plaintiff pled separate claims for misappropriation and unfair competition, but acknowledges that misappropriation is just "a form of common law unfair competition" and treats them as one and the same in its moving brief.  Pl. Mem. 13.

[12] *See, e.g.*, *Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs., LLC*, 748 F. Supp. 2d 1145, 1178 (C.D. Cal. 2010).  Plaintiff has failed utterly to show "wrongful disposition" here, since there is no evidence that Sirius XM "intentionally prevented the plaintiff from having access to the property for a significant period of time, refused to return the property upon plaintiff's demand, or otherwise wrongfully disposed of the property." *Id.*

[13] California law mandates dismissal of a conversion claim where a plaintiff "seek[s] compensatory damages in an unspecified sum without stating either of the alternative measures of damage required by section 3336 of the Civil Code." *Baldwin v. Marina City Props., Inc.*, 79 Cal. App. 3d 393, 411-12, 145 Cal. Rptr. 406, 417 (1978).  Plaintiff has neither pled nor established as damage either the value of its recordings (which it cannot, since it retains those recordings) nor any loss actually caused by Sirius XM's public performance of those recordings. *See Tyrone Pac. Intern., Inc. v. MV Eurychili,* 658 F.2d 664, 666-67 (9th Cir. 1981)

1 | 102-104. Absent any dispossession or any proven damage, Plaintiff's attempt to
2 | extend the conversion cause of action to bar unauthorized performances of its
3 | recordings must fail. *See Miles, Inc. v. Scripps Clinic & Research Found.*, 810 F.
4 | Supp. 1091, 1098 (S.D. Cal. 1993) ("strong policy considerations weigh against
5 | expanding the conversion cause of action").[14]

6 | Plaintiff devotes a single paragraph to alleging that Sirius XM's activities
7 | violate Section 17200, but fails to explain how or why, save for the one-sentence
8 | assertion that Sirius XM's commercial use of Plaintiff's recordings "is the
9 | consummate definition of unfair." Pl. Mem. 12. That analysis-free assertion—
10 | which fails completely to consider the types of activities that prior courts have found
11 | to be "unlawful" or "unfair" under Section 17200—is woefully insufficient to
12 | support summary judgment in Plaintiff's favor. Among many deficiencies, Plaintiff
13 | has failed to establish: that Sirius XM's activities harm the *public*, or that it has
14 | standing as a *competitor* of Sirius XM; that it has suffered the type of economic
15 | injury *itself* as required to sustain a claim under the statute; and that Sirius XM
16 | has engaged in conduct that qualifies as an "unlawful, unfair or fraudulent business
17 | act or practice" under the statute, as those terms of art have been applied by
18 | California courts in practice. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310,
19 | 320, 120 Cal. Rptr. 3d 741, 749 (2011); *Dillon v. NBCUniversal Media LLC*, No.
20 | CV 12-09728 SJO AJWX, 2013 WL 3581938, at *7 (C.D. Cal. June 18, 2013);
21 | *Informix Software, Inc v. Oracle Corp.*, 927 F. Supp. 1283, 1287 (N.D. Cal. 1996);

22 |
23 |

24 | (plaintiff could not properly plead damages for conversion where property returned without loss of value after temporary detention by defendant).
25 | [14] Even where California courts have extended the tort to unconsented uses of intangible property such as sound recordings, they have carefully limited the scope
26 | of such protection to piracy of the property, which clearly "interferes" with a sale that the plaintiff otherwise might have made even if it does not literally deprive the
27 | plaintiff of possession. *See, e.g., Heilman*, 75 Cal. App. 3d at 570; *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 722, 725 (9th Cir. 1985).
28 | Plaintiff's claims also suffer from a complete failure of proof on this score.

1 | *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1554-55, 127 Cal. Rptr. 3d
2 | 569, 576-78 (2011).

3 |     In sum, neither the authorities claimed by Plaintiff to directly identify a
4 | performance right under California law nor Plaintiff's half-hearted efforts to locate
5 | such a right in various other state tort law doctrines remotely suffice to carry
6 | Plaintiff's burden of demonstrating the existence of such a right.

7 |     **C.   Plaintiff's Claimed Entitlement To A Performance Right Is**
8 |            **Undermined By the History of Failed Legislative Efforts To Secure**
   |            **Such A Right And The Essentially Legislative Policy**
   |            **Considerations That Are Entailed in Consideration of Such**
9 |            **Expansion of Law**

10 |    Plaintiff's case is further undermined by the uniform recognition over many
11 | decades on the part of record industry advocates, broadcasters, the U.S. Copyright
12 | Office, and Congress that there never has been any state performance right in Pre-
13 | 1972 Recordings.  Whereas musical compositions, as distinct from the sound
14 | recordings in which those compositions are sometimes embodied, have been
15 | protected by federal copyright laws since at least 1831,[15] it was not until enactment
16 | of the Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 ("Sound
17 | Recording Act"), that sound recordings began to receive any protection at all under
18 | federal law.  The record surrounding the nature and extent of protection to be
19 | afforded sound recordings under federal law could not be clearer in relation to state-
20 | level protection of sound recording performance rights: they have never existed, and
21 | the remedy, if any, was to be had at the federal level.

22 |    The Sound Recording Act was expressly intended to address record piracy,
23 | which had "rapid[ly] increase[d]" in preceding years due to technological advances
24 | and inconsistent state law protection.  117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971)
25 | (statement of Sen. John McClellan), Puglisi Decl. Ex. 23; *see also Arista Records,*
26 | *LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009).  In furtherance of this

27 |

28 | [15] *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436, Declaration of Fred R. Puglisi, dated July 7, 2014 ("Puglisi Decl."), Ex. 2.

1  goal, owners of qualifying recordings—those created on or after February 15, 1972

2  ("Post-1972 Recordings")—were granted carefully circumscribed prospective rights

3  to combat record piracy, specifically the rights "[t]o reproduce and distribute"

4  "tangible" copies of sound recordings.  Sound Recording Act §§ 1, 3, Puglisi Decl.

5  Ex. 22; 17 U.S.C. § 106(1), (3).   Effective January 1, 1978, the rights so conferred

6  pre-empted parallel state enforcement efforts.  *See* 17 U.S.C. § 301.

7       The debate over the scope of federal copyright rights to be accorded sound

8  recordings centrally included the issue whether, in addition to exclusive rights to

9  reproduce and distribute such works, Congress should also provide a right of public

10 performance akin to that conferred by federal law upon owners of musical works

11 (found in 17 U.S.C. § 106(4)).  Congress determined otherwise.  *See* Sound

12 Recording Act §§ 1(a), 3, Puglisi Decl. Ex. 22; 17 U.S.C. § 114(a) (stating that

13 sound recording rights "do not include any right of performance under section

14 106(4)" of the Copyright Act); *see also* H.R. Rep. No. 92-487, at 14 (1971), Puglisi

15 Decl. Ex. 24.  The record of that debate is extensive and uniform in reflecting the

16 common understanding among all interested parties that existing state laws did *not*

17 extend to such public performances; to the contrary, the record industry advocated

18 for such federal protection precisely to remedy this perceived inequity, much as

19 radio broadcasters opposed such a new legal and economic constraint on their

20 businesses.  *See* Puglisi Decl. Exs. 37, 38.[16]

21

22 ─────────────────

23 [16] In order to accept Plaintiff's misportrayal of the scope of California common law
    and the protection it purportedly has "long provided," Pl. Mem. 1, the Court would
24 need to believe that Congress, by preempting state laws with respect to Post-1972
    Recordings and determining not to create a federal performance right for such
25 recordings, actually dramatically *narrowed* the rights afforded to sound recording
    owners at the time under state law.  This is plainly absurd.  Not a single legislative
26 advocate ever so argued.  Quite to the contrary, Congress clearly understood that it
27 was leaving public performances of sound recordings unregulated *at either the state
    or federal level.*

28

-16-

1    The issue was revisited in connection with what became, in 1995, the Digital

2 Performance Rights in Sound Recordings Act ("DPRSRA"). Congress there

3 responded affirmatively—to a point—to the record industry's persistent drive for

4 recognition of a sound recording performance right, adding a limited such right,

5 confined to digital audio transmissions of *Post-1972* Recordings, that was further

6 circumscribed to ensure that it would not impede the development of new

7 technologies for increasing public access to performances of sound recordings.

8 These limitations included a compulsory statutory license designed to ensure that

9 various categories of services delineated by the statute, including satellite radio,

10 would be assured uninterrupted access to the sound recordings involved and that

11 such access would be provided at a reasonable price. An elaborate agency rate-

12 setting process was established as a part of this framework; the responsible agency,

13 now the Copyright Royalty Board, has actively regulated the post-1972 recording

14 performance royalties payable by Sirius XM and others ever since. *See* H.R. Rep.

15 104-274, at 22 (1995), Puglisi Decl. Ex. 28; 17 U.S.C. §§ 114(d), 114(f), 801-805.

16    The record surrounding federal creation of this circumscribed sound recording

17 performance right applicable to Post-1972 Recordings confirms the uniform

18 understanding by all constituent interests that state laws did not afford sound

19 recording owners public performance rights in their works. The leading record

20 industry trade association, the Recording Industry Association of America,

21 summarized it well in testifying: "Under existing law, record companies and

22 performers . . . have *no rights* to authorize or be compensated for the broadcast or

23 other public performance of their works." *See* Puglisi Decl. Ex. 29. The testimony

24 of the National Association of Broadcasters and others was in line. *See* Puglisi

25 Decl. Exs. 30-31. No less an authority than the U.S. Copyright Office, both in

26 contemporaneous submissions concerning such federal legislation and since, has

27 shared that understanding. *See* Puglisi Decl. Exs. 33-36; U.S. Copyright Office,

28

-17-

1 | *Federal Copyright Protection for Pre-1972 Sound Recordings* 44-45 (2011), Puglisi
2 | Decl. Ex. 8.

3 | Against this legislative backdrop, it is nothing short of disingenuous for
4 | Plaintiff to claim that California has long recognized a right that its own industry
5 | trade association, among other knowledgeable constituents, has repeatedly
6 | acknowledged does not exist.  As important, the competing policy arguments that
7 | have animated those legislative efforts, and the careful balancing of those interests
8 | that is reflected in the complex web of federal statutory provisions enveloping
9 | performance rights in Post-1972 Recordings, counsels in favor of retaining the
10 | *status quo*, namely, leaving consideration of the pros and cons of extending
11 | performance rights protection to Pre-1972 Recordings to Congress, [17] rather than
12 | accommodating Plaintiff's interest in judicially rewriting decades of settled law and
13 | applying that change retroactively—damages and all—to Sirius XM's detriment.

14 | The responsibility of a federal court in a diversity case is to apply the law of
15 | the state in which the court sits, not to modify that law.  As the Second Circuit
16 | observed in refusing to expand New York's law of unfair competition to encompass
17 | "free riding" by a defendant that did not compete with the plaintiff, "it is not the role
18 | of a federal court . . . to undertake such an expansion of New York law." *H.L.*
19 | *Hayden Co. of N.Y. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1025 (2d Cir.
20 | 1989); *see also Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) ("We
21 | must apply the law of the forum as we infer it presently to be, not as it might come
22 | to be.") (citation omitted).  This principle alone warrants denial of the relief sought
23 | by Plaintiff here.

24 | There is, in any event, no reason to believe that the California Supreme Court
25 | would expand state common law to encompass an exclusive right of public
26 | performance in Pre-1972 Recordings, and there are many reasons to believe that it

27 |

28 | [17] Federal legislative debate over this very issue is currently ongoing.  *See* Declaration of David J. Frear, dated July 3, 2014 ("Frear Decl.") ¶ 15 & Exs. C-E.

would not.  First, the creation and retroactive application of a performance right under California common law for Pre-1972 Recordings would do little to achieve the central purpose of copyright: to provide incentives for the creation of *new* works for dissemination to the public.[18]  As Plaintiff, by definition, cannot make any new Pre-1972 Recordings now (and new recordings are incentivized by federal copyright protection), the proposed new right would not provide incentives to creative activity.[19]  Indeed, the creation of a new performance right would *reduce* the availability of Pre-1972 Recordings by imposing new and unanticipated fees on Sirius XM and other users if they wish to continue to perform Pre-1972 Recordings, with a concomitant decrease in their use of Pre-1972 Recordings.  Any such decrease in public access to such recordings almost assuredly would adversely impact Plaintiff's ability to sell its recordings.  SXM 56-2 ¶ 108 (Kaylan Tr. 71:7-22) (acknowledging promotional impact of radio play).

Second, the creation of a new performance right for Pre-1972 Recordings would impose unfair burdens upon stockholders of Sirius XM and other businesses that were built in good-faith reliance upon the extant legal regime.  Those investors took huge risks.  SXM 56-2 ¶ 45-46.  To impose retroactively new burdens on these enterprises would be unfair.

---

[18] *See Feist Publ'ns v. Rural Tel Serv. Co.*, 499 U.S. 340, 349-50, 111 S. Ct. 1282 (1991) ("The primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.'") (quoting U.S. Const. art. I, § 8, cl. 8); *Goldstein v. California*, 412 U.S. 546, 559, 93 S. Ct. 2303 (1973) ("the very objective of the grant of protection" is "to induce new artistic creations").

[19] The broad new right that Plaintiff asks this Court to create would apply retroactively to works that were made—at minimum—42 years ago and that would include recordings made as far back as 90 years ago. These recordings (depending on the release date and popularity) could have been sold first on 78s; then on LPs; then on cassette tape; then on CDs; and then as digital downloads—thus providing their creators many successive revenue streams.  In all events, each such recording was created at a time when there was no expectation of any performance right.

-19-

1         Third, the creation of the proposed right would frustrate a key goal of the

2   compulsory licensing regimes created by Congress in 1995 and 1998 to govern

3   digital audio transmissions of Post-1972 Recordings by satellite broadcasters

4   (including Sirius XM) and webcasters: to preserve incentives for innovative services

5   such as satellite radio to make sound recordings publicly available by depriving the

6   record industry of the right to withhold access to its works and/or charge exorbitant

7   royalties as a condition of their use.  *See* H.R. Rep. No. 104-274, at 12-14, Puglisi

8   Decl. Ex. 28; S. Rep. No. 104-128, at 14-15 (1995), Puglisi Decl. Ex. 32.   The relief

9   sought by Plaintiff would run roughshod over this Congressional solicitude for

10  public access to sound recordings, creating as it would an unqualified state common

11  law right, without compulsory licensing, that would allow owners of sound

12  recordings to dictate the conditions of public access to the works they administer.

13        This array of policy counter-arguments underscores the inappropriateness of

14  Plaintiff's effort to upend decades of settled practice and extract punitive retroactive

15  penalties through litigation rather than having such a consequential matter

16  considered through legislation, where all interested stakeholders (most of which are

17  not parties to this action) could be heard, and where a full complement of policy

18  judgments could be made.

19      **D.**    **State Regulation Of Performances By A Nationwide Broadcaster**
         **Like Sirius XM Would Violate The Commerce Clause**

20

21        The Supreme Court has long held that the Commerce Clause precludes state

22  regulation of "commerce that takes place wholly outside of the State's borders,

23  whether or not the commerce has effects within the State."  *Healy v. Beer Inst., Inc.*,

24  491 U.S. 324, 335-36, 109 S. Ct. 2491 (1989) (internal quotation omitted).  This bar

25  applies equally to enactments of a state legislature and to court pronouncements.

26  *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013)

27  ("Neither the California courts nor the California legislature are permitted to

28  regulate commerce entirely outside of the state's borders.").  The Supreme Court has

-20-

1   developed a categorical approach to state economic regulation like that proposed
2   here: "When a state statute directly regulates . . . interstate commerce . . . [the Court
3   has] generally struck down the statute without further inquiry." *Brown-Forman*
4   *Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080
5   (1986). If the regulation has such a "practical effect" on interstate commerce, "it
6   violates the Commerce Clause per se." *NCAA v. Miller*, 10 F.3d 633, 638-39 (9th
7   Cir. 1993); *see also Healy*, 491 U.S. at 336 ("The critical inquiry is whether the
8   practical effect . . . is to control conduct beyond the boundaries of the State").
9   Applying these principles, courts repeatedly have struck down state regulations that,
10  in practical effect, regulated conduct beyond the state's boundaries where, as here,
11  the regulated activity necessarily was national in scope. *See. e.g.*, *Am. Booksellers*
12  *Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003); *Am. Civil Liberties Union v.*
13  *Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999); *Partee v. San Diego Chargers*
14  *Football Co.*, 34 Cal. 3d 378, 384-85, 194 Cal. Rptr. 367, 371-72 (1983).
15       Recognizing a California public performance right in Pre-1972 Recordings
16  would, as to any broadcast activity that is national in scope, impermissibly regulate
17  extraterritorial conduct in violation of the dormant Commerce Clause. Sirius XM
18  broadcasts identical programming to subscribers in California and every other state
19  in the continental U.S. *See* SXM 56-2 ¶¶ 33-35 . This is required both by law and
20  technological necessity: Sirius XM's FCC licenses prevent it from offering state-
21  specific programming, and Sirius XM's delivery systems are not designed to direct
22  (or restrict) the transmission of signals or programming to particular states or the
23  location of the radio receiver unit. *Id.* at ¶¶ 34, 35. Indeed, a large majority of
24  Sirius XM's subscribers listen through radios installed in their vehicles or on mobile
25  phones or laptop computers, which inevitably cross state lines. The practical effect
26  of Plaintiff's proposed state regulation would be that Sirius XM could not broadcast
27  Pre-1972 Recordings on any of its channels to any of its subscribers anywhere in the
28  United States, including in all of the other states that do not recognize any such

performance right, without securing a license or otherwise complying with California regulation.  By effectively requiring Sirius XM to obtain a license or other consent to play Pre-1972 Recordings anywhere in the country, California would impermissibly "project its legislation into other States by regulating the price to be paid" for public performances of those recordings in other states.  This is a per se violation of the Commerce Clause.  *See Brown-Forman*, 476 U.S. at 582 ("Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.").

Neither 17 U.S.C. § 301(c) nor *Goldstein*, 412 U.S. 546, is to the contrary. The savings clause of Section 301(c) just leaves states free to regulate *intra*-state commerce (*e.g.*, piratical sales in the state); it does not grant new powers to states to regulate interstate commerce.[20]  *See, e.g., Wyoming v. Oklahoma*, 502 U.S. 437, 457-58, 112 S. Ct. 789 (1992).  *Goldstein*—a case addressing California's record piracy statute—was premised on the assumption that geographic limitations inherent in state prohibitions on *copying and piracy* naturally prevented one state's laws from impermissibly intruding into other states: "If one State grants such protection, the interests of States which do not are not prejudiced since their citizens remain free to copy within their borders those works which may be protected elsewhere."  412 U.S. at 558.  Adopting a California performance right in Pre-1972 Recordings, however, would do just what *Goldstein* suggested would be impermissible:  require a broadcaster to pay a "tariff" in one state before it could broadcast Pre-72 Recordings anywhere in the nation or to forego broadcasting those recordings everywhere if unable to obtain such a license in California.  *Id.* at 559.

---

[20] The legislative history is clear: the Justice Department proposed 301(c) (then identified as 301(b)) specifically to preserve state record piracy laws for Pre-72 Recordings.  *See Copyright Law Revision: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary on H.R. 2223*, at 1396-98 (Comm. Print 1975) (statement of RIAA President in support of the amendment so as to preserve state "antipiracy statutes"), Puglisi Decl. Ex. 21.

-22-

## II.   COPIES OF PRE-1972 RECORDINGS MADE BY SIRIUS XM IN AID OF PUBLIC PERFORMANCES ARE NOT ACTIONABLE

Plaintiff asserts that Sirius XM has violated California law by making unauthorized copies of its recordings in connection with its broadcast activities. That claim fails for numerous reasons.  First, Plaintiff fails completely to identify what copies of its recordings Sirius XM has made *in California*.  As the Supreme Court made clear in *Goldstein*, "a copyright granted by a particular State has effect only within its boundaries," and citizens of *other* states "remain free to copy within their borders those works which may be protected elsewhere."  412 U.S. at 558. Second, Plaintiff fails to identify which copies of its recordings were made by Sirius XM in California *after* January 1, 2012; server and other "ephemeral" copies prior to that date are insulated from attack here by a class-wide settlement agreement from a previous litigation that binds Plaintiff.  *See* SXM 56-2 ¶¶ 17, 74, 109-117; Final Order and Judgment, *In re XM Satellite Radio Copyright Litigation*, No. 06 CV 3733 (LAK) (S.D.N.Y. Mar. 22, 2011), Dkt. No. 123; Final Order and Judgment, *Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc.*, No. 07 CV 6307 (AKH) (S.D.N.Y. Jan. 9, 2012), Dkt. No. 57.

As opposed to Plaintiff's failure of proof, the record and the case law establish that there is no actionable reproduction in this case.  To start, Sirius XM has not distributed or otherwise allowed its subscribers to save and access copies of Plaintiff's recordings, either in the form of individual song downloads or downloads of Sirius XM programs available for on-demand streaming.  SXM 56-2 ¶ 70. Moreover, the only copies of Plaintiff's recordings that reside on computer servers in California were made in New York or Washington and *sent* to Los Angeles (as *Goldstein* allows), not *made* there, with one *de minimis* exception: the first and last few seconds of "It Was a Very Good Year," which was digitally transmitted from New York to Los Angeles and saved on a server there in May 2012.  As the Declaration of Terrence Smith explains, the only other copying activity in the state

-23-

1  is the momentary caching of "tips and tails" in the workstations of Sirius XM

2  producers to record voiceovers during the transitions in and out of songs.  SXM 56-

3  2 ¶¶ 59-61, 65.  For at least three reasons, these instances of internal, incidental

4  copying are not cognizable infringements under California law.

5       First, California law regarding sound recordings has only ever condemned full

6  copies of recordings made and sold to the public in competition with the owner's

7  own sales, not internal, incidental reproductions made solely in aid of broadcast

8  performances. *See Heilman*, 75 Cal. App. 4th at 564; *Erickson*, 2 Cal. App. 3d at

9  527-28, 538.  Such non-public copies do not unfairly compete with, misappropriate,

10 or convert Plaintiff's recordings any more than Sirius XM's performances of the

11 recordings do.  Second, recognizing an infringement claim for fragmentary copies

12 made solely in aid of public performance would have the same economic effect as

13 creating a performance right itself, as the record industry could extract the entire

14 perceived economic value of the public performances by taxing the reproductions

15 necessarily made to facilitate them.  In this respect, Plaintiff's reproduction-based

16 claims are simply an attempt to achieve indirectly what the absence of a

17 performance right under California law precludes it from achieving directly.  Third,

18 these incidental, fragmentary copies made solely to effectuate performances that

19 themselves require no license clearly constitute a fair use of the recordings. *See*

20 *Kramer*, 2006 WL 4729242, at *9-12 (explaining that California recognizes the fair

21 use doctrine and is guided by the same four-factor test codified in Section 107 of the

22 federal Copyright Act).  Under the first fair-use factor, the "tips and tails" are made

23 for a distinct and transformative purpose (creating voice tracks to facilitate lawful

24 broadcasts) that in no way supersedes the sale of full copies to consumers. *See*

25 *Authors Guild, Inc. v. HathiTrust*, 2014 WL 2576342, at *6 (2d Cir. June 10, 2014)

26 (explaining that "a transformative work is one that serves a new and different

27 function from the original work and is not a substitute for it"); *id.* at *8-9 (creation

28 and maintenance of full copies of copyrighted works on computer servers at four

-24-

different locations, as well as disaster back-up tapes, not "excessive or unreasonable" where "necessary to facilitate the services [defendant] provides to the public and to mitigate against the risk of disaster or data loss"); *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-20 (9th Cir. 2003) (caching of copies of Plaintiff works transformative); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1119 (D. Nev. 2006) (same).  In addition, the "tips and tails" represent a tiny portion of the recordings, tipping the third factor in Sirius XM's favor as well.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-50, 104 S. Ct. 774 (1984) (finding copying of entire television programs for time-shifted viewing to be fair use).  Nor has Plaintiff demonstrated any effect on the market (or potential market) for its recordings under the fourth fair use factor.  As noted above, Plaintiff's principals and agents confirmed there is none.  SXM 56-2 ¶¶ 100-108.  The internal copies that Sirius XM makes in aid of public performance simply do not "substitute[] for the market of the original work."  *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998).  A copyright holder cannot establish market harm just by pointing to the defendant's failure to pay a license fee for its use of the work.  *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006); *Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1387-88 (6th Cir. 1996) (observing that copyright holder must have a right to copyright revenues before finding that a failure to pay license fee equals market harm).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment should be denied, and the Complaint should be dismissed with prejudice.

Dated:  July 7, 2014

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By        _/s/ Fred R. Puglisi_
                  FRED R. PUGLISI

WEIL, GOTSHAL & MANGES LLP

R. BRUCE RICH (admitted _pro hac vice_)
BENJAMIN E. MARKS (admitted _pro hac vice_)
TODD LARSON (admitted _pro hac vice_)

KRAMER LEVIN NAFTALIS & FRANKEL LLP

MICHAEL S. OBERMAN

Attorneys for Defendant
SIRIUS XM RADIO INC.

[List of additional counsel for Defendant SIRIUS XM RADIO INC.]

WEIL, GOTSHAL & MANGES LLP
JOHN R. GERBA (admitted _pro hac vice_)
john.gerba@weil.com
767 Fifth Avenue
New York, New York 10153
Telephone:  212-310-8000
Facsimile:   212-310-8007

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
KENT R. RAYGOR, Cal. Bar No. 117224
kraygor@sheppardmullin.com
VALERIE E. ALTER, Cal. Bar No. 239905
valter@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:   310.228.3701

-26-