WEIL, GOTSHAL & MANGES LLP
R. BRUCE RICH (admitted *pro hac vice*)
bruce.rich@weil.com
BENJAMIN E. MARKS (admitted *pro hac vice*)
benjamin.marks@weil.com
TODD LARSON (admitted *pro hac vice*)
todd.larson@weil.com
767 Fifth Avenue
New York, New York 10153
Telephone:  212.310.8000
Facsimile:   212.310.8007

KRAMER LEVIN NAFTALIS & FRANKEL LLP
MICHAEL S. OBERMAN, Cal. Bar. No. 101857
MOberman@KRAMERLEVIN.com
1177 Avenue of the Americas
New York, New York 10036
Telephone:  212.715.9294
Facsimile:   212.715.8294

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
FRED R. PUGLISI, Cal. Bar No. 121822
fpuglisi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:   310.228.3701

Attorneys for Defendant
SIRIUS XM RADIO INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLO & EDDIE, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIRIUS XM RADIO INC., and DOES 1 through 100,<br><br>Defendants. | Case No. 13-CV-5693 PSG (RZx)<br><br>**DEFENDANT SIRIUS XM RADIO INC.'S LOCAL RULE 56-2 STATEMENT OF GENUINE ISSUES OF MATERIAL FACT IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

1

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Local Rule 56-2, and the Honorable Philip S. Gutierrez's Standing Order, defendant Sirius XM Radio Inc. ("Sirius XM") hereby submits this Statement of Genuine Issues of Material Fact in opposition to plaintiff Flo & Eddie, Inc.'s ("Plaintiff") Motion for Summary Judgment.

## I.
## PLAINTIFF'S ALLEGED UNCONTROVERTED MATERIAL FACTS

| Allegedly Undisputed Fact | Alleged Evidentiary Support and Whether Fact is Disputed or Undisputed |
|---|---|
| 1. Sirius XM considers pre-1972 sound recordings to be in the public domain. | • Declaration of Harvey Geller ("Geller Decl.") ¶ 4, Ex. 3 [Deposition of David Frear ("Frear Depo.") 25:19:21, 75:13-76:2]<br>• Geller Decl. ¶ 5, Ex. 4 [Frear Depo. 35:13-36:12]<br><br>**Disputed in part.**<br><br>**This statement mischaracterizes Frear's testimony and Sirius XM's position.  *See* Frear Decl. ¶ 19 (citing Frear Decl. Ex. F (Frear 3/12/14 Tr. 26:8-13, 36:25–37:20, 38:18–39:12, 40:11-23, 41:13–42:8) (limiting "public domain" description to satellite/Internet radio and refusing to extend it to "any use" beyond that)); Sirius XM's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment.** |
| 2. The Turtles were formed in 1965 by Howard Kaylan, Mark Volman, Don Murray, Al Nichol, Charles Portz, and Jim Tucker. | • Declaration of Mark Volman ("Volman Decl.") ¶ 2.<br><br>**Undisputed.** |

| | | |
|---|---|---|
| 3. | White Whale Record Co., Inc. ("White Whale") signed The Turtles to a recording agreement on May 24, 1965.  Murray and Portz left the group in 1965 and were subsequently replaced by John Barbata, and James Pons.  In 1969, John Seiter replaced Barbata. | • Volman Decl. ¶ 2.<br><br>**Undisputed.** |
| 4. | The Turtles recorded a number of hit songs in the 1960s, including the iconic song "Happy Together." | • Volman Decl. ¶ 3.<br><br>**Undisputed.** |
| 5. | In 1970, The Turtles filed a lawsuit against White Whale claiming that it had systematically underpaid them royalties that they were owed from the exploitation of The Turtles' recordings.  Subsequently, the parties agreed to a settlement of the litigation.  As part of that settlement and in exchange for a release and waiver of claims by The Turtles (including a waiver of the large amount of underpaid royalties owed to The Turtles) White Whale transferred to Kaylan, Volman, Nichol, Seiter, and Pons all right, title and interest in and to the original master recordings of The Turtles.  This transfer included the 100 master recordings listed on Exhibit A to the Complaint in the instant case. | • Volman Decl. ¶¶ 4 and 5.<br><br>**Undisputed.** |

| 6. | On May 1, 1971, in exchange for payments from Kaylan and Volman, Nichol, Seiter, and Pons transferred all of their right, title, and interest in and to The Turtles' master recordings and the name The Turtles to Kaylan and Volman. | •     Volman Decl. ¶ 6.<br><br>**Disputed.**<br><br>**Volman's declaration is not consistent with the dates of such alleged transfers by Seiter and Pons reflected in the documents produced by Plaintiff.** |
|---|---|---|
| 7. | Kaylan and Volman transferred all of the rights to The Turtles' master recordings to Flo & Eddie, a corporation created in 1971 and owned and controlled exclusively by them. | •     Volman Decl. ¶ 7.<br><br>**Disputed.**<br><br>**Plaintiff has produced no documentary evidence supporting the conclusory assertion by Volman of the alleged transfers or any indication as to the date on which Plaintiff purportedly acquired the rights at issue.  Sirius XM disputes the ownership of the sound recordings in suit.** |

| 8. | For the last four decades, Flo & Eddie has been exploiting The Turtles master recordings by, among other things, licensing the rights to make and sell records and licensing the rights for The Turtles recordings to be used in movies, TV shows, and commercials.  Flo & Eddie has also licensed The Turtles recordings to The Orchard to be exploited digitally, including through the iTunes and Amazon stores. | • Volman Decl. ¶ 7.<br><br>**Disputed in part.**<br><br>**It is not disputed that Plaintiff has licensed others to make and sell copies of its recordings, including in digital download format.**<br><br>**However, Plaintiff's agreement with The Orchard dates back only to 2005, not four decades.**  **_See_ Declaration of Fred R. Puglisi, dated July 7, 2014 ("Puglisi Decl."),** **Ex. 2 (Cohen Tr. 90:10-20); _see also infra_ ¶¶ 84-85.**<br><br>**In addition, as opposed to digital download sellers like iTunes and Amazon, Plaintiff has _never_ licensed a radio station (digital or otherwise), Internet webcaster, or public establishment (nightclub, bar, restaurant, etc.) to publicly perform its recordings or to make copies in aid of such performances. _See infra_ ¶¶ 86-99.** |

| | | |
|---|---|---|
| 9. | Kaylan and Volman continue to devote their time and effort to promoting The Turtles and their music, and have been the main act on annual summer tours, such as the "Happy Together Tour," which features The Turtles and other musical groups from the 1960s. | • Volman Decl. ¶ 7.<br><br>**Disputed.**<br><br>**Both Kaylan and Volman admitted that they do not undertake efforts to promote the Turtles' sound recordings.  *See* Puglisi Decl. Ex. 3 (Kaylan Tr. 73:12-22) (Q. Now, do you currently undertake any efforts to promote The Turtles sound recordings?  A. Well, not particularly.  I mean, we tour not to promote the sound recordings, but to make money.  We don't really – we're not trying to sell records that are 40 or 50 years old.  I mean, we're not.  They sell with us or without us.  That's just historical.); Ex. 4 (Volman Tr. 47:19-23) (Q. Do you recall during that time period, same time period [1975-1985], did Flo & Eddie make any investments or expenditures in marketing or promoting the sale of The Turtles' recordings?  A. No.).** |
| 10. | Sirius XM claims to be the largest radio broadcaster in the United States measured by revenue and is the result of the 2008 merger of Sirius Satellite Radio and XM Satellite Radio.  Sirius claims to have 25.8 million paying subscribers. | • Geller Decl. ¶ 6, Ex. 5.<br><br>**Disputed in part.**<br><br>**The 2008 merger was between a subsidiary of Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Radio Holdings Inc. ("XM").  *See* Smith Decl. ¶ 7; *see also infra* ¶¶ 40-44.** |

| | |
|---|---|
| 11. Sirius XM operates both a subscription based nationwide satellite radio service as well as a subscription based internet radio service. | • Geller Decl. ¶ 6, Ex. 5, 6.<br><br>**Undisputed.** |
| 12. In exchange for monthly subscription fees which range from $9.99-$18.99, a subscriber can get access to, among other things, Sirius XM's broadcasts of commercial-free music. | • Geller Decl. ¶ 6, Ex. 6.<br><br>**Disputed in part.**<br><br>**Sirius XM frequently offers rates for subscriptions, including promotional rates, for less than $9.99 per month.** *See, e.g.*, **Puglisi Decl. Ex. 5 (Website Page for Sirius XM's A La Carte Packages, http://siriusxm.com/packages/alacart echoices (last visited July 3, 2014)).** |
| 13. Through its network of satellites, ground based terrestrial repeaters, and command and control earth stations, Sirius XM's satellite radio service broadcasts on hundreds of channels, including a number of channels devoted solely to playing recordings fixed prior to February 15, 1972 ("pre-1972 recordings"), such as "40s on 4," "50s on 5," and "60s on 6." | • Geller Decl. ¶ 6, Ex. 7.<br><br>**Disputed in part. Sirius XM broadcasts over 135 full-time channels, many of which are devoted to non-music content, as part of its satellite radio service.** *See* **Smith Decl. ¶ 4;** *see also infra* **¶ 29.** |

| | |
|---|---|
| 14. Sirius XM also streams and distributes music over the Internet. Sirius' Internet radio service includes most of the same channels offered by Sirius as part of its satellite service. However, the Internet radio service also offers channels, features, and mobile and smart phones applications that are not available through the satellite radio service. | • Geller Decl. ¶ 6, Ex. 8.<br><br>**Disputed in part.**<br><br>**Sirius XM streams music over the Internet, but those streams are *performances*, not *distributions*: i.e., users can listen to the music, but Sirius does not "distribute" the music in the sense of providing users with copies of the recording that they can download, retain, or access later (the way the term "distribution" is used in the copyright context). Sirius XM has never distributed any of Plaintiff's Pre-1972 Recordings over the Internet. Sirius XM does allow certain limited content to be "time shifted" for later listening by subscribers, much like a VCR or digital video recorder allows television viewers to "time-shift" viewing of television programs. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442-56 (1984); *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130, 134-140 (2d Cir. 2008). Such content is almost exclusively non-music, and does not include Plaintiff's recordings; to the limited extent it includes music, Sirius XM has obtained separate express authorization from the rights owner. *See* Smith Decl. ¶¶ 14-15; *see also infra* ¶¶ 69-73.** |

| | |
|---|---|
| 15. Two of the features that Sirius offers through its Internet service are Sirius XM On Demand (which allows subscribers the ability to download certain broadcasts from a catalog of content to listen to whenever they want) and MySXM (which permits subscribers to personalize their music listening experience). | • Geller Decl. ¶ 6, Ex. 8.<br><br>**Disputed in part.**<br><br>**Sirius XM's Internet service makes certain programs available on demand, and further offers subscribers the ability to temporarily "cache" certain of those on-demand programs in their entirety, typically for no more than 30 days, on their mobile devices.  This allows users to "time shift" the program for listening at a more convenient time, much like a VCR or digital video recorder allows television viewers to "time-shift" viewing of television programs.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442-56 (1984); *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130, 134-140 (2d Cir. 2008).  This functionality is offered primarily for non-music programming, and, in very limited circumstances (where the owner expressly grants permission), for music programming, but no such programming has included any of Plaintiff's Pre-1972 Recordings.  *See* Smith Decl. ¶ 15; *see also infra* ¶¶ 62-63, 71-72.<br><br>The MySXM feature allows users to fine-tune a particular Sirius XM channel, which allows subscribers to receive a more customized version of the channel reflecting certain of their preferences (it does not allow users to select which songs they will hear).  *See* Smith Decl. ¶ 29; *see also infra* ¶¶ 62-63.** |

| | |
|---|---|
| 16. Sirius copied and reproduced pre-1972 recordings, including many of The Turtles recordings identified in Exhibit A to the complaint, in creating the music libraries and databases it named Prophet, Dalet 5.1, and Dalet Plus. | • Geller Decl. ¶ 7, Ex. 9 [2/11/14 Deposition of Terrence Smith ("Smith 2/11/14 Depo.") 154:2-8]<br>• Geller Decl. ¶ 8, Ex. 10 [3/12/14 Deposition of Terrence Smith ("Smith 3/12/14 Depo.") 12:10-13:6, 17:3-6, 19:24-20:10]<br>• Geller Decl. ¶ 9, Ex. 11 [Smith 3/12/14 Depo. 38:6-44:19]<br><br>**Disputed in part.**<br><br>**The Prophet database was originally populated by Sirius. The Dalet databases were originally populated by XM. Sirius XM now maintains the Prophet and Dalet databases.** ***See*** **Smith Decl. ¶¶ 18-19, 21;** *see also infra* **¶¶ 51-52.**<br><br>**Objection: relevance.**<br><br>**None of the copying done by Sirius XM, including its predecessors Sirius and XM, in creating the Prophet, Dalet 5.1 or Dalet Plus databases took place in California. It is therefore not subject to California law and not at issue in this proceeding.** ***See Goldstein v. California*,** **412 U.S. 546, 558-59 (1973); Complaint at ¶¶ 18-34 (alleging only violations of California law);** *see also infra* **¶¶ 51-54, 58-61.**<br><br>**Although Plaintiff purports to bring this action on behalf of a class, it has failed to move for class certification and any alleged activities with respect to sound recordings owned** |

| | |
|---|---|
| | by putative class members are not before the Court on this motion. |
| 17. Sirius XM copied and reproduced at least 18,000 pre-1972 recordings to the Prophet database and 24,000 pre-1972 recordings to the Dalet 5.1 and Dalet Plus databases.  However, it also admitted that it probably copied many more than that. | • Geller Decl. ¶ 10, Ex. 12 [Smith 3/12/14 Depo. 60:8-62:11].<br><br>**Objection:  relevance.**<br><br>**None of the copying done by Sirius XM, including its predecessors Sirius and XM, in creating the Prophet, Dalet 5.1 or Dalet Plus databases took place in California.  It is therefore not subject to California law and not at issue in this proceeding.** *See Goldstein v. California*, **412 U.S. 546, 558-59 (1973); Complaint at ¶¶ 18-34 (alleging only violations of California law);** *see also infra* **¶¶ 51-54, 58-61.**<br><br>**Although Plaintiff purports to bring this action on behalf of a class, it has failed to move for class certification and any alleged activities with respect to sound recordings owned by putative class members are not before the Court on this motion.**<br><br>**In addition, copies made before 2012 are covered by class-action settlements, which bars claims arising out of such copying.  Plaintiff is a member of the settlement class.** *See infra* **¶¶ 109-117.** |

| | |
|---|---|
| 18. Sirius XM copied and reproduced its entire Prophet, Dalet 5.1, and Dalet Plus music libraries and databases to create backup libraries and databases and then copied them again to create disaster recovery libraries and databases. Sirius also created additional copies of those libraries and databases (including pre-1972 recordings) to give to third parties. | • Geller Decl. ¶ 11, Ex. 13 [Smith 2/11/14 Depo. 154:13-157:7, 73:3-77:19]<br>• Geller Decl. ¶ 12, Ex. 14 [Smith 2/11/14 Depo. 158:2-165:15], [Smith 3/12/14 Depo. 51:11-55:14]<br><br>**Disputed in part.**<br><br>**Sirius XM provided copies of only a subset of the Prophet and Dalet databases to a single third-party, Omnifone.** ***See infra*** **¶¶ 63-64.**<br><br>**Objection: relevance.**<br><br>**None of the copying done by Sirius XM, including its predecessors Sirius and XM, in creating the Prophet, Dalet 5.1 or Dalet Plus databases took place in California. It is therefore not subject to California law and not at issue in this proceeding.** ***See Goldstein v. California*, 412 U.S. 546, 558-59 (1973); Complaint at ¶¶ 18-34** **(alleging only violations of California law);** *see also infra* **¶¶ 51-54, 58-61.**<br><br>**Although Plaintiff purports to bring this action on behalf of a class, it has failed to move for class certification and any alleged activities with respect to sound recordings owned by putative class members are not before the Court on this motion.** |

| | |
|---|---|
| 19. In connection with its broadcasting of songs, Sirius XM also copied and reproduced pre-1972 recordings (including The Turtles recordings), by creating "tips and tails." "Tips and tails" are the beginnings and endings of recordings that are used by Sirius XM's programmers to bracket the voice transitions that it broadcasts between songs. The "tips and tails" are first copied to workstations by Sirius XM's programmers who then insert the voice transitions in between the "tips" and the "tails." A copy of the entire sequence (tips, tails, and voice transition) is then transferred from the workstation back to Sirius' music libraries and databases and stored for later use. | • Geller Decl. ¶ 13, Ex. 15 [Smith 2/11/14 Depo. 18:6-25, 52:20-56:17], [Smith 3/12/14 Depo. 80:2-84:21].<br><br>**Disputed in part.**<br><br>**"Tips and tails" contain only the first and last few seconds of certain songs. When tips and tails are obtained for use at a producer workstation, they are "cached" in the computer memory of the workstation only long enough to be used in creating the voiceover, and not retained permanently. The subsequent recording of the voiceover does <u>not</u> contain the tip or tail of the song, just the voice track. *See* Smith Decl. ¶¶ 27, 31; Puglisi Decl. Ex. 6 (Smith 2/11/14 Tr. 18:4-25); *see also infra* ¶¶ 50, 60-2, 65.** |

13

| | |
|---|---|
| 20.  Sirius XM makes a new copy and reproduction of each song that it broadcasts prior to broadcasting that song.  Sirius XM does this by sending a copy to a "play out" server.  If a particular song is broadcast one hundred times, it will be copied to the play out server one hundred times. | • Geller Decl. ¶ 14, Ex. 16 [Smith 2/11/14 Depo. 19:2-16, 114:15-117:11], [Smith 3/12/14 Depo. 88:2- 91:16]<br><br>**Disputed in part.**<br><br>**In advance of broadcasting a playlist of recordings for a particular channel, Sirius XM's computer systems will retrieve the songs comprising the playlist and assemble the program, in order, on a "play-out server" located in New York or Washington.  The program is cached on the play-out server only until the broadcast occurs, and at no time is accessible to the public.  *See* Smith Decl. ¶ 32; *see also infra* ¶¶ 50, 66-68.**<br><br>**Objection:  relevance.**<br><br>**The alleged activity in connection with Sirius XM's "play out servers" does not take place in California.  It is therefore not subject to California law and not at issue in this proceeding.  *See Goldstein v. California*, 412 U.S. 546, 558-59 (1973); Complaint at ¶¶ 18-34 (alleging only violations of California law).** |

| | |
|---|---|
| 21. In order to create redundancies in its broadcasting, after a song is transmitted from the play out server but before it is perceived by Sirius XM's subscribers, Sirius XM makes additional copies and reproductions (such as buffer copies). | • Geller Decl. ¶ 15, Ex. 17 [Smith 2/11/14 Depo. 92:7-97:7, 111:15-112:10, 118:22-120:2, 135:18-137:18, 138:7-13]<br><br>**Disputed.**<br><br>**During the process of transmitting songs from the "play out servers" to Sirius XM's satellites and ultimately to subscribers, Sirius XM utilizes short transmission buffers to ensure uninterrupted receipt by subscribers.  The buffer does not contain a complete copy of a sound recording—only rolling four second fragments that are continuously overwritten on a "first in, first out" basis.  *See infra* ¶¶ 50, 67, 71-72.**<br><br>**Objection:  relevance.**<br><br>**The alleged activity by Sirius XM does not take place in California.  *See* Smith Decl. ¶ 3, 32-33.  It is therefore not subject to California law and not at issue in this proceeding.  *See Goldstein v. California*, 412 U.S. 546, 558-59 (1973); Complaint at ¶¶ 18-34 (alleging only violations of California law).** |

| | |
|---|---|
| 22. Sirius XM has authorized a third party company, Quickplay Media, to copy all of Sirius XM's broadcasts in order to maintain a five hour cache so that the broadcasts can be repackaged for later on demand delivery to mobile devices. | • Geller Decl. ¶ 16, Ex. 18 [Smith 2/11/14 Depo. 178:16-179:17, 193:16-19; 214:9-19].<br><br>**Disputed.**<br><br>**A feature of Sirius XM's Internet radio service called "Start Now" allows users to start from the beginning of a program currently being broadcast. A rolling, continuously updating five-hour cache of the transmission is used to make this feature work. For subscribers accessing the feature on mobile devices, QuickPlay Media maintains the stream. *See infra* ¶ 68.**<br><br>**Objection:  relevance.**<br><br>**The alleged activity by Sirius XM and QuickPlay Media does not take place in California. It is therefore not subject to California law and not at issue in this proceeding. *See Goldstein v. California*, 412 U.S. 546, 558-59 (1973); Complaint at ¶¶ 18-34 (alleging only violations of California law).** |

16

| | |
|---|---|
| 23. As part of its satellite and internet radio services, Sirius XM performs pre-1972 recordings (including The Turtles recordings) by broadcasting and streaming those recordings to delivery partners who operate content delivery networks; by broadcasting and streaming those recordings directly to its own subscribers; and by broadcasting and streaming those recordings to the end users of the Dish Network. Sirius XM has also authorized third parties to broadcast and stream recordings to Sirius XM's end users. | • Geller Decl. ¶ 17, Ex. 19 [Smith Depo (2/11/14) 176:5-179:17,]; [Smith 3/12/14 Depo. 46:5-20, 96:21-97:25, 104:8-108:21] <br> • Answer Dkt. 38 ¶ 3, Geller Decl. ¶ 18, Ex. 20 [Sirius XM 12/31/13 10-K pp. 1-5], [Smith 2/11/14 Depo. 194:22-25]) <br> • Geller Decl. ¶ 19, Ex. 21 [Smith 2/11/14 Depo. 224:22-226:18] <br> • Geller Decl. ¶ 20, Ex. 22 [Smith 2/11/14 Depo. 33:25-35:25; 176:5-18]. <br><br> **Disputed.** <br><br> **Sirius XM has only performed 15 of the 100 sound recordings identified in Exhibit A to the Complaint through its satellite radio service and Internet radio service.  In connection with its Internet radio service in particular, Sirius XM uses the services of certain third parties (intermediaries such as Akamai known as "content delivery networks") to assist in the delivery of the service via the Internet.  Those services are "authorized" to broadcast and stream recordings to Sirius XM subscribers and do so only insofar as Sirius XM has retained them to serve as an intermediary in the delivery of programming from Sirius XM to its subscribers.  *See* Smith Decl. ¶¶ 23-24; *also infra* ¶¶ 31, 49, 56-57.** <br><br> **Sirius XM also offers a service whereby it provides its music channels to subscribers of Dish** |

**Network's satellite network.** *See* **Smith Decl. ¶ 6.**

**Objection:  relevance.**

**Although Plaintiff purports to bring this action on behalf of a class, it has failed to move for class certification and any alleged activities with respect to sound recordings owned by putative class members are not before the Court on this motion.**

| 24. Sirius XM copied, reproduced, and performed the pre-1972 recordings without a license, and without paying royalties. | • Geller Decl. ¶ 21, Ex. 23 [Frear Depo. 58:10-16, 66:16-67:2, 77:20-81:15; 90:11-92:25]<br>• Geller Decl. ¶ 22, Ex. 24 [Frear Depo. 69:10-16]<br><br>**Disputed in part.**<br><br>**Sirius XM's relevant copying activity in California included the tip and tail of one Turtles recording and temporary cache copies of tips and tails of several others used during the pre-production process.** *See infra* **¶¶ 50-73.**<br><br>**Objection:  relevance.**<br><br>**The alleged activity in connection with Sirius XM's "play out servers" does not take place in California.  It is therefore not subject to California law and not at issue in this proceeding.** *See Goldstein v. California***, 412 U.S. 546, 558-59 (1973); Complaint at ¶¶ 18-34 (alleging only violations of California law).**<br><br>**Although Plaintiff purports to bring this action on behalf of a class, it has failed to move for class certification and any alleged activities with respect to sound recordings owned by putative class members are not before the Court on this motion.** |
| --- | --- |

| | |
|---|---|
| 25. The only factor that Sirius XM considered in deciding not to obtain licenses for pre-1972 recordings was its analysis of the law. | • Geller Decl. ¶ 23, Ex. 25 [Frear Depo., 112:16-115:21].<br><br>**Disputed.**<br><br>**Plaintiff misrepresents the cited testimony.** *See* **Frear Depo. 112:16 - 115:21;** *see also infra* **¶¶ 74-80, 86-99 (describing Plaintiff's years-long failure to pursue Sirius XM and historic lack of licenses with AM/FM radio, Internet webcasters, and physical establishments).** |

## II.
## SIRIUS XM'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS

| Additional Material Fact | Evidence |
|---|---|
| **The Parties and Sirius XM's Nationwide Service Offering** | |
| 26. Plaintiff is a California corporation with its principal place of business in Los Angeles, California. | • Complaint ¶ 18. |
| 27. Plaintiff's principals, Mark Volman and Howard Kaylan, each own 50% of the corporation. Plaintiff has no other employees, but uses Evan S. Cohen, Esq. as its music administrator and lawyer. | • Complaint ¶ 2.<br>• Puglisi Decl. Ex. 4 (Volman Tr. 29:9-24; 30:10-11); Ex. 3 (Kaylan Tr. 29:1-4) |
| 28. Defendant Sirius XM is a Delaware corporation with its principal place of business in New York, New York, and operates a satellite digital audio radio service. | • Smith Decl. ¶¶ 4, 7. |

| | |
|---|---|
| 29. Sirius XM broadcasts music and non-music content 24 hours a day, seven days a week, on more than 135 channels to subscribers across the continental United States.  The wide variety of content offered to Sirius XM's subscribers includes a mix of diverse genres of music and often exclusive offerings of talk, sports, news, and other entertainment programming including Howard Stern, the NFL, and Major League Baseball. | • Smith Decl. ¶ 4. |
| 30. The majority of Sirius XM subscribers receive their service through a radio in a newly purchased or leased vehicle containing a proprietary computer chip designed by Sirius XM engineers to be capable of receiving and decoding digital transmissions from Sirius XM's satellite systems.  Sirius XM has agreements with every major automaker to offer satellite radios as factory- or dealer-installed equipment in their vehicles. | • Smith Decl. ¶¶ 4-5. |

| | |
|---|---|
| 31. In addition to the satellite radio service, Sirius XM also offers an Internet radio service, which "simulcasts" substantially all of Sirius XM's satellite radio channels, as well as a handful of Internet-only channels, to users on personal computers and mobile devices.  Most of Sirius XM's Internet subscribers obtain that service as part of a package with their satellite radio subscription, although there are some standalone Internet subscribers. | • Smith Decl. ¶ 6. |
| 32. Sirius XM also offers what is known as a Business Establishment Service providing music to retail stores, bars and restaurants, and the like, as well as a service providing music channels accessible to subscribers of the Dish satellite television service.  The channels offered on these two services represent a subset of the channels on Sirius XM's primary consumer satellite radio service. | • Smith Decl. ¶ 6. |
| 33. Sirius XM's service is national in scope and not tailored by geography.  Sirius XM's channels are available to subscribers nationwide, regardless of which city or state they live in.  If Sirius XM makes a change to a channel, that change affects what its subscribers hear on that channel in every single state. | • Smith Decl. ¶ 11. |

22

| | |
|---|---|
| 34. If Sirius XM were not able to play a certain group of songs in a given state, its system would not allow it to change its programming solely for that state, nor would it allow it to prevent radios solely in that state from hearing the given songs. Specifically, Sirius XM's satellite radio system is "one way,"—i.e., radios receive Sirius XM's broadcasts, but Sirius XM does not receive a signal back from the radios telling it what channel the radio is tuned to or where the radio is located.  For that reason, it is not possible to identify those radios currently in California, for example, or to know whether subscribers registered in California are actually in California, versus in a different state. | • Smith Decl. ¶ 11 & n.2. |
| 35. Sirius XM's FCC licenses currently prevent it from offering state-specific programming.  To remove a recording from the service in one state, Sirius XM would have to remove the recording from the service altogether, with the effect that subscribers in every other state would be prevented from hearing them as well. | • Smith Decl. ¶ 11. |
| 36. Terrestrial (e.g., AM/FM) radio broadcasters (which pay no performance royalties whatsoever to the record industry for broadcasts of sound recordings) are Sirius XM's primary competitors and the dominant form of in-vehicle listening. | • Frear Decl. ¶ 17. |

| | |
|---|---|
| 37. AM/FM radios are in every new and used car on the road, and radio stations blanket the country.  Over 90% of Americans have access to and enjoy free terrestrial radio. | • Frear Decl. ¶ 17. |
| 38. Many radio broadcasters now broadcast signals in high definition (HD) —a higher quality, digital version of traditional broadcast radio that is also available for free over the air. | • Frear Decl. ¶ 17. |
| 39. Sirius XM's other competitors are non-interactive webcasting services, like Pandora, which are integrated into radios in dozens of vehicles, and like Sirius XM, offer nationwide, largely commercial-free access to a diverse genre of music and other content. | • Frear Decl. ¶ 18. |
| 40. Sirius XM's predecessor companies, Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Radio Inc. ("XM"), were each first established more than twenty years ago.   Sirius was based in New York and operated the Sirius satellite radio service, while XM was based in Washington, D.C. and operated the XM satellite radio service. | • Smith Decl. ¶ 7. |

| | |
|---|---|
| 41. Sirius and XM each independently and concurrently developed the infrastructure necessary to create two separate satellite radio services offering uninterrupted programming nationwide to moving vehicles, including the design and manufacture of two separate and independent satellite networks, development of terrestrial repeater networks, and the invention of chipsets and radios capable of receiving satellite content from each respective network.  The total expenditures to do so were several billion dollars each. | • Smith Decl. ¶ 8. |
| 42. XM commenced broadcasting its satellite radio service in September 2001.  Sirius commenced its satellite radio service in February 2002. | • Smith Decl. ¶ 8. |

| | |
|---|---|
| 43. In 2008, XM merged with a subsidiary of Sirius, which resulted in the formation of Sirius XM.  Sirius XM continues to operate the two separate satellite radio networks (the former legacy Sirius and legacy XM systems) because its millions of subscribers, at the time of the merger, had satellite radios capable of receiving only one or the other service, and the company could not cut off service on one or the other of the legacy networks without shutting off access to existing subscribers.  Thus, although Sirius XM is now one combined company, subscribers are still technically either a "Sirius" or "XM" subscriber depending on which platform's radio is installed in their particular automobile. | • Smith Decl. ¶¶ 7, 9. |
| 44. Sirius XM divides the production of its programming between its New York and Washington locations, and thus continues to maintain separate production and satellite uplink facilities in each city, although the same mix of channels is generally available to all subscribers regardless of which platform they are on and regardless of where the program was produced. | • Smith Decl. ¶ 9. |

| | |
|---|---|
| 45. The development and maintenance of Sirius XM's business, the technology required for Sirius XM's satellite broadcast systems and Internet streaming capabilities, and the broad variety of programming content provided by Sirius XM, all required the investment of billions of dollars and immense amounts of risk by investors and shareholders. Specifically, Sirius XM invested over $2.6 billion to acquire spectrum and build from scratch an entirely new category of service: nationwide satellite-delivered radios.  Sirius XM has expended additional billions maintaining, updating and replacing the three principal components of its satellite radio systems: (1) satellites, terrestrial repeaters and other satellite facilities related to the network uplink and transmission of the signal, (2) broadcast studios and (3) the "chipsets" and radios that enable subscribers to receive our content.  Between 2005 and 2012, for example, Sirius XM spent approximately $1.5 billion on a complete replenishment of the satellite systems on both the Sirius and XM systems. | • Frear Decl. ¶¶ 4-6. |
| 46. Additional investments are also made in efforts to add new subscribers and retain existing ones.  For example, from 2008-2013, Sirius XM's "subscriber acquisition costs" came to over $2.5 billion. | • Frear Decl. ¶ 5. |

| | |
|---|---|
| 47.  In 2012 and 2013, Sirius XM's operating expenses were $2.53 billion and $2.75 billion, respectively, including over $200 million spent each year in royalty payments to recording artists and owners of sound recordings pursuant to the Section 114 statutory license applicable to works protected by federal copyright law.  Sirius XM's accumulated deficit as of year-end 2013 was $6.4 billion.  From 2007 to 2012, Sirius XM experienced negative net income (in the aggregate) while paying the recording industry over $800 million in royalties. | • Frear Decl. ¶ 6. |
| **Sirius XM's Actual Use of the Turtles' Sound Recordings** | |
| 48.  Sirius XM's predecessors, Sirius and XM, began performing (i.e., broadcasting) certain of The Turtles' sound recordings more than a decade ago. | • Smith Decl. ¶ 12. |

| | |
|---|---|
| 49. Since July 1, 2009, Sirius XM has broadcast on its satellite radio service, and transmitted over its Internet radio service, 15 out of the 100 Pre-1972 Recordings by The Turtles listed on Schedule A to the First Amended Complaint. These recordings are:<br><br>(1) Ain't Gonna Party No More<br>(2) Elenore<br>(3) Happy Together<br>(4) House on the Hill<br>(5) It Ain't Me Babe<br>(6) Let Me Be<br>(7) Let the Cold Winds Blow<br>(8) She'd Rather Be With Me<br>(9) She's My Girl<br>(10) The Last Thing I Remember<br>(11) The Story of Rock and Roll<br>(12) You Baby<br>(13) You Don't Have to Walk in the Rain<br>(14) You Know What I Mean<br>(15) You Showed Me.<br><br>Sirius XM has not publicly performed any of the other Pre-1972 Recordings identified by Plaintiff on Schedule A to the Complaint. | • Smith Decl. ¶¶ 3, 12. |

| **Sirius XM's Limited Incidental, Non-Public Copying Made Solely in Aid of the Public Performance of Sound Recordings** | |
|---|---|
| 50. In order to deliver public performances of sound recordings, Sirius XM makes certain internal, incidental copies: (1) server copies (and backups of such in case of emergency) and (2) various temporary (and mostly fragmentary) copies—retained briefly in what are commonly referred to as buffers or caches—that assist in the transmission process and then are discarded. Only the server copies are permanent, and none of the copies are accessible to subscribers in any way. The copies exist as a result of modern broadcasting and webcasting technology because it is no longer possible to simply queue up a record or CD and broadcast it "live" without making such incidental copies, although the end result—a radio-like transmission to the public—is basically identical to what has been offered by radio stations for decades. | • Smith Decl. ¶ 17. |

| | |
|---|---|
| 51. Sirius XM maintains certain libraries of digital sound recording files (commonly called "server copies" or "ephemeral" copies) in order to effectuate its public performance of sound recordings. The library located in New York, which is used in connection with channels programmed in New York, is known as the "Prophet" Database.  Sirius XM retains a backup copy of the Prophet database on site in New York so that service is not interrupted if there is a problem with the active database, and also keeps disaster recovery copies in Vernon, New Jersey, for the same purpose.  It does not make or maintain any such libraries in California. | • Smith Decl. ¶ 18. |
| 52. Sirius XM also maintains a server copy library in Washington, DC, called the "Dalet" database.  The first version was known as Dalet 5.1; the upgraded version is called Dalet Plus.  For those channels that have been migrated over to the upgraded system (which Sirius XM has been doing channel-by-channel since 2009) Dalet Plus contains the same tracks as Dalet 5.1, plus any new tracks added after the migration.  Sirius XM maintains a backup copy of Dalet Plus in its Washington, DC facility and disaster recovery copies in Ellenwood, Georgia.  It does not make or maintain any such libraries in California. | • Smith Decl. ¶ 19. |

| | |
|---|---|
| 53. Both Prophet and Dalet are standard database tools marketed to, and used in, the broadcast radio industry. | • Smith Decl. ¶ 19. |
| 54. The original sound recording files in the Prophet database were added just prior to Sirius's 2002 launch, and created from CDs purchased through an account with the Virgin Megastore.  Prior to its launch in 2001, XM's Dalet database was populated with tracks from CDs purchased through an entity called Valley Music. | • Smith Decl. ¶ 21. |
| 55. Over the years, each database was supplemented with promotional CDs or digital downloads provided directly to Sirius and XM (and then the merged company) by record companies, recording artists, or their representatives for the purpose of obtaining airplay on Sirius XM.  Such promotional distribution has become the source for the overwhelming majority of Sirius XM's new content, although Sirius XM may still occasionally purchase a copy of a recording that has not already been provided if its programmers wish to include the track in Sirius XM programming. | • Smith Decl. ¶ 22. |

| | |
|---|---|
| 56. For Sirius XM's Internet radio service (which consists primarily of "simulcasts" of the satellite radio channels, along with a few Internet-only channels), the standard stream is delivered via Akamai, which functions as a content delivery network.  Sirius XM does not provide a copy of any of its databases to Akamai. | • Smith Decl. ¶ 23. |
| 57. Sirius XM also provides content to certain mobile devices (*e.g.*, iPhones).  In addition to using Akamai as a distributor for the delivery of streams to mobile devices, Sirius XM utilizes QuickPlay in an intermediary role similar to that of Akamai.  Sirius XM does not provide a copy of any of its databases to QuickPlay. | • Smith Decl. ¶ 24. |
| 58. A small number of Sirius XM's channels and/or programs are produced in "remote" locations other than New York or Washington where certain DJs and/or producers reside, including California.  The only channels produced in California that have included plays of Turtles recordings included on Exhibit A to Plaintiff's Complaint include Sirius XM's "60s on 6," "Deep Tracks," and "Siriusly Sinatra" channels. | • Smith Decl. ¶ 25. |

| | |
|---|---|
| 59. To assist the on-site producers in programming the "60s on 6" and Deep Tracks" channels, Sirius XM copied the sound recording libraries for those channels on to separate hard-drives in Washington and delivered those hard-drives to California.  No server copies of the Turtles songs played on these channels were ever made in California. | • Smith Decl. ¶ 26. |

| | |
|---|---|
| 60. Sirius XM also maintains a database for the "Siriusly Sinatra" channel in Los Angeles.  That database contains only the "tips" and "tails"—i.e., the first few seconds and last few seconds—of sound recordings used on the channel.  Tips and tails allow producers and on-air talent to pre-record "interstitials" in advance of a program being broadcast, typically voiceover announcements by the DJ between songs as to what song just played, what song is starting, and the like.  To assure that an interstitial is timed properly during the cross-fade from song A to song B, the producer will listen to the last few seconds of song A (a "tail") and the first few seconds of song B (a "tip") while recording the interstitial to make sure she has timed her voiceover properly; that interstitial (comprising solely the voice track) is recorded in the Sirius XM library and later inserted at the proper point when Sirius XM assembles and broadcasts the particular playlist of songs comprising the program. | • Smith Decl. ¶ 27. |
| 61. The Sinatra database contains the tip/tail for just one Turtles recording, "It Was a Very Good Year."  That recording was transmitted electronically from New York to Los Angeles and added to the database in May 2012. | • Smith Decl. ¶ 28. |

| | |
|---|---|
| 62. As part of its Internet radio service, Sirius XM also offers a feature called MySXM, which allows users to fine-tune a particular Sirius XM channel by prioritizing their musical-style preferences.  After ranking their preferences, subscribers receive a more customized version of the channel reflecting those preferences.  Subscribers cannot choose which songs they hear. | • Smith Decl. ¶ 29. |
| 63. Sirius XM has engaged Omnifone, a company based in the United Kingdom, to help develop and deliver MySXM to Sirius XM subscribers via PC applications and mobile devices.  To do so, Omnifone required a copy of the subset of the Sirius XM library of recordings used in the MySXM service.  Sirius XM delivered the initial library subset to Omnifone (in the United Kingdom) on a computer hard drive.  Subsequent updates have been delivered to Omnifone in the United Kingdom from Sirius XM's Washington facilities via a private Internet connection. | • Smith Decl. ¶ 30. |

| | |
|---|---|
| 64. Omnifone was provided with 15 of Plaintiff's Pre-1972 Recordings. These include 14 of the 15 sound recordings identified in paragraph <u>49</u> above (not including "Let the Cold Winds Blow"), as well as "Guide for the Married Man." Omnifone does not use the server copies for any other purpose. None of this activity occurred in California. | • Smith Decl. ¶ 30. |
| 65. Sirius XM uses standard radio industry workstations that allow producers and on-air talent to pre-record voiceovers and other interstitials in advance of a program being broadcast, as described above in paragraph <u>60</u>. In order to record these interstitials with the proper timing, the workstations will temporarily retrieve from the channel database the tip and tail of the songs comprising the particular transition, which the host will listen to for reference while recording the interstitial. The tips and tails themselves are not re-recorded as part of the interstitial, and are not retained at the workstation after the interstitial is recorded. This process is used in Los Angeles in connection with the production of the "60s on 6," "Deep Tracks," and "Siriusly Sinatra" programs. | • Smith Decl. ¶ 31. |

| | |
|---|---|
| 66.  A couple hours in advance of broadcasting a playlist of recordings for a particular channel (a three hour programming block, for example), Sirius XM's computer systems will retrieve the songs comprising the playlist from the song library (following instructions pre-programmed by Sirius XM producers using standard radio industry software) and assemble the program, in order, on a "play-out server" located in New York or Washington (depending on the program).  This process ensures that the songs will be ready for broadcast at the time they are needed, without network congestion delaying delivery of the song form the library at the time of broadcast.  The program is cached on the play-out server only until the broadcast occurs, and at no time is it accessible to the public. | • Smith Decl. ¶ 32. |

| | |
|---|---|
| 67. When the time comes to broadcast the program, the broadcast signal (whether from our New York or Washington production facility) is transmitted from the respective play-out server to an "earth station," where it is uplinked to the satellites.  The satellites actually transmit two streams of the programming, one with a four-second delay; Sirius XM does this so that if a user's radio loses contact with one transmission (for example, if it is blocked by an overpass or mountain), it can substitute the second transmission without interrupting the user's listening experience. To effectuate this process, the computers at the earth station buffer one of the transmissions for four seconds before uplinking it to the satellites. At no time does the buffer contain a complete copy of a sound recording – just rolling four-second fragments that are continuously overwritten during the course of the transmission on a "first-in, first-out" basis.  There is no buffer on the satellite itself. | • Smith Decl. ¶ 33; *see also supra* ¶ 21. |

| | |
|---|---|
| 68.   Sirius XM's Internet radio service offers a service called "Start Now," which allows a user to start a program currently being broadcast at the beginning of the program.  For example, if a user logs on to SiriusXM.com at 8:30 a.m., he can use the "Start Now" function to listen to Howard Stern's show from the beginning, even though that program started at 6:00 a.m.   In order to make this functionality work, Sirius XM maintains a rolling, continuously updating five-hour cache of the transmission, which is overwritten on a first-in, first-out basis.  (Sirius XM does this itself for listeners accessing the Internet radio service on a PC; QuickPlay maintains the cache on behalf of Sirius XM for listeners accessing the service on mobile devices.)  This means that a listener can go back no more than five hours to "start now," and at no time can a listener choose a particular recording on demand; the transmission itself is the same non-interactive stream the person would hear "live." | • Smith Decl. ¶ 34; *see also supra* ¶ 22. |

| | |
|---|---|
| 69. None of the server copies made by Sirius XM and none of the temporary copies made by Sirius XM and its content-delivery partners is ever distributed to the public.  The copies are made solely to assist in Sirius XM's broadcasts and Internet streams to the public, and are similar to the types of copies made by radio stations since at least the 1990s. | • Smith Decl. ¶¶ 17, 20. |
| 70. Sirius XM does not distribute tracks to its subscribers in the way that iTunes or other download sellers do, where purchasers retain a permanent copy of a song on their computers or mobile devices. Nor does Sirius XM allow users to download and save tracks temporarily, as do interactive subscription service like Rhapsody and Spotify – *i.e.*, where users can listen to specific tracks of their choosing on demand as long as they remain subscribers. | • Smith Decl. ¶ 14. |

| | |
|---|---|
| 71. Sirius XM does allow users to "cache" (store temporarily in computer memory) certain designated programs in their entirety – typically for thirty days or until their subscription lapses, whichever is less – on their mobile devices.  This allows the users to "time shift" the program – *i.e.*, to listen to it at a later time that is more convenient, like a VCR or digital video recorder allows television viewers to "time shift" television programs.  That functionality is limited, however, to selected non-music programming (news, sports, and/or talk programming like the "Sirius XM Fantasy Baseball" show, for example); Sirius XM would offer it for music programs where permission has been obtained from the copyright owners, but in practice it have done so only on an extremely limited basis.  None of these programs include any of Plaintiff's Pre-1972 Recordings. | • Smith Decl. ¶ 15. |
| 72. Sirius XM does not allow subscribers to download songs to their computers or mobile devices.  When subscribers use the Sirius XM "app" to listen on a mobile device, the device may buffer a second or two of the transmission to ensure a smooth, uninterrupted signal delivery.  (This is similar to what standard FM car radios have done for years.) | • Smith Decl. ¶ 35. |

| | |
|---|---|
| 73. In addition, a small number of Sirius XM satellite radios buffer up to 30 minutes of the programming on the channel to which the user is tuned.  Sirius XM does this to support its limited "replay" feature, which allows the subscriber to move back in the program (if, for example, the user got a phone call and missed a few minutes of the show).  As with the buffers described above, this is a temporary, rolling buffer which is overwritten on a first-in, first-out basis.  If the user changes channels or turns off the radio, the buffer is erased.  Because the satellite technology is "one way," Sirius XM does not know which channels users listen to, and thus does not know which particular songs are buffered using this feature. | • Smith Decl. ¶ 36. |
| 74. Certain mobile devices that were marketed by Sirius XM in the past did allow users to save individual tracks on the devices for later listening (as they might do with a VCR or DVR).  Sirius XM did not know whether or how subscribers were actually using that capability, and therefore has no records showing which tracks were saved by users.  Such activity is covered by the terms of class action settlements discussed below at paragraphs 109-117. | • Smith Decl. ¶ 16. |

| | | |
|---|---|---|
| | **<u>Plaintiff Has Long Been Aware That Sirius XM Plays Certain of its Pre-1972 Sound Recordings</u>** | |
| 75. | Plaintiff has been aware of the existence of Sirius XM for at least ten years. | • Puglisi Decl. Ex. 2 (Cohen Tr. 96:20-22) (Q. Mr. Cohen, when did you first become aware of the existence of Sirius XM?  A. Ten years ago.)<br>• Puglisi Decl. Ex. 4 (Volman Tr. 83:4-22) (Q. Can you say roughly when you became aware of those separate companies, Sirius and XM? A. Well, I don't know the dates. Q. But it was around the time they launched? A. Yes.)<br>• Puglisi Decl. Ex. 3 (Kaylan Tr. 74:3-10) (Q. And when did you first become aware of Sirius XM? . . . A. I don't know. Maybe 10 years – when Howard Stern went over to Sirius is when I first took notice.) |
| 76. | Volman has been a subscriber of Sirius XM's satellite radio service for about seven years.  Cohen has been a subscriber for about five years. | • Puglisi Decl. Ex. 4 (Volman Tr. 83:23-85:4) (Q. Have you ever been a subscriber to either of them [Sirius or XM]?  A. Yes . . . Q. For how long have you been – when did you subscribe?  A. Oh, I don't – I don't know . . . Q. Do you believe it's been more than seven years?  A. Yes.).<br>• Puglisi Decl. Ex. 2 (Cohen Tr. 97:5-9) (Q. How long have you been a subscriber?  A. Maybe five years). |

44

| | |
|---|---|
| 77. Plaintiff has also been aware that Sirius XM plays tracks by The Turtles for over seven years. Volman testified that he has been aware of that fact since he became a subscriber to Sirius XM over seven years ago.  Kaylan admitted he has been aware of that fact since he first learned about Sirius XM. | • Puglisi Decl. Ex. 4 (Volman Tr. 85:5-8) (Q. Have – were you aware from the time that you first started subscribing that Sirius – that Sirius was playing Turtles' tracks?  A. Yes.)<br>• Puglisi Decl. Ex. 3 (Kaylan Tr. 74:3-19) |
| 78. Prior to commencing this lawsuit, Plaintiff never asked Sirius XM to stop performing its Pre-1972 Recordings or to take a license from Plaintiff for its performances or copies of recordings made in aid thereof. | • Puglisi Decl. Ex. 7 (Plaintiff's Response to Defendant Sirius XM Radio Inc.'s Requests for Admission ("RFA Response") Nos. 5, 7, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 1:13-cv-23182-KMM (S.D. Fla.) ("Florida Action"));<br>• Puglisi Decl. Ex. 2 (Cohen Tr. 98:24-99:2) |
| 79. Furthermore, Plaintiff's exclusive licensing agent, The Orchard, does not have any licensing arrangement in place with Sirius XM, despite knowing that Sirius XM plays Plaintiff's Pre-1972 Recordings. | • Puglisi Decl. Ex. 1 (Pascal Tr. 49:8-10, 52:5-13). |

| 80. | The Orchard has never suggested to Sirius XM that Sirius XM needs to take a license from it in order to perform Pre-1972 Recordings in The Orchard's repertory.  And no other digital music service provider has ever declined to enter into a license with The Orchard or claimed it should get a lower royalty rate because Sirius XM plays Pre-1972 Recordings without a license.  Sirius XM has not even been mentioned in such negotiations. | • Puglisi Decl. Ex. 1 (Pascal Tr. 51:24-53:11; 69:11-70:12). |
|---|---|---|
| 81. | Plaintiff admitted that it sued Sirius XM in order to bring attention to the fact that Congress did not provide a performance right for Pre-1972 Recordings and thus "some artists were receiving money and other artists weren't." | • Puglisi Decl. Ex. 4 (Volman Tr. 88:12-89:3). |
|  | **Sirius XM's Operation Under the Federal Section 114 Statutory Licenses and the Copyright Royalty Board (CRB) Rate-Setting Process** | |
| 82. | Sirius XM operates pursuant to the statutory licenses available under Sections 112 and 114 of the Copyright Act for satellite radio, Internet radio, and the transmission of music services to cable television subscribers and to business establishments.  The statute requires that Sirius XM be non-interactive (users cannot select songs on demand), and to follow a variety of other detailed requirements to avoid allowing users to know which songs will be played (and thus avoid being a substitute for sales of recordings). | • 17 U.S.C. §§ 112(e), 114(d)(2). <br> • Frear Decl. ¶ 9. |

| | |
|---|---|
| 83. The rates Sirius XM pays for performances of Post-72 Recordings pursuant to statutory licenses available to eligible services under Sections 112 and 114 of the Copyright Act are set by adversarial litigation before the Copyright Royalty Board ("CRB").  Sirius XM has litigated two CRB proceedings, one in 2006-2007 (covering the 2007-2012 license period) and one in 2011-2012 (covering the 2013-2017 license period). | • Frear Decl. ¶ 9. |

**The Limited Scope of Plaintiff's Licensing of Its Pre-1972 Sound Recordings**

| | |
|---|---|
| 84. Plaintiff's only licensing activities are limited to (a) licensing various entities to sell copies of certain of The Turtles' sound recordings on albums, CDs and other physical media; (b) licensing producers to include some of The Turtles' sound recordings in the soundtracks of movies, television programs, and commercial advertisements; and (c) licensing certain digital uses of The Turtles' sound recordings through The Orchard. | • Puglisi Decl. Ex. 2 (Cohen Tr. 75:13-20; 106:14-108:20) |

| | |
|---|---|
| 85. Even when The Orchard does license Plaintiff's sound recordings to other entities, it does not distinguish between Pre-1972 and Post-1972 Recordings, for Plaintiff or any of its other artists. ███████████████████████████ | • Puglisi Decl. Ex. 1 (Pascal Tr. 42:8-11; 67:12-68:8); *see supra* ¶ 8. |
| **Terrestrial (AM/FM) Radio Stations Have Performed Plaintiff's Pre-1972 Recordings For Decades Without a License and Without Complaint or Objection from Plaintiff** | |
| 86. Since they were recorded in the 1960s and 1970s, The Turtles' sound recordings have been played on terrestrial (AM/FM) radio stations, and Plaintiff has been aware of these performances for nearly fifty years. | • Puglisi Decl. Ex. 7 (RFA Response No. 9) |
| 87. Radio stations have not obtained licenses for these performances from Plaintiff or otherwise.  At no point since the creation of Plaintiff's sound recordings have any terrestrial radio broadcasters taken a license to publicly perform these tracks. | • Puglisi Decl. Ex. 2 (Cohen Tr. 165:7-166:2); Ex. 7 (RFA Response No. 10). |

| 88. Plaintiff's exclusive licensing agent, The Orchard, also has never licensed Plaintiff's sound recordings for public performances by terrestrial radio stations. | • Puglisi Decl. Ex. 1 (Pascal Tr. 44:5-45:21). |
|---|---|
| 89. Plaintiff has also never issued a license to any terrestrial radio broadcaster to make reproductions of Plaintiff's Pre-1972 Recordings in order to publicly perform such recordings. | • Puglisi Decl. Ex. 2 (Cohen Tr. 166:10-14); Ex. 7 (RFA Response No. 15). |
| 90. Despite decades of performances of The Turtles' sound recordings by radio stations, Plaintiff has never sued any radio station for publicly performing The Turtles' sound recordings or for making reproductions to aid those performances. Plaintiff has never contacted even a single radio station to request compensation for public performances of The Turtles' tracks. | • Puglisi Decl. Ex. 3 (Kaylan Tr. 99:1-100:4); Ex. 2 (Cohen Tr. 167:17-168:12); Ex. 7 (RFA Response Nos. 17, 18). |
| 91. Kaylan doubts that radio plays of The Turtles' sound recordings cause Plaintiff to lose any sales. | • Puglisi Decl. Ex. 3 (Kaylan Tr. 101:22-102:8) (Q. Has Flo & Eddie, Inc., lost any sales of sound recordings due to the fact that terrestrial radio stations play The Turtles sound recordings? . . . A. Are you saying that because radio plays our records we lose sales? . . . I doubt it. That would be a guess, but I doubt it."). |

| | |
|---|---|
| **Webcasting Services and Physical Establishments Also Have Long Performed Plaintiff's Pre-1972 Recordings Without a License and Without Complaint or Objection from Plaintiff** | |
| 92. Webcasting services are media providers that stream audio or video content over the Internet, such as Internet radio or other online streaming services. Webcasting services have publicly performed The Turtles' sound recordings since the 1990s. | • Puglisi Decl. Ex. 7 (RFA Response No. 20)<br>• L.M. Brownlee, *IP Due Diligence in Corp. Transactions* § 8:87 (Westlaw 2014) ("Webcasting is the act of transmitting audio or video over the Internet…").<br>• Brian Flavin, Comment, *A Digital Cry for Help: Internet Radio's Struggle to Survive A Second Royalty Rate Determination Under the Willing Buyer/Willing Seller Standard*, 27 St. Louis U. Pub. L. Rev. 427, 428 (2008) ("Internet radio first garnered national media attention in 1993 when Internet Talk Radio began broadcasting its weekly half-hour radio programs over the Internet."). |
| 93. Like Sirius XM, webcasting services must pay for Post-72 recordings pursuant to the federal Section 112 and 114 statutory licenses. | • 17 U.S.C. §§ 112(e), 114(d)(2) |
| 94. Plaintiff has been aware that webcasting services have been publicly performing its Pre-1972 Recordings since at least 2000. | • Puglisi Decl. Ex. 7 (RFA Response No. 20) |

| | |
|---|---|
| 95. Webcasting services have not obtained licenses for their public performances of Plaintiff's Pre-1972 Recordings, and Plaintiff has not sought any such licenses. | • Puglisi Decl. Ex. 4 (Volman Tr. 79:3-20); Ex. 7 (RFA Response No. 21); ███████████ ██████ |
| 96. Plaintiff has never issued a license to any webcasting service to make reproductions of Plaintiff's sound recordings in order to publicly perform such sound recordings. | • Puglisi Decl. Ex. 7 (RFA Response No. 23); Ex. 3 (Kaylan Tr. 91:9-11). |
| 97. Physical establishments (as used herein, connoting spaces open to the public like retail stores, bars, restaurants, or fitness centers) have not obtained licenses for their public performances of Plaintiff's sound recordings nor been requested to do so. | • Puglisi Decl. Ex. 7 (RFA Response No. 29); ████████ ████████ |
| 98. Plaintiff has never filed a lawsuit against any physical establishment for publicly performing its Pre-1972 Recordings without a license. | • Puglisi Decl. Ex. 7 (RFA Response No. 31). |

| | |
|---|---|
| 99. By comparison, the American Society of Composers, Authors and Publishers ("ASCAP") (an organization that licenses performing rights in music compositions on behalf of its composer and music publisher members) has licenses for the public performance of musical composition in place with over 14,000 California entities, including nearly 900 radio stations, more than 6000 bars and restaurants, and more than 2000 retails stores. | • Puglisi Decl. Ex. 10 (ASCAP's Response to Subpoena of Sirius XM Radio Inc., Florida Action). |

**Plaintiff Has Not Suffered Any Harm From Sirius XM's Alleged Conduct**

| | |
|---|---|
| 100. Plaintiff is unable to identify any cognizable harm or loss it has suffered as a result of Sirius XM's public performance of Plaintiff's Pre-1972 Recordings. | • Puglisi Decl. Ex. 4 (Volman Tr. 95:23-25; 97:5-12; 99:5-7) (Q. Can you identify a single lost sale caused by Sirius XM's activities? A. No.; Q. Are you aware of any evidence that Sirius XM has impaired Flo & Eddie's ability to sell its Turtles' recordings? A. No  Q. Are you aware of any evidence that Sirius XM has impaired Flo and Eddie's ability to license its pre-'72 recordings?  A. No.; Q. Do you know what the damages sought in this case are?  A. No.) |
| 101. Plaintiff does not consider itself a competitor of Sirius XM. | • Puglisi Decl. Ex. 3 (Kaylan Tr. 93:18-94:4) (Q. Do you have an understanding of who you consider to be Flo & Eddie, Inc.'s competitors? . . . A. I don't know how we would be considered a competitor with a satellite provider.  We don't do that.) |

| | |
|---|---|
| 102. In response to whether or not Plaintiff has lost any sales due to Sirius XM playing The Turtles' sound recordings, Kaylan conceded that he did not "know why it would cause anything one way or another to lose or gain," or how Sirius XM's activities "would affect sales particularly."  Volman also admitted that he could not identify a single lost sale caused by Sirius XM playing The Turtles' sound recordings, and that he was unaware of any evidence that Sirius XM has impaired Plaintiff's ability to sell or license The Turtles' sound recordings. | • Puglisi Decl. Ex. 4 (Volman Tr. 95:23-25; 97:5-12); Ex. 3 (Kaylan Tr. 107:13-108:5). |
| 103. Neither Cohen nor Jason Pascal of The Orchard could identify any license fees or sales lost by Plaintiff as a result of Sirius XM's activities. | • Puglisi Decl. Ex. 2 (Cohen Tr. 123:2-6); Ex. 1 (Pascal Tr. 71:14-22). |
| 104. Plaintiff has been unable to identify any specific instances of "lost license fees" and/or "lost sales" caused by Sirius XM's activities. | • Puglisi Decl. Ex. 11 (Plaintiff's Response to Defendant Sirius XM Radio Inc.'s First Set of Interrogatories ("ROG Response") No. 8, Florida Action) |
| 105. Plaintiff admits that it has no evidence of and is unaware of any actual confusion between Plaintiff and Sirius XM as a result of Sirius XM's use of The Turtles' sound recordings. | • Puglisi Decl. Ex. 11 (ROG Response No. 5) |

| | |
|---|---|
| 106. Kaylan admitted that he does not believe that when an artist's recording is played by Sirius XM, the artist is sponsoring Sirius XM. | • Puglisi Decl. Ex. 3 (Kaylan Tr. 106:4-18). |
| 107. Plaintiff currently does not undertake any efforts, and does not expend any money, on the promotion of The Turtles' sound recordings. This is also true for the decade following Plaintiff's purported receipt of sole ownership of The Turtles sound recordings. | • Puglisi Decl. Ex. 3 (Kaylan Tr. 73:12-22) (Q. Now, do you currently undertake any efforts to promote The Turtles sound recordings? A. Well, not particularly. I mean, we tour not to promote the sound recordings, but to make money. We don't really – we're not trying to sell records that are 40 or 50 years old. I mean, we're not. They sell with us or without us. That's just historical.); Ex. 4 (Volman Tr. 47:19-23) (Q. Do you recall during that time period, same time period [1975-1985], did Flo & Eddie make any investments or expenditures in marketing or promoting the sale of The Turtles' recordings? A. No.); |
| 108. Plaintiff acknowledges the promotional impact of radio plays on its ability to sell its sound recordings. | • Puglisi Decl. Ex. 3 (Kaylan Tr. 71:7-22). |
| **Sirius and XM Devices and the Device Litigation Settlements** | |
| 109. Sirius XM previously manufactured certain mobile devices that allowed users to save individual tracks on the devices for later listening (as they might do with a VCR or DVR). These devices, however, are no longer produced. | • Smith Decl. ¶ 16. |

| | |
|---|---|
| 110. These devices were the subject of two class action litigations: *In re XM Satellite Radio Copyright Litigation* and *Nota Music Publishing, Inc., et al. v. Sirius Satellite Radio Inc.* (the "Device Actions"). At issue in the Device Actions was the fact that these recording devices allegedly infringed the copyrights of musical composition and sound recording copyright owners. | • Puglisi Decl. Ex. 12 (Stipulation and Agreement of Settlement, *In re XM Satellite Radio Copyright Litigation*, No. 06 CV 3733 (LAK) (S.D.N.Y. Nov. 15, 2010), Dkt. No. 109-1 ("XM Settlement Agreement")) at 1-2<br>• Puglisi Decl. Ex. 13 (Stipulation and Agreement of Settlement, *Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc.*, No. 07 CV 6307 (AKH) (S.D.N.Y. May 13, 2011), Dkt. No. 43-1 ("Sirius Settlement Agreement")) at 1-2 |
| 111. The Device Actions were settled pursuant to two separate written settlement agreements. Under each agreement, members of the settlement class completely released Sirius and XM from any liability, damages, or other claims. | • Puglisi Decl. Ex. 12 (XM Settlement Agreement at 1-2 and ¶ 54)<br>• Puglisi Decl. Ex. 13 (Sirius Settlement Agreement at 1-2 and ¶ 49) |

| | | |
|---|---|---|
| 112. | The Device Actions settlement agreements also expressly included releases and covenants not to sue regarding "ephemeral reproductions of sound recordings made before or during the Term on computers and other transmission equipment owned or controlled or otherwise used by" XM or Sirius "for making transmissions as part of the" XM or Sirius Service. "Ephemeral" reproductions include server copies, backup copies, and other incidental copies made by Sirius XM service-wide, and is not limited to copies made in relation to the devices at issue in the litigation. The Term of the settlement ran through December 31, 2011. | • Puglisi Decl. Ex. 12 (XM Settlement Agreement at 1-2 and ¶ 54)<br>• Puglisi Decl. Ex. 13 (Sirius Settlement Agreement at 1-2 and ¶ 49)<br>• 17 U.S.C. § 112 (statutory license for "Ephemeral Recordings")<br>• Puglisi Decl. Ex. 14 (H.R. Rep. 105-796 (1998) (Conf. Rep.) at 75-76) (describing ephemeral copies as including server copies)) |
| 113. | The settlement class is defined the same way in each of the Device Actions as: "All persons or entities who own or control (in whole or in part) exclusive rights in at least one sound recording protected under federal copyright law and/or state common law and/or unfair competition law that was transmitted by the [XM or Sirius] Service at least once during the time period from March 30, 2006 to the date of Preliminary Approval." | • Puglisi Decl. Ex. 12 (XM Settlement Agreement ¶ 49)<br>• Puglisi Decl. Ex. 13 (Sirius Settlement Agreement ¶ 44) (defining period as from November 1, 2005 to the date of Preliminary Approval) |

| | |
|---|---|
| 114. Plaintiff is a member of the Settlement Class. | • Puglisi Decl. Ex. 12 (XM Settlement Agreement ¶ 49)<br>• Puglisi Decl. Ex. 13 (Sirius Settlement Agreement ¶ 44) |
| 115. The settlement in *In re XM Satellite Radio Copyright Litigation* received final approval from the Court on March 22, 2011, and the settlement in *Nota Music Publishing, Inc., et al. v. Sirius Satellite Radio Inc.* received final approval from the Court on January 9, 2012. | • Puglisi Decl. Ex. 15 (Final Order and Judgment, *In re XM Satellite Radio Copyright Litigation*, No. 06 CV 3733 (LAK) (S.D.N.Y. Mar. 22, 2011), Dkt. No. 123 ("XM Final Order and Judgment"))<br>• Puglisi Decl. Ex. 16 (Final Order and Judgment, *Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc.*, No. 07 CV 6307 (AKH) (S.D.N.Y. Jan. 9, 2012), Dkt. No. 57 ("Sirius Final Order and Judgment")) |
| 116. The Court's orders granting final approval in each of the Device Actions contained language permanently barring all members of the settlement class from commencing a proceeding against the Device Actions defendants on any of the claims brought in the Device Actions, and releasing the Device Actions defendants from all such future claims. | • Puglisi Decl. Ex. 15 (XM Final Order and Judgment ¶ 12)<br>• Puglisi Decl. Ex. 16 (Sirius Final Order and Judgment ¶ 11) |
| 117. Plaintiff did not opt out of the settlement class.  It thus remains subject to the settlement agreements in the Device Actions, and is barred from bringing any claims brought in the Device Actions against the Device Actions defendants. | • Puglisi Decl. Ex. 15 (XM Final Order and Judgment, Exhibit A)<br>• Puglisi Decl. Ex. 16 (Sirius Final Order and Judgment, Exhibit A). |

# III.
# CONCLUSIONS OF LAW

| Conclusions of Law | Authority |
|---|---|
| **Section 980(a)(2)** | |
| 118. Section 980(a)(2) does not provide a right of public performance in Pre-1972 Recordings, but rather was enacted to maintain the rights and remedies in Pre-1972 Recordings that existed at common law *prior* to enactment of the statute – namely, protection against unauthorized acts of *duplication* and *distribution* by record bootleggers. | • Puglisi Decl. Ex. 17 (S. Comm. on Judiciary, *AB 3483 (Katz) as introduced Civil Code/Bus. & Professions Code RT*, *Copyright Conformity to Federal Law*, Reg. Sess., at p. 2 (Cal. Comm. Print 1981-82))<br>• Puglisi Decl. Ex. 18 (Assemb. Comm. on Judiciary, *AB 3483 (Katz) As introduced 3/12/82*, at pp. 1-2 (Cal. Comm. Print 1982))<br>• Puglisi Decl. Ex. 20 (S. Comm. on Judiciary, *Background Information AB 3483*, at p. 1 & Attach. at p. 106 (Cal. Comm. Print), attaching Letter from Executive Comm. of the Patent, Trademark and Copyright Section, to Members, Board of Governors (Oct. 27, 1981))<br>• *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 564 (1977)<br>• *Capitol Records, Inc. v. Erickson*, 2 Cal. App. 3d 526, 527-28 (1969)<br>• 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8C.03[C] (Lexis 2013) |

| | |
|---|---|
| 119. The bundle of rights that a property owner is afforded are neither absolute or foreordained, but offset by a variety of privileges allowing others to make use of that property without the owner's permission. | • *Warsaw v. Chicago Metallic Ceilings, Inc.*, 35 Cal. 3d 564, 570-72 (1984)<br>• *Felgenhauer v. Soni,* 121 Cal. App. 4th 445, 449-50 (2004)<br>• *Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 84, 88 (1980) (1979)<br>• *United States v. Causby*, 328 U.S. 256, 260-68 (1946) |
| 120. The fair use doctrine, as embodied by 17 U.S.C. § 107, is applicable to Section 980 claims. | • *Kramer v. Thomas*, CV 05-8381AGCTX, 2006 WL 4729242, at *12 (C.D. Cal. Sept. 28, 2006)<br>• *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003)<br>• *Golan v. Holder*, 132 S. Ct. 873, 890 (2012) |
| 121. The statute of limitations for state copyright claims brought under Section 980(a)(2) is three years. | • *Bridge Publ'ns Inc. v. Vien*, 827 F. Supp. 629, 634 n.1 (S.D. Cal. 1993) |
| **Misappropriation and Unfair Competition under California Common Law** | |
| 122. Misappropriation and unfair competition claims require a showing of competitive injury. | • *Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-00094 LGB MCX, 2000 WL 709149, at *5-7 (C.D. Cal. May 24, 2000)<br>• *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1187-88 (S.D. Cal. 2012)<br>• *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1013 (C.D. Cal. 2011) |
| 123. The statute of limitations for common law misappropriation is two years. | • *Garcia v. Coleman*, No. C-07-2279 EMC, 2008 WL 4166854, at *9 (N.D. Cal. Sept. 8, 2008) |

| 124. | The statute of limitations for common law unfair competition is two years. | • | *Garcia v. Coleman*, No. C-07-2279 EMC, 2008 WL 4166854, at *9 (N.D. Cal. Sept. 8, 2008) |
|---|---|---|---|
| **Unfair Competition Under Section 17200** | | | |
| 125. | To prove a Section 17200 claim, plaintiff must establish that defendant's activities harm the public or that plaintiff is a competitor of defendant. | • <br> • <br><br><br> • <br><br><br> • <br><br> • <br><br> • | *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (2011) <br> *Dillon v. NBCUniversal Media LLC*, CV 12-09728 SJO AJWX, 2013 WL 3581938, at *7 (C.D. Cal. June 18, 2013) <br> *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141, 1155 (E.D. Cal. 2013) <br> *Sybersound Records v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008) <br> *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 998-99 (N.D. Cal. 2010) <br> *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App. 4th 1073, 1075, 1077-78 (Ct. App. 2002) |
| 126. | To prove a Section 17200 claim, plaintiff must establish a loss or deprivation of money or property sufficient to qualify as injury in fact. | • | *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322-24 (2011) |
| 127. | Failure to pay royalties to perform Pre-1972 Recordings to subscribers in California, when no such royalty obligation has ever been recognized and no other radio broadcaster has ever paid such royalties, is not the sort of "deprivation" required to prove a claim under Section 17200. | • <br><br><br> • | *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1554-55 (Ct. App. 2011) <br> *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 252 (Ct. App. 2010) |

| | |
|---|---|
| 128. To prove a Section 17200 claim, plaintiff must establish that defendant has engaged in conduct that qualifies as an "unlawful, unfair or fraudulent business act or practice" under the statute. | • *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (2011) |
| 129. For conduct to be considered "fraudulent" under Section 17200, it is, at a minimum, necessary for plaintiff to show that members of the public are *likely* to be deceived. | • *Shvarts v. Budget Grp., Inc.*, 81 Cal. App. 4th 1153, 1159-60 (Ct. App. 2000) |
| 130. For conduct to be considered "unlawful" under Section 17200 plaintiff must show that defendant's conduct constitutes a business practice that is prohibited by federal, state, or local law. | • *Brandon v. Nat'l R.R. Passenger Corp. Amtrak*, No. CV 12-5796 PSG (VBKx), 2013 WL 800265, at *3 (C.D. Cal. Mar. 1, 2013) |
| **Conversion Under California Common law** | |
| 131. A conversion claim requires the wrongful exercise of dominion over the property of another and proof of (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. | • *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (Ct. App. 1998) |

61

| | |
|---|---|
| 132. "Wrongful disposition" requires a showing that defendant intentionally prevented the plaintiff from having access to the property for a significant period of time, refused to return the property upon plaintiff's demand, or otherwise wrongfully disposed of the property. | • *Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs., LLC*, 748 F. Supp. 2d 1145, 1178 (C.D. Cal. 2010) |
| 133. California law mandates dismissal of a conversion claim where a plaintiff seeks compensatory damages in an unspecified sum without stating either of the alternative measures of damages required by section 3336 of the Civil Code. | • *Baldwin v. Marina City Props., Inc.*, 79 Cal. App. 3d 393, 411-12 (Ct. App. 1978)<br>• *Tyrone Pac. Intern., Inc. v. MV Eurychili*, 658 F.2d 664, 667 (9th Cir. 1981) |
| 134. Where courts have extended the tort of conversion to unconsented uses of intangible property, they have limited the scope of protection to piracy of the property, which clearly "interferes" with a sale that the plaintiff otherwise might have made even if it does not literally deprive the plaintiff of possession. | • *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 570 (1977)<br>• *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 722, 725 (9th Cir. 1985) |
| 135. The statute of limitations for conversion claims regarding intangible property is two years. | • Cal. Civ. Proc. Code § 339(1)<br>• *Italiani v. Metro-Goldwyn-Mayer Corp.*, 45 Cal. App. 2d 464, 466 (Cal. Dist. Ct. App. 1941). |

| Copies Made Outside of California and Fair Use Copies | |
|---|---|
| 136. Copies made outside of California are beyond the territorial reach of California law. | • *Goldstein v. California*, 412 U.S. 546, 558-59 (1973) |
| 137. Internal, incidental copies of sound recordings made in aid of lawful performances is protected by the fair use doctrine because the copies are made for a transformative purpose in furtherance of a lawful end, the extent of copying is necessary to facilitate its lawful performance, and there is no effect on the potential market for or value of the copyrighted work. | • *Authors Guild, Inc. v. HathiTrust*, 12-4547-CV, 2014 WL 2576342, at *5-13 (2d Cir. June 10, 2014) <br> • *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638-45 (4th Cir. 2009) <br> • *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608-15 (2d Cir. 2006) <br> • *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22-25 (1st Cir. 2000) |
| 138. The creation and use of "tips and tails" of recordings to ensure harmonious transitions in and out of songs when planning a program and recording voiceovers is a fair use because they are made for a transformative purpose in furtherance of a lawful end, the "tips and tails" represent a tiny portion of the recordings, and there is no effect on the potential market for or value of the copyrighted work. | • *Perfect 10 v. Amazon, Inc.*, 508 F.3d 1146, 1164-68 (9th Cir. 2007) <br> • *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-22 (9th Cir. 2003) <br> • *Calkins v. Playboy Enters. Int'l*, 561 F. Supp. 2d 1136, 1140-44 (E.D. Cal. 2008) <br> • *SOFA Entm't, Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1279 (9th Cir. 2013) |

| Commerce Clause of the U.S. Constitution | |
|---|---|
| 139. State regulation of performances by nationwide broadcasters would violate the Commerce Clause of the U.S. Constitution. | • *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986)<br>• *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989)<br>• *NCAA v. Miller*, 10 F.3d 633, 638-39 (9th Cir. 1993)<br>• *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102-04 (2d Cir. 2003)<br>• *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999)<br>• *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 384-85 (1983) |
| 140. The Commerce Clause precludes state regulation of commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State. | • *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36 (1989) |
| 141. The bar against extraterritorial regulation applies equally to enactments of a state legislature and to court pronouncements. | • *Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013) |
| 142. If a state regulation has the practical effect of controlling conduct beyond the boundaries of the state, it violates the Commerce Clause per se. | • *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)<br>• *NCAA v. Miller*, 10 F.3d 633, 638-39 (9th Cir. 1993)<br>• *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003)<br>• *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) |

| | |
|---|---|
| 143. The savings clause of 17 U.S.C. § 301(c) leaves states free to regulate intra-state commerce, but it does not grant new powers to regulate interstate commerce and does not authorize states to regulate performances by nationwide broadcasters such as Sirius XM. | • *Wyoming v. Oklahoma*, 502 U.S. 437, 457-58 (1992)<br>• *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 48-49 (1980)<br>• Puglisi Decl. Ex. 21 (*Copyright Law Revision: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary on H.R. 2223*, at 137-38, 1396-98 (Comm. Print 1975)) |
| **Federal Protection of Sound Recordings** | |
| 144. Sound recordings did not receive any protection at all under federal law until the enactment of the Sound Recording Act of 1971. | • Puglisi Decl. Ex. 22 (Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971) ("Sound Recording Act"))<br>• *Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009) |
| 145. The Sound Recording Act was expressly intended to address record piracy. | • Puglisi Decl. Ex. 23 (117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) (statement of Sen. John McClellan))<br>• *Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009)<br>• Puglisi Decl. Ex. 24 (H.R. Rep. No. 92-487, at 2 (1971))<br>• Puglisi Decl. Ex. 25 (S. Rep. No. 92-72, at 1, 7 (1971)) |
| 146. In enacting the Sound Recording Act, Congress withheld from owners of sound recordings an exclusive right of public performance. | • Puglisi Decl. Ex. 22 (Sound Recording Act §§ 1(a), 3)<br>• 17 U.S.C. § 114(a)<br>• Puglisi Decl. Ex. 24 (H.R. Rep. No. 92-487, at 3 (1971)) |

| | |
|---|---|
| 147. In 1995, Congress first afforded sound recordings a public performance right by enacting the Digital Performance Right in Sound Recordings Act; however, that right was afforded *only* to Post-1972 Recordings and brigaded with numerous limitations, exceptions, and protections for users made subject to it. | • Digital Performance Right in Sound Recordings Act of 1995, Pub. L. 104-39, 109 Stat. 336<br>• Puglisi Decl. Ex. 26 (141 Cong. Rec. S945-02 at S949 (daily ed. Jan. 13, 1995)) |
| **Other Conclusions of Law** | |
| 148. The responsibility of a federal court in a diversity case is to apply the law of the state in which the court sits, not to modify that law. | • *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988)<br>• *City of Philadelphia v. Lead Indus. Ass'n*, 994 F.2d 112, 123 (3d Cir. 1993)<br>• *H.L. Hayden Co. of N.Y. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1025 (2d Cir. 1989) |
| 149. The central purpose of copyright is to provide incentives for the creation of new works for dissemination to the public. | • *Feist Publ'ns v. Rural Tel Serv. Co.*, 499 U.S. 340, 349-50 (1991)<br>• *Goldstein v. California*, 412 U.S. 546, 555-59 (1973)<br>• *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 546 (1985) |
| 150. There is a general doctrine that copyright statutes do not apply retroactively. | • 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8D.06 [E] (Lexis 2013) |

Dated:  July 7, 2014

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____/s/ Fred R. Puglisi_____
FRED R. PUGLISI

WEIL, GOTSHAL & MANGES LLP

R. BRUCE RICH (admitted *pro hac vice*)
BENJAMIN E. MARKS (admitted *pro hac vice*)
TODD LARSON (admitted *pro hac vice*)

KRAMER LEVIN NAFTALIS & FRANKEL LLP

MICHAEL S. OBERMAN

Attorneys for Defendant
SIRIUS XM RADIO INC.

[List of additional counsel for Defendant SIRIUS XM RADIO INC.]

WEIL, GOTSHAL & MANGES LLP
JOHN R. GERBA (admitted *pro hac vice*)
john.gerba@weil.com
767 Fifth Avenue
New York, New York 10153
Telephone:  212-310-8000
Facsimile:  212-310-8007

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
KENT R. RAYGOR, Cal. Bar No. 117224
kraygor@sheppardmullin.com
VALERIE E. ALTER, Cal. Bar No. 239905
valter@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:  310.228.3700
Facsimile:  310.228.3701

US_ACTIVE:\44509943\7\76061.0012