WEIL, GOTSHAL & MANGES LLP
R. BRUCE RICH (admitted *pro hac vice*)
bruce.rich@weil.com
BENJAMIN E. MARKS (admitted *pro hac vice*)
benjamin.marks@weil.com
TODD LARSON (admitted *pro hac vice*)
todd.larson@weil.com
767 Fifth Avenue
New York, New York 10153
Telephone: 212.310.8000
Facsimile: 212.310.8007

KRAMER LEVIN NAFTALIS & FRANKEL LLP
MICHAEL S. OBERMAN, Cal. Bar. No. 101857
MOberman@KRAMERLEVIN.com
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212.715.9294
Facsimile: 212.715.8294

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
FRED R. PUGLISI, Cal. Bar No. 121822
fpuglisi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone: 310.228.3700
Facsimile: 310.228.3701

Attorneys for Defendant
SIRIUS XM RADIO INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLO & EDDIE, INC., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIRIUS XM RADIO INC., and DOES 1 through 100,<br><br>Defendants. | Case No. 13-CV-5693 PSG (RZx)<br><br>**DECLARATION OF DAVID J. FREAR IN SUPPORT OF SIRIUS XM'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: July 28, 2014<br>Time: 1:30 p.m.<br>Ctrm: 880<br>Honorable Philip S. Gutierrez<br><br>[Filed Concurrently with Defendants' Opposition to Plaintiff's Motion for Summary Judgment] |

I, David J. Frear, declare under penalty of perjury as follows:

## I. Introduction

1. I am Executive Vice President and Chief Financial Officer of Sirius XM Radio Inc. ("Sirius XM" or the "Company"). Prior to the merger of Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Radio Holdings, Inc. ("XM"), I served as Executive Vice President and Chief Financial Officer of Sirius, which I joined in 2003. I hold a Master of Business Administration degree from University of Michigan Graduate School of Business Administration as well as a Bachelor of Arts degree from University of Michigan.

2. I make three points in the body of this declaration based on personal knowledge and business records of the Company (including for Sirius and XM for periods prior to the merger). First, I describe the billions of dollars Sirius XM has invested in building its system and, more specifically, the millions we have spent on channels devoted to sound recordings created on or before February 15, 1972 ("Pre-1972 Recordings") – all without any indication from the Plaintiff that the performance of such recordings (and the creation of ephemeral copies to aid in such performances) required a license or subjected us to copyright infringement or other state-law liability. Second, I describe the way Plaintiff's years-long delay in pressing its claims affected positions we took in litigation before the Copyright Royalty Board – again with the understanding that our use of Pre-1972 Recordings did not require licensing and (just as important) that owners of such recordings concurred in that view and did not intend to press state-law claims for our use of them. Third, I describe briefly our primary competition: traditional terrestrial radio and, increasingly, webcasting services that are now available to consumers in "connected" vehicles. In addition, I briefly address Plaintiff's contention in its brief regarding my use of the term "public domain" in my deposition testimony and clarify the nature of my testimony on that point.

## II. Sirius XM's Investments and Expenditures, Including Channels Devoted to Pre-1972 Sound Recordings

3. As described in the accompanying declaration of Terrence Smith, Sirius XM is a satellite radio company that broadcasts music and non-music content 24 hours a day, seven days a week, on more than 135 channels to subscribers throughout the continental United States. In addition to our flagship satellite radio service, we also offer an Internet radio service, a Business Establishment Service, and a service providing music channels on the Dish satellite television service. XM commenced its satellite digital audio radio service in September 2001, and Sirius commenced its satellite digital audio radio service in February 2002.

4. Prior to launch, Sirius and XM invested over $2.6 billion to acquire spectrum and build from scratch an entirely new category of service: nationwide satellite-delivered radio. Since launch, Sirius XM (including the separate companies pre-merger) has expended additional billions maintaining, updating and replacing the three principal components of our satellite radio systems: (1) satellites, terrestrial repeaters and other satellite facilities related to the network uplink and transmission of the signal, (2) broadcast studios and (3) the "chipsets" and radios that enable subscribers to receive our content. Between 2005 and 2012, for example, Sirius XM went through a complete replenishment of the satellite infrastructure on both the Sirius and XM systems. Overall, this project cost the Company approximately $1.5 billion.

5. In addition to the need to expend substantial amounts of capital on research and development simply to remain competitive in the rapidly evolving audio entertainment marketplace, the Company also continues to invest in efforts to add new subscribers and retain existing ones. Over the 2008-2013 period, our "subscriber acquisition costs" came to over $2.5 billion. *See* Ex. A (2010 Sirius XM

Radio Inc. Annual Report on Form 10-K, at 47); Ex. B (2013 Sirius XM Radio Inc. Annual Report on Form 10-K, at 45.)

6. In 2012 and 2013, our operating expenses were $2.53 and $2.75 billion, respectively, including over $200 million spent each year in royalty payments to recording artists and owners of sound recordings pursuant to the Section 114 statutory license applicable to works protected by federal copyright law. *See* Ex. B at 24; 17 U.S.C. § 114. Our accumulated deficit as of year-end 2013 was $6.4 billion. *See* Ex. B at F-11. From 2007 to 2012, Sirius XM's experienced negative net income (in the aggregate) while paying the recording industry over $800 million in royalties.

7. Focusing more specifically on Pre-1972 Recordings, between 2009 and 2014 Sirius XM has spent over $2 million per year (and more than $13 million in total) solely on operating expenses related to five channels that feature Pre-1972 Recordings either exclusively ("40s on 4," "50s on 5," "60s on 6") or predominantly ("Elvis Radio" and "Siriusly Sinatra"). Those amounts include personnel costs (producers, DJs and the like), as well as license fees paid to the Sinatra and Presley estates for use of the name, image, and likeness of each artist, associated trademarks, and certain other benefits; they do not take into account the additional costs associated with other channels on our service that regularly play Pre-1972 Recordings (*e.g.*, "Classic Vinyl," "Deep Tracks," "Real Jazz"). We made these investments without any indication that Plaintiff, many years into our operation, would suddenly decide to allege that our performance of its recordings violates state law and exposes us to alleged infringement liability and to seek hundreds of millions of dollars in damages. Sirius XM did not accrue or reserve funds to cover such alleged damages for past use or to cover new license fees for ongoing use.

### III. Sirius XM's Litigation Position Before the Copyright Royalty Board

8.      Plaintiff's delay in asserting its claims against Sirius XM has also impacted our positions in litigation before the Copyright Royalty Board and our relationship with SoundExchange, the recording industry's agent in the collection of royalties for copyrighted sound recordings created on or after February 15, 1972 ("Post-72 Recordings") under Section 106(6) of the Copyright Act.

9.      As background, Sirius XM performs Post-72 Recordings pursuant to statutory licenses available to eligible services under Section 114 of the Copyright Act (for performance via digital audio transmission) and Section 112 (for ephemeral copies created in aid of such performances, including server copies). The rates we pay under such licenses are set by adversarial litigation before the Copyright Royalty Board ("CRB").   We have litigated two CRB proceedings, one in 2006-2007 (covering the 2007-2012 license period) and one in 2011-2012 (covering the 2013-2017 license period).

10.     In 2007, the CRB ordered that we pay a rate increasing from 6% of gross revenues (as defined) in 2007 rising gradually to 8.0% in 2012.  In 2012, the CRB increased our rates from 9.0% in 2013 rising to 11% by 2017.  (There is no additional royalty obligation for Section 112 copies; the regulations simply attribute 5% of the Section 114 payments to the Section 112 license. *See* 37 C.F.R. § 382.12(b)).

11.     Because we pay for the federal statutory license under a percentage of revenue formula, we needed a way to reduce our revenue (and thus our payments to SoundExchange) to account for the proportion of our subscription fees attributable to the performance of Pre-1972 Recordings that are not covered by the Section 114 license.  In the 2007 proceeding, the CRB adopted a definition of revenue that exempted revenues from programming "exempt from any license requirement" or "separately licensed."   We understood the former to allow a deduction from the revenue base on account of performances of Pre-1972

Recordings (which are not subject to any "license requirement") and reduced the revenue base upon which the statutory rate is applied to reflect such performances. (Specifically, we used a straight pro-ration: if 12% percent of our plays of sound recordings in a particular month were Pre-1972 Recordings, we reduced the revenue base – and thus the payment to SoundExchange – by 12%). We did so because we believed that to be the most reasonable and logical way to implement the above-mentioned revenue exclusion; but the issue of how to account for performances of Pre-1972 Recordings was not the focus of either side's trial presentation before the CRB in 2007, and the Copyright Royalty Judges therefore did not explicitly identify the specific mechanism a service should use to reduce its revenue base on account of such performances.

12. In 2012, SoundExchange sued Sirius XM, asserting (incorrectly, we believe) that the definition adopted by the CRB in 2007 did not allow for this type of deduction, and that Sirius XM should have paid SoundExchange, under the federal statutory license, for the very same performances for which the Plaintiff here seeks license fees and damages pursuant to *state* law. *See SoundExchange, Inc. v. Sirius XM Radio Inc.*, No. 1:13-cv-01290-RJL (D.D.C. 2012).

13. Had Plaintiff pursued its claims in a timely fashion, shortly after our 2001/2002 launch, and had it been determined then whether or not Sirius XM's performances of Pre-1972 Recordings required a licenses under state law, Sirius XM would have had reason to address the matter more specifically before the CRB, and to put forth a more detailed proposal as to how performances of Pre-1972 Recordings should be addressed in setting and calculating fees under the federal license. The resulting ruling might have avoided the lack of specificity in the regulations that SoundExchange has seized on to sue Sirius XM (however groundless), and avoided the issue we now confront: Plaintiff pressing for payment under state law while its agent presses for payment for the exact same performances under federal law. This is not just speculation; rather, it is exactly what happened

in the 2011-2012 CRB proceeding, where we proposed, and the Judges adopted, a more specific crediting mechanism both for performances of Pre-1972 Recordings and performances licensed directly from the copyright owner – something we recommended after SoundExchange raised the issue with us.  *See* 37 C.F.R. § 382.12(d), (e).

14. Had Plaintiff (or any other record company) established a cognizable right in public performances of Pre-1972 Recordings as a matter of state law prior to 2007, the CRB might also have factored any compensability of such performances into the rates they set, and adjusted the federal license rate downward to reflect the additional royalty burden being placed on Sirius XM at the state level. (The rate-setting standard guiding the Judges required them to take into account the possibility of "disruption" to Sirius XM arising out of the royalty fees.  17 U.S.C. § 801(b)(1)(D).)

15. Of course, we also might have determined to stop broadcasting Pre-1972 Recordings altogether (or at least the small number of Turtles tracks we play), thus preventing us from incurring liability year after year.  Or we might have worked out an arrangement with SoundExchange whereby we could pay SoundExchange for such tracks along with our payment for post-72 recordings – thus avoiding the need to locate and negotiate separately with every single owner of Pre-1972 Recordings.  (This is the position SoundExchange has advocated on Capitol Hill and that is about to be introduced as a new bill in Congress.  Exhibit C to this declaration is a copy of H.R. 4772, and Exhibit D is a press release from SoundExchange celebrating the bill's introduction by Congressmen George Holding and John Conyers, Jr.  Exhibit E is my recent testimony to Congress on the subject.)  Either route would have avoided litigation.

16. Because Plaintiff waited so long to assert its state law claims, we did not do any of those things – and now find ourselves a defendant not only in this litigation, but in a lawsuit by SoundExchange as well.

## IV. Sirius XM's Primary Competitors

17. Terrestrial radio broadcasters (which pay no performance royalties whatsoever to the record industry for broadcasts of sound recordings) remain our primary competition and the dominant form of in-vehicle listening. AM/FM radios are in every new and used car on the road, and radio stations blanket the country. Over 90% of Americans have access to and enjoy free terrestrial radio. Many broadcasters now broadcast signals in high definition (HD) – a higher quality, digital version of traditional broadcast radio that is also available for free over the air.

18. The combination of rapid advances in broadband and wireless network technology, and smartphones equipped to take advantage of this technology, has enabled a new generation of Internet-based content providers to deliver content directly to consumers in automobiles in a variety of ways, including by integration of such services directly into the in-dash audio entertainment systems of the vehicles. These competitors offer consumers features and advantages that formerly set satellite radio apart from terrestrial radio: nationwide, largely commercial-free access to diverse genres of music and other content. Most prominent among these competitors is Pandora, a non-interactive Internet radio services that is now integrated in radios in dozens of vehicles. As I understand it, Plaintiff has never licensed, or attempted to license, Pandora for use of its Pre-1972 Recordings.

## V. Plaintiff's Recordings and the "Public Domain"

19. Finally, I wish to address Plaintiff's repeated reference in its brief to my deposition testimony in this case, where I used the term "public domain" in relation to Plaintiff's recordings. As I explained in the deposition, I used that term only to signify that Sirius XM does not need to obtain permission from Plaintiff to publicly perform its Pre-72 Recordings on our satellite and Internet radio services; I made clear that I did not mean to suggest that "any use" of

Plaintiff's recordings without permission was allowed, including, for example, the distribution of copies of those recordings to the public. *See* Exhibit F (3/12/14 deposition transcript) at 26:8-13, 36:25–37:20, 38:18–39:12, 40:11-23, 41:13–42:8.

* * *

20.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 3, 2014, at New York, New York.

_____
David J. Frear