WEIL, GOTSHAL & MANGES LLP
R. BRUCE RICH (admitted *pro hac vice*)
bruce.rich@weil.com
BENJAMIN E. MARKS (admitted *pro hac vice*)
benjamin.marks@weil.com
TODD LARSON (admitted *pro hac vice*)
todd.larson@weil.com
767 Fifth Avenue
New York, New York 10153
Telephone:   212.310.8000
Facsimile:   212.310.8007

KRAMER LEVIN NAFTALIS & FRANKEL LLP
MICHAEL S. OBERMAN, Cal. Bar. No. 101857
MOberman@KRAMERLEVIN.com
1177 Avenue of the Americas
New York, New York 10036
Telephone:   212.715.9294
Facsimile:   212.715.8294

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
   Including Professional Corporations
FRED R. PUGLISI, Cal. Bar No. 121822
fpuglisi@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone:   310.228.3700
Facsimile:   310.228.3701

Attorneys for Defendant
SIRIUS XM RADIO INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLO & EDDIE, INC., individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>SIRIUS XM RADIO INC., and DOES 1 through 100,<br><br>　　　　　Defendants. | Case No. 13-CV-5693 PSG (RZx)<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Supplemental Declaration of Terrence Smith filed concurrently herewith; Declarations of Terrence Smith, David Frear, and Fred Puglisi and Defendant's Statement of Genuine Issues of Material Fact previously filed on July 7, 2014] |

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND.................................................................................. 3

ARGUMENT ........................................................................................................ 5

    I.    California Law Does Not Provide A Right Of Public
        Performance In Pre-1972 Recordings ..................................................... 6

        A.    Section 980(a)(2) Does Not Provide An Exclusive Right
            of Public Performance In Pre-1972 Recordings ......................... 6

        B.    California Common Law Has Never Provided Copyright
            Owners With An Exclusive Right Of Public Performance ......... 9

        C.    Plaintiff's Performance Right Claim Is Undermined by the
            History of Failed Legislative Efforts To Secure Such A
            Right and the Associated Policy Implications……................... 15

        D.    State Regulation Of Performances By A Nationwide
            Broadcaster Like Sirius XM Would Violate The
            Commerce Clause ....................................................................... 20

    II.    Copies Of Pre-1972 Recordings Made By Sirius XM In Aid Of
        Public Performances Are Not Actionable............................................. 23

CONCLUSION.................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5
*A&M Records, Inc. v. Heilman*,
   75 Cal. App. 3d 554, 142 Cal. Rptr. 390 (1977) ........................................*passim*

6
*Allergan, Inc. v. Athena Cosmetics, Inc.*,
7
   738 F.3d 1350 (Fed. Cir. 2013) ........................................................................20

8
*Am. Booksellers Found. v. Dean*,
9
   342 F.3d 96 (2d Cir. 2003) ..............................................................................21

10
*Am. Civil Liberties Union v. Johnson*,
11
   194 F.3d 1149 (10th Cir. 1999) .......................................................................21

12
*Arista Records, LLC v. Launch Media, Inc.*,
   578 F.3d 148 (2d Cir. 2009) .............................................................................16
13

14
*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) ..............................................................................25
15

16
*Balboa Ins. Co. v. TransGlobal Equities*,
   218 Cal. App. 3d 1327, 1267 Cal. Rptr. 787 (1990) .......................................12

17
*Baldwin v. Marina City Props., Inc.*,
18
   79 Cal. App. 3d 393, 145 Cal. Rptr. 406 (1978) .............................................14

19
*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
20
   650 F.3d 876 (2d. Cir. 2011) ...........................................................................12

21
*Bill Graham Archives v. Dorling Kindersley Ltd.*,
22
   448 F.3d 605 (2d Cir. 2006) ............................................................................25

23
*Borg-Warner Protective Servs. Corp. v. Superior Court*,
24
   75 Cal. App. 4th 1203, 89 Cal. Rptr. 2d 687 (1999) .........................................8

25
*Bower v. AT&T Mobility, LLC*,
   196 Cal. App. 4th 1545, 1554-55, 127 Cal. Rptr. 3d 569 (2011).....................15
26

27
*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
   476 U.S. 573, 106 S. Ct. 2080 (1986) ..................................................20, 21, 22

28

-ii-

*Burlesci v. Petersen*,
 68 Cal. App. 4th 1062, 80 Cal. Rptr. 2d 704 (1998) ........................................... 13

*Capitol Records Inc. v. Erickson*,
 2 Cal. App. 3d 526, 82 Cal. Rptr. 798 (1969) .............................................. 10, 24

*Capitol Records, LLC v. BlueBeat, Inc.*,
 765 F. Supp. 2d 1198 (C.D. Cal. 2010) ...................................................... 10, 11

*Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs., LLC*,
 748 F. Supp. 2d 1145 (C.D. Cal. 2010) ...................................................... 13, 14

*Dillon v. NBCUniversal Media LLC*,
 No. CV 12-09728 SJO AJWX, 2013 WL 3581938 (C.D. Cal. June 18, 2013)...15

*Erie Railroad Co. v Tompkins*,
 304 U.S. 64, 58 S. Ct. 817 (1938) ................................................................... 12

*Feist Publ'ns v. Rural Tel. Serv. Co.*,
 499 U.S. 340, 111 S. Ct. 1282 (1991) ............................................................. 19

*Goldstein v. California*,
 412 U.S. 546, 93 S. Ct. 2303 (1973) ...................................................... 19, 22, 23

*Gomez v. Rossi Concrete Inc.*,
 No. 08cv1442 BTM (CAB), 2011 WL 666888 (S.D. Cal. Feb. 17, 2011).......... 5

*H.L. Hayden Co. of N.Y. v. Siemens Medical Sys., Inc.*,
 879 F.2d 1005 (2d Cir. 1989) ........................................................................ 18

*Halstead v. Grinnan*,
 152 U.S. 412, 14 S. Ct. 641 (1894) ................................................................. 11

*Healy v. Beer Inst., Inc.*,
 491 U.S. 324, 109 S. Ct. 2491 (1989) ........................................................ 20, 21

*Informix Software, Inc v. Oracle Corp.*,
 927 F. Supp. 2d 1283 (N.D. Cal. 1996) ........................................................... 15

*Int'l News Serv. v. Associated Press*,
 248 U.S. 215, 39 S. Ct. 68 (1918) ............................................................ 12, 13

*Kramer v. Thomas*,
 No. CV 05-8381AGCTX, 2006 WL 4729242 (C.D. Cal. Sept. 28, 2006) .... 9, 24

-iii-

*Kwikset Corp. v. Superior Court*,
   51 Cal. 4th 310, 120 Cal. Rptr. 3d 741 (2011) .................................................... 15

*Lone Ranger Television, Inc. v. Program Radio Corp.*,
   740 F.2d 718 (9th Cir. 1985) ........................................................................ 14

*Miles, Inc. v. Scripps Clinic & Research Found.*,
   810 F. Supp. 1091 (S.D. Cal. 1993) ............................................................. 14

*NCAA v. Miller*,
   10 F.3d 633 (9th Cir. 1993) ......................................................................... 21

*Pagliero v. Wallace China Co.*,
   198 F.2d 339 (9th Cir. 1952) ....................................................................... 12

*Partee v. San Diego Chargers Football Co.*,
   34 Cal. 3d 378, 194 Cal. Rptr. 367 (1983) .................................................. 21

*People v. Massicot*,
   97 Cal. App. 4th 920, 118 Cal. Rptr. 2d 705 (2002) ..................................... 8

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146
   508 F.3d 1146 (9th Cir. 2007) ............................................................... 24, 25

*Princeton Univ. Press v. Mich. Document Servs.*,
   99 F.3d 1381 (6th Cir. 1996) ....................................................................... 25

*Pruneyard Shopping Ctr. v. Robins*,
   447 U.S. 74, 100 S. Ct. 2035 (1980) ............................................................. 8

*SkinMedica, Inc. v. Histogen Inc.*,
   869 F. Supp. 2d 1176 (S.D. Cal. 2012) ....................................................... 13

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417, 104 S. Ct. 774 (1984) ........................................................... 25

*Tidler v. Eli Lilly & Co.*,
   851 F.2d 418 (D.C. Cir. 1988) .................................................................... 18

*Trovan, Ltd. v. Pfizer, Inc.*,
   No. CV-98-00094 LGB MCX, 2000 WL 709149 (C.D. Cal. May 24, 2000)…13

*Tyrone Pac. Intern., Inc. v. MV Eurychili*,
   658 F.2d 664 (9th Cir. 1981) ....................................................................... 14

-iv-

US_ACTIVE:\44536184\1\76061.0012

*Warsaw v. Chicago Metallic Ceilings, Inc.*,
    35 Cal. 3d 564, 199 Cal. Rptr. 773 (1984) ............................................................. 9

*WCVB-TV v. Boston Athletic Ass'n*,
    926 F.2d 42 (1st Cir. 1991) (Breyer, J.) ........................................................... 12

*Weir v. Joly*,
    No. CV-10-898-HZ, 2011 WL 6043024 (D. Or. Dec. 2, 2011)........................... 5

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ......................................................................................... 22

**Statutes**

17 U.S.C. § 106 ................................................................................................. 16

17 U.S.C. § 107 ............................................................................................. 9, 24

17 U.S.C. § 114 .......................................................................................... 16, 17

17 U.S.C. § 301 ...................................................................................... 7, 16, 22

17 U.S.C. § 801 ................................................................................................. 17

17 U.S.C. § 802 ................................................................................................. 17

17 U.S.C. § 803 ................................................................................................. 17

17 U.S.C. § 804 ................................................................................................. 17

17 U.S.C. § 805 ................................................................................................. 17

Act of Feb. 3, 1831, ch. 16, 4 Stat. 436 ........................................................... 15

Cal. Bus. & Prof. Code § 17200 .......................................................... 12, 14, 15

Cal. Civ. Code § 980(a)(2) ......................................................................... 5, 6, 7, 8, 9

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 ................. 15, 16

**Other Authorities**

117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971) ................................................. 16

Assemb. Comm. on Judiciary, *AB 3483 (Katz) As introduced 3/12/82* (Cal. Comm.
    Print 1982). ...................................................................................................... 7

-v-

Assemb. Judiciary Comm. - Minority, *Comments on AB 3483* (Cal. Comm. Print) 7

*Copyright Law Revision: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary on H.R. 2223* (Comm. Print 1975) ............................................................................. 22

Defs.' Mem. of P. & A. in Opp'n to Pls.' Mot. for Partial Summ. J., *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) (No. 09-8030) ..................................................................................................... 10

H.R. Rep. No. 92-487 (1971) .................................................................. 16

H.R. Rep. No. 104-274 (1995) ......................................................... 17, 20

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (Lexis 2013) .......... 7

Pls.' Mem. of P. & A. in Supp. of Mot. for Partial Summ. J., *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010) (No. 09-8030) ......... 10

S. Comm. on Judiciary, *AB 3483 (Katz) as introduced Civil Code/Bus. & Professions Code RT, Copyright Conformity to Federal Law*, Reg. Sess. (Cal. Comm. Print 1981-82) ............................................................................. 7

S. Comm. on Judiciary, *Background Information AB 3483* (Cal. Comm. Print), attaching Letter from Executive Comm. of the Patent, Trademark and Copyright Section, to Members, Board of Governors (Oct. 27, 1981) ................................ 7

S. Rep. No. 104-128, at 14-15 (1995) .................................................... 20

Joseph Singer, *Property* §1.1.2 (4th ed. 2014) ......................................... 9

1

## **PRELIMINARY STATEMENT**

2      By this lawsuit, Plaintiff seeks to overturn decades of settled law and industry

3  practice concerning public performances of sound recordings created prior to

4  February 15, 1972 ("Pre-1972 Recordings").  Although Plaintiff's recordings were

5  made more than 40 years ago, Plaintiff never before claimed that the rights it

6  accuses Sirius XM of infringing so much as exist, let alone sought to enforce such

7  asserted rights against any entity amongst the countless thousands of radio

8  broadcasters and others that have performed its works in and outside of California.

9  Nothing has changed in the governing law to validate its claims here.  Plaintiff's

10  principals' grievance, without more, is that they are not paid royalties on account of

11  performances of Pre-1972 Recordings.  Stripped of its zippy one-liners and musical

12  lyric metaphors, Plaintiff's motion reduces to the assertion that one thirty-year-old

13  subsection of the California Civil Code never construed by a state court to

14  encompass a performance right, together with one federal case that erroneously

15  interpreted the one precedent it cited, sprinkled with a dollop of ill-suited tort law

16  doctrines never applied to the issue presented, affords Plaintiff sweepingly broad,

17  unprecedented, and market-destabilizing legal remedies.  Plaintiff is wrong.

18      Plaintiff concedes that its interpretation of California law is not dependent on

19  evolving technology or the medium of distribution: "the result is the same" whether

20  the Court is dealing with "cassette tape" or "the digital revolution."  Pl. Mem. 18.

21  This concession serves only to widen the credibility chasm over which this lawsuit

22  tries in vain to leap.  If California has long provided an exclusive right of public

23  performance applicable across all media, why has Plaintiff waited more than four

24  decades to enforce it?  Why has Plaintiff now asserted that claimed right against just

25  one broadcaster out of the many thousands of music users engaging in the same

26  conduct—and why did it wait more than a decade after Sirius XM's launch to do so?

27      The answer is straightforward.  The relief Plaintiff seeks is anything but the

28  uncontroversial application of settled California law Plaintiff claims it to be.  It

1    entails instead a radical expansion of the scope of intellectual property rights

2    accorded the record industry, implicating not only significant consequences for

3    thousands of California businesses, but also issues of constitutional dimension

4    insofar as it would regulate the interstate commerce of entities such as Sirius XM.

5    With such consequences in mind, generations of record industry advocates,

6    broadcasters, Copyright Office spokespersons, and members of Congress have

7    debated the merits and demerits of expanding *federal* copyright law expressly in

8    recognition that state law does *not* protect performances of Pre-1972 Recordings.

9    Indeed, such legislation was recently introduced in Congress, which clearly is the

10   proper forum for resolution of this issue, involving as it does interstate commerce,

11   complex public policy issues, and many interested parties not before this Court.

12        As a tag along to its meritless performance-based claims, Plaintiff contends

13   that the server and other incidental copies of Pre-1972 Recordings made by Sirius

14   XM in aid of its lawful broadcast activities violate Plaintiff's right of reproduction

15   under California law.  This effort to evade the consequences of a non-existent

16   performance right fails for at least two reasons.  First, with truly *de minimis*

17   exception, all of the copying activity cited has taken place *outside of California* and

18   therefore is beyond the reach of California law.  As Plaintiff has only asserted

19   claims under California law, those claims must be dismissed.  Second, California

20   law does not entitle record companies to condition lawful performances of their

21   works by entities that are not engaged in competing sales of sound recordings upon

22   payment of a royalty arising out of acts of incidental copying necessary to enable

23   such performances to be made in the first place.  Allowing Plaintiff to extract

24   payments for such copying would be tantamount to permitting the record industry to

25   regulate those very performances.

26        For the foregoing reasons, as amplified herein, Plaintiff's motion for

27   summary judgment should be denied, and the Complaint should be dismissed.

28

# **FACTUAL BACKGROUND**

Plaintiff purports to own certain sound recordings of songs by The Turtles, each of which was created prior to February 15, 1972.  Mark Volman and Howard Kaylan are Plaintiff's sole owners, officers, directors, and employees.  Sirius XM's Statement of Genuine Issues of Material Fact ("SXM 56-2") ¶¶ 5-7, 27.

Sirius XM is a satellite radio provider that operates a nationwide broadcast service.  Sirius XM is the result of the July 2008 merger between Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Radio Inc. ("XM"), which began operations in February 2002 and September 2001 respectively.  Sirius XM has continued to operate both services since the merger.  SXM 56-2 ¶¶ 11, 42-43.  Sirius XM broadcasts over 135 channels of music, sports, news, talk, and other entertainment content nationwide.  Sirius XM delivers its broadcasts via satellite radio and, with the assistance of certain third parties, by streaming over the Internet.  By federal law and technological necessity, Sirius XM's satellite radio broadcasts in California are identical to those transmitted to subscribers in every other state.

Sirius XM does not offer digital downloads to its subscribers as Plaintiff alleges.  In order to ensure smooth, uninterrupted Internet streaming transmissions, short, encrypted chunks of programming are temporarily buffered on user's mobile devices, but those fragments are not retained on the device and not accessible to the user.  *See* Supp. Decl. of Terrence Smith ¶¶ 3-4.  Sirius XM also offers certain limited content "on demand," some of which may be stored temporarily by subscribers for later listening, but that content does not include any of Plaintiff's recordings (or any other unlicensed music).  SXM 56-2 ¶¶ 13, 15, 29, 31, 33-35, 56-57.  Finally, as a necessary incident to broadcasting and streaming sound recordings, Sirius XM (and certain third parties assisting in the delivery of its Internet service) make a limited number of copies of those recordings.  These take the form of digital copies stored on the computer servers that house Sirius XM's library of recordings, as well as certain copies "cached" temporarily on a "playout server" in the course of

the broadcast transmission.  None of these server or cache copies is ever accessible to the public.  Moreover, *none of these copies was made in California*.  SXM 56-2 ¶¶ 20-22, 50, 56-59.  In addition, Sirius XM producers sometimes utilize "tips and tails," *i.e.*, very short portions of the beginnings and ends of songs, when recording voiceovers to be inserted during the transitions between songs in a program.  The complete extent of Sirius XM's copying of Plaintiff's recordings within California consists of (a) a permanent copy of the tip and tail of *one recording* made in 2012 and (b) tips and tails of a few others temporarily cached in producer workstations during the production process.  SXM 56-2 ¶¶ 19, 24, 60, 65.

Plaintiff has been aware of the Sirius and XM services for at least ten years and has long known that Sirius XM was playing certain of its Pre-1972 Recordings.  Prior to filing this lawsuit, Plaintiff never communicated to Sirius XM that it believed Sirius XM was infringing its rights nor asked for compensation of any kind.  The sole stated rationale for this lawsuit is that Plaintiff was not being paid royalties by Sirius XM on account of its performances of Pre-1972 Recordings and wanted to "raise awareness" of that.  SXM 56-2 ¶¶ 75-78, 81.

The same Turtles' recordings at issue in this lawsuit have been played on countless radio stations since those songs were recorded in the 1960s and early 1970s, and on Internet radio since the 1990s.  Retail stores, bars, restaurants, fitness centers, and many other physical establishments publicly perform sound recordings, including those by the Turtles.  Plaintiff has never licensed, tried to license, or sued any of the radio stations, webcasters, or physical establishments that publicly perform (as well as make server or other incidental copies of) Plaintiff's recordings without a license.  SXM 56-2 ¶¶ 86-90, 92, 94-98.

Plaintiff licenses certain digital uses of its recordings through The Orchard ("Orchard"), a distributor of music and video content that aggregates the rights to recordings from tens of thousands of independent labels, and then licenses those recordings, on a catalog-wide basis, to music users around the world.  ████

-4-

Redacted

Although broadcast radio stations commonly perform Pre-1972 Recordings, Orchard has never licensed a radio station.  SXM 56-2 ¶ 88 (Pascal Tr. 44:5-45:21) ("They don't distribute our music. They may play our music, but [] they aren't required by law to pay us for it, so we've not sought to license them in any way.").  No music provider has ever refused to take a license from Plaintiff or Orchard, or sought a lower royalty rate, because Sirius XM plays Pre-1972 Recordings without a license.  Sirius XM has never even come up in such discussions.  SXM 56-2 ¶ 80.

## ARGUMENT[1]

To the extent based on Sirius XM's performances of Plaintiff's Pre-1972 Recordings to subscribers in California, Plaintiff's claims fail as a matter of law. Neither Civil Code Section 980(a)(2) nor the cases and tort doctrines cited by Plaintiff remotely support its performance rights claim.  *See* Points I.A-B.  This conclusion is powerfully supported by the multi-decade record of efforts by the record industry to secure such protections as a matter of federal copyright law.  That record provides the context and explanation for why neither Plaintiff nor any other record company has sought licenses from radio broadcasters, and is replete with admissions that undercut Plaintiff's case; it also reveals the significant public policy

---

[1] Plaintiff's moving brief is replete with references to recordings it does not own, but the claims of putative class members are not before the Court on this motion.  In leap-frogging its summary judgment filing ahead of class determination or a motion by Sirius XM, Plaintiff has disregarded the "one-way intervention doctrine," which, absent extraordinary circumstances or a waiver not present here, calls for resolution of class status prior to the plaintiff's filing of such a motion.  *See, e.g., Gomez v. Rossi Concrete Inc.*, No. 08cv1442 BTM (CAB), 2011 WL 666888, at *1 (S.D. Cal. Feb. 17, 2011); *Weir v. Joly*, No. CV-10-898-HZ, 2011 WL 6043024, at *1 (D. Or. Dec. 2, 2011).

issues implicated by Plaintiff's proposed expansion of the law.  *See* Point I.C.  Even were such a claim cognizable under state law, given the nature of Sirius XM's nationwide broadcasts, it would constitute an impermissible regulation of interstate commerce barred by the Commerce Clause of the U.S. Constitution.  *See* Point I.D.

To the extent that Plaintiff's claims are based on alleged distribution of copies of Plaintiff's recordings to subscribers, they fail for lack of proof.  There has been no such distribution.  *See* Point II.  To the extent that Plaintiff's claims are based on copies necessary to facilitate Sirius XM's broadcast and streaming activities, they fail as well.  With *de minimis* exception, such copying activity does not take place in California and therefore is not subject to California law.  Even were it otherwise, such incidental copying activity strictly in aid of Sirius XM's lawful public performances is not actionable under California law and is a fair use.  *See id.*[2]

# I.   CALIFORNIA LAW DOES NOT PROVIDE A RIGHT OF PUBLIC PERFORMANCE IN PRE-1972 RECORDINGS

Plaintiff claims infringements of 100 of its Pre-1972 Recordings.  *See* Compl. ¶¶ 2-4, 6, 20, 25, 31.  85 of these recordings have never been broadcast by Sirius XM, SXM 56-2 ¶¶ 23, 49, and Plaintiff's claims as to the remaining 15 fail because Plaintiff's blithe assertion that "California law has long provided" a right of public performance in Pre-1972 Recordings, Pl. Mem. 1, is flatly incorrect.

## A.   Section 980(a)(2) Does Not Provide An Exclusive Right of Public Performance In Pre-1972 Recordings

Plaintiff attempts to locate an exclusive right of public performance in Section 980(a)(2) of the California Civil Code, arguing hyperbolically that the "exclusive ownership" language of that provision pertaining to Pre-1972 Recordings sweeps within it "*all* unauthorized uses by anyone."  Pl. Mem. 11.  The statute itself, of course, says no such thing; it merely identifies Pre-1972 Recordings as property

---

[2] Plaintiff's motion all but ignores Sirius XM's affirmative defenses save for a trio of footnotes.  Sirius XM reserves its affirmative defenses and, with the exception of the fair use defense discussed in Part II below, predicates its opposition to the present motion on the failure of the asserted claims.

capable of ownership without specifying any affirmative rights residing in the owner. In the 32 years that provision has been on the books, no court has ever construed that statutory language as granting an exclusive right to publicly perform Pre-1972 Recordings.

The legislative history of Section 980(a)(2) (entitled "Copyright Conformity to Federal Law") explains why this is so. That history makes abundantly clear that the 1982 revision was motivated by the preemption provisions of Section 301(c) of the Copyright Act, which, as of 1978, had made much of Section 980 "obsolete"; consequently, the law needed amendment to clarify what state-level protections *remained*—chiefly for unfixed and unpublished works.[3] The specification of Pre-1972 Recordings as another state-protected category surviving federal preemption merely flowed from the statute's conforming purpose as opposed to signaling a conscious effort to create or codify a new public performance right. To the contrary, the legislative history makes plain that the statute was intended merely to "maintain" the rights and remedies in Pre-1972 Recordings that existed at common law *prior* to enactment of the statute. *See* S. Comm. on Judiciary, *AB 3483 (Katz) as introduced Civil Code/Bus. & Professions Code RT*, *Copyright Conformity to Federal Law*, Reg. Sess., at p. 2 (Cal. Comm. Print 1981-82) (bill would "maintain rights and remedies in sound recordings fixed prior to February 15, 1972").

As we detail below, such "rights and remedies" were limited by California jurisprudence—consistent with federal law at the time—to protecting sound recording owners solely against unauthorized acts of *duplication* and *distribution* by record bootleggers. *See* Point I.B *infra*; *see also* 2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8C.03[C] (Lexis 2013) (explaining that prior to

---

[3] *See* Assemb. Comm. on Judiciary, *AB 3483 (Katz), As introduced 3/12/82*, at pp. 1-2 (Cal. Comm. Print 1982); Assemb. Judiciary Comm. - Minority, *Comments on AB 3483* (Cal. Comm. Print); S. Comm. on Judiciary, *Background Information AB 3483*, at p. 1 & Attach. at p. 106 (Cal. Comm. Print), attaching Letter from Executive Comm. of the Patent, Trademark and Copyright Section, to Members, Board of Governors (Oct. 27, 1981).

enactment of Section 980(a)(2), "California courts protected against *duplication and distribution* of sound recordings on a conversion theory") (emphasis added).  It is both contrary to the historical record and counterintuitive for Plaintiff to contend that the revised Section 980 was intended to expand the scope of preexisting California law and exceed the scope of rights conferred by Congress on sound recordings created on or after February 15, 1972 ("Post-1972 Recordings") without so much as a legislative mention of that intent.  It also violates "the well-established rule in California that statutes are not presumed to alter the common law unless expressly stated."  *Borg-Warner Protective Servs. Corp. v. Superior Court*, 75 Cal. App. 4th 1203, 1207-08, 89 Cal. Rptr. 2d 687, 689-90 (1999).  As further explained in *Borg-Warner*, "a statute will be construed in light of common law principles unless it contains clear and unequivocal language that discloses an intent to depart from, alter, or abrogate the common law rule concerning a particular subject matter."  *Id.* at 1208.  Absent such language, a court "must presume that the Legislature intended no change in the common law in the absence of any indication to the contrary."  *Id.*; *see also People v. Massicot*, 97 Cal. App. 4th 920, 928, 118 Cal. Rptr. 2d 705, 710 (2002) ("One tenet of statutory construction is that statutes are presumed to codify common law rules absent clear language disclosing an intent to depart from those rules.").  Section 980(a)(2) obviously contains no "clear" or "unequivocal" language expanding the scope of preexisting common-law protections for Pre-1972 Recordings by adding a performance right (or any other rights).  Accordingly, that silence does not, as Plaintiff contends, permit the inference that Section 980(a)(2) incorporates such an expansion; it squarely *forecloses* that contention.

Finally, and more fundamentally, the conception of "property" that underlies Plaintiff's claim to absolute and unqualified rights in its recordings is simply indefensible.  California law does not recognize, and never has recognized, unqualified property rights.  The entitlements of a property owner to control, dispose

-8-

of, or profit from a resource are *always* offset by a variety of privileges, shaped by courts and legislatures alike, to protect "the legitimate interests of others."  Joseph Singer, *Property* §1.1.2 (4th ed. 2014).  *See, e.g.*, *Warsaw v. Chi. Metallic Ceilings, Inc.*, 35 Cal. 3d 564, 570-72, 199 Cal. Rptr. 773, 776-78 (1984) (recognizing that property owners in California can become subject to prescriptive easements where someone uses their property in a continuous, open, and uninterrupted fashion for a period of five years without express permission); *see also Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 84, 88, 100 S. Ct. 2035 (1980) (affirming privilege under California law to enter private property for political protest).  Plaintiff's overreaching interpretation of Section 980, by contrast, would turn every radio station in California that has broadcasted "oldies" for decades with Plaintiff's consent into a serial infringer; require rejection of equitable defenses such as fair use and laches; and even go so far as to bar unauthorized *private* performances by consumers in their homes no less than the public performances of the type Plaintiff challenges here.  Unsurprisingly, courts have rejected so untethered a conception of property rights.  *See, e.g.*, *Kramer v. Thomas*, No. CV 05-8381AGCTX, 2006 WL 4729242, at *12 (C.D. Cal. Sept. 28, 2006) (granting summary judgment to defendants accused of infringing Pre-1972 Recording on the basis of fair use and applying federal test from 17 U.S.C. § 107).

## B.   California Common Law Has Never Provided Copyright Owners With An Exclusive Right Of Public Performance

Plaintiff's claimed alternative support for locating a state public performance right in Pre-1972 Recordings rests principally on a solitary federal case that erroneously relied for the snippet of its ruling on which Plaintiff depends on misrepresentations by counsel there as to the holdings of two state law cases, on which Plaintiff here also relies.  Plaintiff's glib argumentation cannot obscure the glaring absence of California state court precedent recognizing the purported performance right on which Plaintiff's case is founded.  The two state cases Plaintiff

cites dealt solely with record piracy.  *See A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 564, 142 Cal. Rptr. 390, 396 (1977); *Capitol Records Inc. v. Erickson*, 2 Cal. App. 3d 526, 527-28, 538, 82 Cal. Rptr. 798, 799-800, 806 (1969).  The claims for relief in both cases arose out of the defendants' unlawful acts of reproduction and distribution *in competition with the plaintiffs' own sales*.  Neither plaintiff sought relief for public performances by the defendants, and no aspect of the rulings addressed that issue.  Both rulings are thus plainly inapposite.

Plaintiff's extensive reliance on *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010), which mistakenly interpreted *Heilman* as identifying a California performance right, also is misplaced.  *BlueBeat* involved a service that sold unlicensed downloads of sound recordings—*i.e.,* pirated copies—in competition with the plaintiffs; it also allowed users to stream certain tracks on demand.  765 F. Supp. 2d at 1200-01.  In addition to alleging that BlueBeat infringed their copyrights in Post-1972 Recordings, the plaintiffs alleged misappropriation, unfair competition, and conversion with respect to BlueBeat's exploitation of their Pre-1972 Recordings, and relied solely on *Erickson* and *Heilman* in their briefing of those claims.  Pls.' Mem. of P. & A. in Supp. of Mot. for Partial Summ. J. at 12, Declaration of Fred R. Puglisi (July 7, 2014) ("Puglisi Decl.") Ex. 39.  Although, as noted, neither case actually addressed the public performance issue, BlueBeat did not contest (or even address) the plaintiffs' mischaracterization in its responsive briefing, arguing only that it had not actually made copies of the plaintiffs' Pre-1972 Recordings.  Defs.' Mem. of P. & A. in Opp'n to Pls.' Mot. for Partial Summ. J. at 21-23, Puglisi Decl. Ex. 40.

Without undertaking any separate analysis or application of the three causes of action, and without distinguishing between BlueBeat's unauthorized sales of downloads and its streaming activities, the court summarily concluded that BlueBeat's "actions" across the board rendered it liable for misappropriation, unfair competition, and conversion under California law.  *BlueBeat*, 765 F. Supp. 2d at

1205-06.  In concluding that "when a defendant duplicates, sells, and performs" sound recordings without authorization, it violates California law, the court relied solely on *Heilman* for supporting precedent.  *Id.*  But, as discussed, *Heilman* did not address, let alone opine on, whether public performances, separate and apart from unauthorized copying and distribution, require a license.  *Heilman*, 75 Cal. App. 3d at 564.  *BlueBeat* is mistaken in suggesting otherwise, and thus of no aid here.

The complete absence of supporting precedent for Plaintiff's claims not only undermines its case, it also explains Plaintiff's silence as to its—indeed, the entire record industry's—record of inaction over many decades in enforcing a supposed California public performance right in Pre-1972 Recordings in relation to the countless millions of performances of such works by a multitude of California entities.  Plaintiff concedes that its conception of a California performance right is entity- and technology-agnostic, such that "the result is the same" across media and distribution platforms.  Pl. Mem. 18.  Why, then, have assumedly economically rational artists and record companies failed to seek royalties from generations of radio broadcasters, bars, restaurants, and myriad other users making performances of their Pre-1972 Recordings?[4]  The absence of such efforts simply reinforces what California precedent already confirms: the absence of any such right.  *See Halstead v. Grinnan*, 152 U.S. 412, 416, 14 S. Ct. 641 (1894) ("[W]hen a party comes into court and asserts that he has been for many years the owner of certain rights, of whose existence he has had full knowledge, and yet has never attempted to enforce them, there is a strong persuasion that, if all the facts were known it would be found his alleged rights either never existed or had long since ceased.").

---

[4] By comparison, the American Society of Composers, Authors & Publishers ("ASCAP"), an organization that licenses performing rights in *musical compositions* contained within sound recordings (which are distinct works for copyright purposes), has licenses in place with more than 14,000 California entities, including nearly 900 radio stations, more than 6000 bars and restaurants, and over 2000 retailers.  SXM 56-2 ¶ 99.  The notion that Plaintiff and other labels have long possessed an equivalent performance right but not bothered to pursue comparable licensing simply lacks credibility.

-11-

Plaintiff half-heartedly tries to fill this legal void by scattershot reference, in barely two pages of briefing, to a variety of California common law tort doctrines, as well as to Section 17200 of the Cal. Bus. & Prof. Code.  It neither fully and accurately identifies the requisite elements of each, nor makes the slightest effort to tie those elements to the fact record presented by this case.  Illustrative is its bromide that Sirius XM is "endeavoring to reap where it has not sown,"  Pl. Mem. 14, quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 239-40, 39 S. Ct. 68, 63 (1918) ("*INS*"), a case decided as a matter of federal common law pre-*Erie Railroad Co. v Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938), that is no longer good law.  *See Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 894 (2d Cir. 2011) ("[A]fter its death under *Erie*, *INS* thus maintains a ghostly presence as a description of a tort theory, not as precedential establishment of a tort cause of action.").  With respect to the misappropriation tort more generally, courts repeatedly have cautioned against indiscriminating application of so loose a conception of property rights as the one Plaintiff presses here.  *See, e.g., WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 45 (1st Cir. 1991) (Breyer, J.) (rejecting claim that defendant had violated the law by reaping where it had not sown and noting that "the law *sometimes* protects investors from the 'free riding' of others; and *sometimes* it does not"); *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343 (9th Cir. 1952) (noting limited application of *INS* to other facts); *Balboa Ins. Co. v. TransGlobal Equities*, 218 Cal. App. 3d 1327, 1353, 1267 Cal. Rptr. 787, 803 (1990) (noting "vagueness" of common law misappropriation claim).  Broadcasting sound recordings has *never* been considered "reaping where one has not sown" as a matter of California law, policy, or industry practice.  The generic principle Plaintiff seeks to extract from *INS* cannot be divorced from its context: an action between competitors and a demonstration of competitive harm through time-sensitive activity (breaking news stories) that, if permitted to continue, would have deprived the plaintiff of sufficient financial incentive to continue its activities and driven it out of

-12-

business.  *INS*, 248 U.S. at 235, 241.  None of the record facts presented in this case aligns with those key elements.  Plaintiff has failed to show that it competes with Sirius XM; that radio broadcasts (however transmitted) usurp Plaintiff's record sales; or that there could be any threat to its incentive to create Pre-1972 Recordings arising out of Sirius XM's performances.  SXM 56-2 ¶¶ 100-108.  The absence of this type of injury is fatal to Plaintiff's misappropriation and unfair competition claims.  *See, e.g.*, *Trovan, Ltd. v. Pfizer, Inc.*, No. CV-98-00094 LGB MCX, 2000 WL 709149, at *6 (C.D. Cal. May 24, 2000) ("Although the California courts may have recognized a [common law unfair competition] cause of action lacking evidence of palming off, they have done so in the context of competing businesses."); *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1188 (S.D. Cal. 2012) (observing that California "common law tort of unfair competition … is rooted in preventing conduct that harms competitors by deceiving customers").[5]

Plaintiff likewise makes no serious effort, nor could it, to prove the elements of a conversion claim, which requires "the wrongful exercise of dominion over the property of another" and proof of "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages."  *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066, 80 Cal. Rptr. 2d 704, 706 (1998).  Sirius XM's public performances of Plaintiff's sound recordings neither dispossess the Plaintiff of those recordings nor cause any injury or lost sale that could be said to "interfere" with or "wrongfully dispossess" Plaintiff of its possessory interest; there is simply no evidence whatsoever that Sirius XM "intentionally prevented the plaintiff from having access to the property for a significant period of time, refused to return the property upon plaintiff's demand, or otherwise wrongfully disposed of the property."  *Chase Inv.*

---

[5] Plaintiff pled separate claims for misappropriation and unfair competition but acknowledges that misappropriation is just "a form of common law unfair competition" and treats them as one and the same in its moving brief.  Pl. Mem. 13.

*Servs. Corp. v. Law Offices of Jon Divens & Assocs., LLC*, 748 F. Supp. 2d 1145, 1178 (C.D. Cal. 2010).  What is more, Plaintiff admits that it cannot identify a single lost sale, lost license, or diminished license fee it has suffered as a result of Sirius XM.  SXM 56-2 ¶¶ 100, 102-104.  Absent any dispossession or any proven damage, Plaintiff's attempt to extend the conversion cause of action to bar unauthorized performances of its recordings must fail.  *See Miles, Inc. v. Scripps Clinic & Research Found.*, 810 F. Supp. 1091, 1098 (S.D. Cal. 1993) ("strong policy considerations weigh against expanding the conversion cause of action").[6]

California law also mandates dismissal of a conversion claim where a plaintiff "seek[s] compensatory damages in an unspecified sum without stating either of the alternative measures of damage required by section 3336 of the Civil Code." *Baldwin v. Marina City Props., Inc.*, 79 Cal. App. 3d 393, 411-12, 145 Cal. Rptr. 406, 417 (1978).  Plaintiff has neither pled nor established as damage either the value of its recordings (which it cannot, since it retains those recordings) nor any loss actually caused by Sirius XM's public performance of those recordings.  *See Tyrone Pac. Intern., Inc. v. MV Eurychili*, 658 F.2d 664, 666-67 (9th Cir. 1981) (no damages for conversion where property returned without loss of value after temporary detention by defendant).  Plaintiff's vague claim for damages "in excess of $100 million" fails to meet this exacting standard.

Plaintiff's sole support for its Section 17200 claim is the one-sentence assertion that Sirius XM's commercial use of Plaintiff's recordings "is the consummate definition of unfair."  Pl. Mem. 12.  That analysis-free assertion— which fails completely to consider the types of activities that prior courts have found

---

[6] Even where California courts have extended the tort to unconsented uses of intangible property such as sound recordings, they have carefully limited the scope of such protection to piracy of the property, which clearly "interferes" with a sale that the plaintiff otherwise might have made even if it does not literally deprive the plaintiff of possession of the original. *See, e.g.*, *Heilman*, 75 Cal. App. 3d at 570; *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 722, 725 (9th Cir. 1985).  Plaintiff's claims suffer from a complete failure of proof on this score.

-14-

to be "unlawful" or "unfair" under Section 17200—is woefully insufficient to support summary judgment in Plaintiff's favor.  Among many deficiencies, Plaintiff has failed to establish: that Sirius XM's activities harm the *public*, or that it has standing as a *competitor* of Sirius XM; that it has suffered the type of economic injury to *itself* as required to sustain a claim under the statute; and that Sirius XM has engaged in conduct that qualifies as an "unlawful, unfair or fraudulent business act or practice" under the statute, as those terms of art have been applied by California courts in practice.  *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320, 120 Cal. Rptr. 3d 741, 749 (2011); *Dillon v. NBCUniversal Media LLC*, No. CV 12-09728 SJO AJWX, 2013 WL 3581938, at *7 (C.D. Cal. June 18, 2013); *Informix Software, Inc v. Oracle Corp.*, 927 F. Supp. 1283, 1287 (N.D. Cal. 1996); *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1554-55, 127 Cal. Rptr. 3d 569, 576-78 (2011).

## C.  Plaintiff's Performance Right Claim Is Undermined by the History of Failed Legislative Efforts To Secure Such a Right and the Associated Policy Implications

Plaintiff's case is further undermined by the uniform recognition over many decades on the part of record industry advocates, broadcasters, the U.S. Copyright Office, and Congress that there never has been any state performance right in Pre-1972 Recordings.  Musical compositions, as distinct from the sound recordings in which those compositions are sometimes embodied, have been protected by federal copyright laws since at least 1831.  *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436, Puglisi Decl. Ex. 27.  Sound recordings did not receive any protection at all under federal law until the Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 ("Sound Recording Act").  The record regarding attempts to secure a performance right at the federal level leaves no doubt that state-level performance rights have never existed, and that the remedy, if any, was to be had at the federal level.

1    The Sound Recording Act was expressly intended to address record piracy,
2    which had "rapid[ly] increase[d]" in preceding years due to technological advances
3    and inconsistent state law protection.  117 Cong. Rec. 2002 (daily ed. Feb. 8, 1971)
4    (statement of Sen. John McClellan), Puglisi Decl. Ex. 23; *see also Arista Records,*
5    *LLC v. Launch Media, Inc.*, 578 F.3d 148, 152 (2d Cir. 2009).  In furtherance of this
6    goal, owners of qualifying recordings—those created on or after February 15, 1972
7    ("Post-1972 Recordings")—were granted carefully circumscribed prospective rights
8    to combat record piracy, specifically the rights "[t]o reproduce and distribute"
9    "tangible" copies of sound recordings.  Sound Recording Act §§ 1, 3, Puglisi Decl.
10   Ex. 22; 17 U.S.C. § 106(1), (3).  Effective January 1, 1978, the rights so conferred
11   pre-empted parallel state enforcement efforts.  *See* 17 U.S.C. § 301.

12   The debate over the scope of federal copyright rights to be accorded sound
13   recordings directly addressed whether, in addition to exclusive rights to reproduce
14   and distribute such works, Congress should also provide a right of public
15   performance akin to that conferred by federal law upon owners of musical works
16   (found in 17 U.S.C. § 106(4)).  Congress determined otherwise.  *See* Sound
17   Recording Act §§ 1(a), 3, Puglisi Decl. Ex. 22; 17 U.S.C. § 114(a) (stating that
18   sound recording rights "do not include any right of performance under section
19   106(4)" of the Copyright Act); *see also* H.R. Rep. No. 92-487, at 14 (1971), Puglisi
20   Decl. Ex. 24.  The record of that debate is extensive and uniform in reflecting the
21   common understanding among all interested parties that existing state laws did *not*
22   extend to such public performances; to the contrary, the record industry advocated
23   for such federal protection precisely to *remedy* this perceived inequity, much as
24   radio broadcasters opposed such a new legal and economic constraint on their
25   businesses.  *See* Puglisi Decl. Exs. 37, 38.  To accept Plaintiff's portrayal of the
26   scope of California common law, the Court would need to believe that Congress, by
27   preempting state laws with respect to Post-1972 Recordings and determining not to
28   create a federal performance right for such recordings, actually dramatically

-16-

*narrowed* the rights afforded to sound recording owners from rights previously available under state law.  This is plainly absurd.  Not a single legislative advocate ever so argued; to the contrary, Congress clearly understood it was leaving public performances of sound recordings unregulated *at either the state or federal level*.

The issue was revisited in connection with what became, in 1995, the Digital Performance Rights in Sound Recordings Act.  Congress there responded affirmatively—to a point—to the record industry's persistent drive for recognition of a sound recording performance right, adding a limited such right, confined to digital audio transmissions of *Post-1972* Recordings, that was further circumscribed to ensure that it would not impede the development of new technologies for increasing public access to performances of sound recordings.  These limitations included a compulsory statutory license designed to ensure that various categories of services delineated by the statute, including satellite radio, would be assured uninterrupted access to the sound recordings involved and that such access would be provided at a reasonable price.  An elaborate agency rate-setting process was established as a part of this framework; the responsible agency, now the Copyright Royalty Board, has actively regulated the Post-1972 Recording performance royalties payable by Sirius XM and others ever since.  *See* H.R. Rep. 104-274, at 22 (1995), Puglisi Decl. Ex. 28; 17 U.S.C. §§ 114(d), 114(f), 801-805.

The record surrounding federal creation of this circumscribed sound recording performance right applicable to Post-1972 Recordings again confirms the uniform understanding by all involved that state laws did not afford sound recording owners public performance rights.  The leading record industry trade association, the Recording Industry Association of America, summarized it well in testifying: "Under existing law, record companies and performers . . . have *no rights* to authorize or be compensated for the broadcast or other public performance of their works."  *See* Puglisi Decl. Ex. 29.  The testimony of the National Association of Broadcasters and others was in line.  *See* Puglisi Decl. Exs. 30-31.  No less an

-17-

1    authority than the U.S. Copyright Office, in contemporaneous submissions

2    concerning such federal legislation, shared that understanding.  *See* Puglisi Decl.

3    Exs. 33-36.

4         Against this legislative backdrop, it is disingenuous for Plaintiff to claim that

5    California has long recognized a right that its own industry trade association, among

6    other knowledgeable constituents, has repeatedly acknowledged does not exist.  As

7    important, the competing policy arguments that have animated those legislative

8    efforts, and the careful balancing of those interests that is reflected in the complex

9    web of federal statutory provisions enveloping performance rights in Post-1972

10   Recordings, counsels in favor of retaining the *status quo*.  Consideration of the pros

11   and cons of extending performance rights to Pre-1972 Recordings, not to mention

12   rewriting decades of settled law and applying that change retroactively—damages

13   and all—to Sirius XM's detriment, is the proper province of the U.S. Congress, not

14   piecemeal (and potentially conflicting) decisions in the courts of various states.

15   Indeed, federal legislative debate over this very issue is currently ongoing.  *See*

16   Declaration of David J. Frear, dated July 3, 2014 ("Frear Decl.") ¶ 15 & Exs. C-E.

17        Moreover, the responsibility of a federal court in a diversity case is to apply

18   the law of the state in which the court sits, not to modify that law.  As the Second

19   Circuit observed in refusing to expand New York's law of unfair competition to

20   encompass "free riding" by a defendant that did not compete with the plaintiff, "it is

21   not the role of a federal court . . . to undertake such an expansion of New York law."

22   *H.L. Hayden Co. of N.Y. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1025 (2d Cir.

23   1989); *see also Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) ("We

24   must apply the law of the forum as we infer it presently to be, not as it might come

25   to be.") (citation omitted).  This principle alone warrants denial of the relief sought

26   by Plaintiff here.

27        There is, in any event, no reason to believe that the California Supreme Court

28   would expand state common law to encompass an exclusive right of public

-18-

performance in Pre-1972 Recordings, and there are many reasons to believe that it would not.  First, the creation and retroactive application of a performance right under California common law for Pre-1972 Recordings—created at a time when there was no expectation of any performance right—would do little to achieve the central purpose of copyright: to provide incentives for the creation of *new* works for dissemination to the public.  *See Feist Publ'ns v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50, 111 S. Ct. 1282 (1991) ("The primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.'") (quoting U.S. Const. art. I, § 8, cl. 8); *Goldstein v. California*, 412 U.S. 546, 559, 93 S. Ct. 2303 (1973) ("the very objective of the grant of protection" is "to induce new artistic creations").  As Plaintiff by definition cannot make any new Pre-1972 Recordings now, and as new recordings are incentivized by the promise of federal copyright protection, the proposed new right—which would apply retroactively to works that were made as far back as 100 years ago—would not provide any necessary incentives to creative activity.  Indeed, the creation of a new performance right would *reduce* the availability of Pre-1972 Recordings by imposing new and unanticipated fees on Sirius XM and other users if they wish to continue to perform Pre-1972 Recordings, with a concomitant decrease in their use.  Any such decrease in public access to such recordings almost assuredly would adversely impact Plaintiff's ability to sell its recordings.  SXM 56-2 ¶ 108 (Kaylan Tr. 71:7-22) (acknowledging promotional impact of radio play).

Second, the creation of a new performance right for Pre-1972 Recordings would impose unfair burdens upon stockholders of Sirius XM and other businesses that were built in good-faith reliance upon the extant legal regime.  Those investors took huge risks.  SXM 56-2 ¶¶ 45-46.  To impose retroactively new burdens on these enterprises would be unfair.  Third, the creation of the proposed right would frustrate a key goal of the compulsory licensing regimes created by Congress in 1995 and 1998 to govern digital audio transmissions of Post-1972 Recordings by

-19-

satellite broadcasters (including Sirius XM) and webcasters: to preserve incentives for innovative services such as satellite radio to make recordings publicly available by depriving the record industry of the right to withhold access to its works and/or charge exorbitant royalties as a condition of their use.  *See* H.R. Rep. No. 104-274, at 12-14, Puglisi Decl. Ex. 28; S. Rep. No. 104-128, at 14-15 (1995), Puglisi Decl. Ex. 32.  The relief sought by Plaintiff would run roughshod over this Congressional solicitude for public access to sound recordings, creating as it would an unqualified state common law right, without compulsory licensing, that would allow owners of sound recordings to dictate the conditions of public access to their works.

This array of policy counter-arguments underscores the inappropriateness of Plaintiff's effort to upend decades of settled practice and extract punitive retroactive penalties through litigation rather than having such a consequential matter considered through legislation, where all interested stakeholders (most of which are not parties to this action) could be heard, and where a full complement of policy judgments could be made.

### D.  State Regulation Of Performances By A Nationwide Broadcaster Like Sirius XM Would Violate The Commerce Clause

The Supreme Court has long held that the Commerce Clause precludes state regulation of "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335-36, 109 S. Ct. 2491 (1989) (internal quotation omitted).  This bar applies equally to enactments of a state legislature and to court pronouncements. *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1359 (Fed. Cir. 2013) ("Neither the California courts nor the California legislature are permitted to regulate commerce entirely outside of the state's borders.").  The Supreme Court has developed a categorical approach to state economic regulation like that proposed here: "When a state statute directly regulates . . . interstate commerce . . . [the Court has] generally struck down the statute without further inquiry."  *Brown-Forman*

1  *Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080

2  (1986).  If the regulation has such a "practical effect" on interstate commerce, "it

3  violates the Commerce Clause per se." *NCAA v. Miller*, 10 F.3d 633, 638-39 (9th

4  Cir. 1993); *see also Healy*, 491 U.S. at 336 ("The critical inquiry is whether the

5  practical effect . . . is to control conduct beyond the boundaries of the State").

6  Applying these principles, courts repeatedly have struck down state regulations that,

7  in practical effect, regulated conduct beyond the state's boundaries where, as here,

8  the regulated activity necessarily was national in scope.  *See, e.g.*, *Am. Booksellers*

9  *Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003); *Am. Civil Liberties Union v.*

10  *Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999); *Partee v. San Diego Chargers*

11  *Football Co.*, 34 Cal. 3d 378, 384-85, 194 Cal. Rptr. 367, 371-72 (1983).

12           Recognizing a California public performance right in Pre-1972 Recordings

13  would, as to any broadcast activity that is national in scope, impermissibly regulate

14  extraterritorial conduct in violation of the dormant Commerce Clause.  Sirius XM

15  broadcasts identical programming to subscribers in California and every other state

16  in the continental U.S.  *See* SXM 56-2 ¶¶ 33-35.  This is not a matter of mere

17  business preference; it is required both by law and technological necessity:  Sirius

18  XM's FCC licenses prevent it from offering state-specific programming, and Sirius

19  XM's delivery systems are not designed to direct (or restrict) the transmission of

20  signals or programming to particular states or the location of the radio receiver unit.

21  *Id.* at ¶¶ 34, 35.  Indeed, a large majority of Sirius XM's subscribers listen through

22  radios installed in their vehicles or on mobile phones or laptop computers, which

23  inevitably cross state lines.  The practical effect of Plaintiff's proposed state

24  regulation would be that Sirius XM could not broadcast Pre-1972 Recordings on any

25  of its channels to any of its subscribers anywhere in the United States, including in

26  all of the other states that do not recognize any such performance right, without

27  securing a license or otherwise complying with California regulation.  By effectively

28  requiring Sirius XM to obtain a license or other consent to play Pre-1972

-21-

Recordings anywhere in the country, California would impermissibly "project its legislation into other States by regulating the price to be paid" for public performances of those recordings in other states. This is a per se violation of the Commerce Clause. *See Brown-Forman*, 476 U.S. at 582 ("Forcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce.").

Neither 17 U.S.C. § 301(c) nor *Goldstein*, 412 U.S. 546, is to the contrary. The savings clause of Section 301(c) was proposed by the Justice Department specifically to preserve state record piracy laws for Pre-72 Recordings. *See Copyright Law Revision: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary on H.R. 2223*, at 137-38 (Comm. Print 1975); *id.* at 1396-98 (statement of RIAA President in support of the amendment so as to preserve state "antipiracy statutes"), Puglisi Decl. Ex. 21. Regardless, it merely leaves states free to regulate *intra*-state commerce (*e.g.*, piratical sales in the state); it does not grant new powers to states to regulate interstate commerce. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 457-58, 112 S. Ct. 789 (1992). *Goldstein*—a case addressing California's record piracy statute—was premised on the assumption that geographic limitations inherent in state prohibitions on *copying and piracy* naturally prevented one state's laws from impermissibly intruding into other states: "If one State grants such protection, the interests of States which do not are not prejudiced since their citizens remain free to copy within their borders those works which may be protected elsewhere." 412 U.S. at 558. Adopting a California performance right in Pre-1972 Recordings, however, would do just what *Goldstein* suggested would be impermissible: require a broadcaster to pay a "tariff" in one state before it could broadcast Pre-72 Recordings anywhere in the nation or to forego broadcasting those recordings everywhere if unable to obtain such a license in California. *Id.* at 559.

-22-

## II.   COPIES OF PRE-1972 RECORDINGS MADE BY SIRIUS XM IN AID OF PUBLIC PERFORMANCES ARE NOT ACTIONABLE

Plaintiff asserts that Sirius XM has violated California law by making unauthorized copies of its recordings in connection with its broadcast activities. That claim fails for numerous reasons.  First, Plaintiff fails completely to identify what copies of its recordings Sirius XM has made *in California*.  As the Supreme Court made clear in *Goldstein*, "a copyright granted by a particular State has effect only within its boundaries," and citizens of *other* states "remain free to copy within their borders those works which may be protected elsewhere."  412 U.S. at 558. Second, Plaintiff fails to identify which copies of its recordings were made by Sirius XM in California *after* January 1, 2012; server and other "ephemeral" copies prior to that date are insulated from attack here by a class-wide settlement agreement from a previous litigation that binds Plaintiff.  *See* SXM 56-2 ¶¶ 17, 74, 109-117; Final Order and Judgment, *In re XM Satellite Radio Copyright Litigation*, No. 06 CV 3733 (LAK) (S.D.N.Y. Mar. 22, 2011), Dkt. No. 123; Final Order and Judgment, *Nota Music Publishing, Inc. v. Sirius Satellite Radio Inc.*, No. 07 CV 6307 (AKH) (S.D.N.Y. Jan. 9, 2012), Dkt. No. 57.

As opposed to Plaintiff's failure of proof, the record and the case law establish that there is no actionable reproduction in this case.  To start, Sirius XM has not distributed or otherwise allowed its subscribers to save and access copies of Plaintiff's recordings, either in the form of individual song downloads or downloads of Sirius XM programs available for on-demand streaming.  SXM 56-2 ¶ 70.  While short, encrypted fragments of content are temporarily buffered on users' mobile devices to ensure uninterrupted Internet streaming transmissions, those fragments are not retained on the device and are never accessible to the user.  *See* Supp. Decl. of Terrence Smith ¶¶ 3-4.  Moreover, the only copies of Plaintiff's recordings that reside on computer servers in California were made in New York or Washington and *sent* to Los Angeles (as *Goldstein* allows), not *made* there, with one *de minimis*

-23-

1   exception: the first and last few seconds of "It Was a Very Good Year," which was

2   digitally transmitted from New York to Los Angeles and saved on a server there in

3   May 2012.  As the Declaration of Terrence Smith explains, the only other copying

4   activity in the state is the momentary caching of "tips and tails" in the workstations

5   of Sirius XM producers to record voiceovers during the transitions in and out of

6   songs.  SXM 56-2 ¶¶ 59-61, 65.  For at least three reasons, these instances of

7   internal, incidental copying are not cognizable infringements under California law.

8        First, California law regarding sound recordings has only ever condemned full

9   copies of recordings made and sold to the public in competition with the owner's

10  own sales, not internal, incidental reproductions made solely in aid of broadcast

11  performances.  *See Heilman*, 75 Cal. App. 4th at 564; *Erickson*, 2 Cal. App. 3d at

12  527-28, 538.  Such non-public copies do not unfairly compete with, misappropriate,

13  or convert Plaintiff's recordings any more than Sirius XM's performances of the

14  recordings do.  Second, recognizing an infringement claim for fragmentary copies

15  made solely in aid of public performance would have the same economic effect as

16  creating a performance right itself, as the record industry could extract the entire

17  perceived economic value of the public performances by taxing the reproductions

18  necessarily made to facilitate them.  In this respect, Plaintiff's reproduction-based

19  claims are simply an attempt to achieve indirectly what the absence of a

20  performance right under California law precludes it from achieving directly.

21       Third, and relatedly, incidental, fragmentary copies made solely to effectuate

22  performances that themselves require no license clearly constitute a fair use of the

23  recordings.  *See Kramer*, 2006 WL 4729242, at *9-12 (fair use doctrine in

24  California guided by the same four-factor test codified in Section 107 of the federal

25  Copyright Act).  Under the first fair-use factor, the fragmentary copies at issue are

26  made for a distinct and transformative purpose (facilitating lawful broadcasts) that

27  in no way supersedes the sale of full copies to consumers.  *See Perfect 10, Inc.* v.

28  *Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) ("The copying function

-24-

performed automatically by a user's computer to assist in accessing the Internet is a transformative use. . . . [A] cache copies no more than is necessary to assist the user in Internet use.  It is designed to enhance an individual's computer use, not to supersede the copyright holders' exploitation of their works."); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98-99 (2d Cir. June 10, 2014) (making full copies of copyrighted works on computer servers at four different locations, as well as disaster back-up tapes, not "excessive or unreasonable" where "necessary to facilitate the services [defendant] provides to the public and to mitigate against the risk of disaster or data loss").  In addition, such copies represent a tiny portion of the recordings, tipping the third factor in Sirius XM's favor as well.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-50, 104 S. Ct. 774 (1984) (copying of even entire television programs for time-shifted viewing fair use).  Nor has Plaintiff carried its burden to demonstrate an effect on the market or potential market for its recordings under the fourth fair use factor.  "Such automatic background copying has no more than a minimal effect" on Plaintiff's rights, "but a considerable public benefit." *Perfect 10*, 508 F.3d at 1169.  Indeed, Plaintiff's principals and agents confirmed the lack of *any* such effect.  SXM 56-2 ¶¶ 100-108. A copyright holder cannot establish market harm just by pointing to the defendant's failure to pay a license fee for its use of the work.  *See Princeton Univ. Press v. Mich. Document Servs.*, 99 F.3d 1381, 1387-88 (6th Cir. 1996) (observing that copyright holder must have a right to copyright revenues before finding that a failure to pay license fee equals market harm); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for summary judgment should be denied, and the Complaint should be dismissed with prejudice.

1

2   Dated:  August 11, 2014

3

4                         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

5

6             By                  */s/ Fred R. Puglisi*
                                     FRED R. PUGLISI

7

8                   WEIL, GOTSHAL & MANGES LLP

9                   R. BRUCE RICH (admitted *pro hac vice*)
                  BENJAMIN E. MARKS (admitted *pro hac vice*)

10                   TODD LARSON (admitted *pro hac vice*)

11                   KRAMER LEVIN NAFTALIS & FRANKEL
                  LLP

12                   MICHAEL S. OBERMAN

13

14                       Attorneys for Defendant
                      SIRIUS XM RADIO INC.

15

16   [List of additional counsel for Defendant SIRIUS XM RADIO INC.]

17   WEIL, GOTSHAL & MANGES LLP
  JOHN R. GERBA (admitted *pro hac vice*)

18   john.gerba@weil.com
  767 Fifth Avenue

19   New York, New York 10153
  Telephone:  212-310-8000

20   Facsimile:  212-310-8007

21   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership

22     Including Professional Corporations
  KENT R. RAYGOR, Cal. Bar No. 117224

23   kraygor@sheppardmullin.com
  VALERIE E. ALTER, Cal. Bar No. 239905

24   valter@sheppardmullin.com
  1901 Avenue of the Stars, Suite 1600

25   Los Angeles, California 90067-6055
  Telephone:  310.228.3700

26   Facsimile:  310.228.3701

27

28

DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT