DANIEL M. PETROCELLI (S.B. #97802)
  dpetrocelli@omm.com
ROBERT M. SCHWARTZ (S.B. #117166)
  rschwartz@omm.com
VICTOR H. JIH (S.B. #186515)
  vjih@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
Los Angeles, California  90067-6035
Telephone:   (310) 553-6700
Facsimile:   (310) 246-6779

Attorneys for Defendant
Sirius XM Radio Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLO & EDDIE, INC., a California corporation, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIRIUS XM RADIO INC., a Delaware corporation; and DOES 1 through 10,<br><br>Defendants. | Case No. CV 13-05693 PSG (RZx)<br><br>**SIRIUS XM'S NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF PARTIAL SUMMARY JUDGMENT ORDER**<br><br>**DECLARATION OF ROBERT M. SCHWARTZ AND [PROPOSED] ORDER FILED HEREWITH**<br><br>**REQUEST FOR JUDICIAL NOTICE FILED CONCURRENTLY HEREWITH**<br><br>**Date:**   January 26, 2015<br>**Time:**   1:30 p.m.<br>**Place:**   Courtroom 880 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on January 26, 2015, at 1:30 p.m., or as soon as counsel may otherwise be heard before the Honorable Philip S. Gutierrez in Courtroom 880 of the Edward R. Roybal Federal Building and United States Courthouse, located at 255 East Temple Street in Los Angeles, California, defendant Sirius XM Radio Inc. ("Sirius XM") will and hereby does move for reconsideration of this Court's September 22, 2014 Order Granting Plaintiff's Motion for Summary Judgment ("Order").

This Motion is made pursuant to the Court's inherent authority and Federal Rule of Civil Procedure 54(b) on three grounds:

1.  In ruling that California Civil Code Section 980(a)(2)—which codified California common law—grants a performance right in pre-1972 sound recordings, the Court did not have the benefit of two key authorities, which confirm that the common law has not recognized such a performance right: (a) *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), and (b) *Supreme Records, Inc. v. Decca Records, Inc.*, 90 F. Supp. 904 (S.D. Cal. 1950).

2.  The Court's rejection of Sirius XM's Commerce Clause argument was based on an erroneous conclusion that 17 U.S.C. § 301(c) authorized protection of pre-1972 sound recordings, but the Court did not consider controlling Supreme Court cases confirming that Section 301(c) is a mere "savings clause" that protects state regulations from preemption, but does not authorize state regulations that burden interstate commerce. *See New Eng. Power Co. v. New Hampshire*, 455 U.S. 331 (1982). Last week, Judge McMahon issued a ruling in the *Flo & Eddie* New York case recognizing that "it is reasonable to interpret § 301(c) as a [savings clause], and not as an authorization for states to interfere with interstate commerce." Request for Judicial

SIRIUS XM'S MOT. FOR
RECONSIDERATION

1   Notice ("RJN") Ex. A at 40-41.  This is an additional basis for
2   reconsideration under Local Rule 7-18.

3   3.   The Court ruled only on Sirius XM's laches defense, and did not rule
4   on its other defenses, which preclude summary judgment for plaintiff.
5   *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d
6   1059, 1085 (C.D. Cal. 2003) ("[A]n interlocutory decision, such as a
7   grant of partial summary judgment, is not final and may be
8   reconsidered at any time."); FED. R. CIV. P. 54(b) (interlocutory orders
9   "may be revised at any time"); *Siegel v. Time Warner Inc.*, 496 F.
10  Supp. 2d 1111, 1134-35 (C.D. Cal. 2007) (granting reconsideration
11  and vacating summary judgment where Court "failed to apply the
12  governing body of copyright law" or consider key legal argument).

13  Through counsel, the parties met and conferred pursuant to Local Rule 7-3
14  and Paragraph 5(b) of this Court's Standing Order.  Declaration of Robert M.
15  Schwartz ("Schwartz Decl.") ¶ 3.

16  This Motion is based on this notice of motion, the attached memorandum of
17  points and authorities, the concurrently filed declaration of Robert M. Schwartz,
18  [Proposed] Order, and Request for Judicial Notice, all of the pleadings, files, and
19  records in this proceeding, all matters of which the Court may take judicial notice,
20  and any argument or evidence that may be presented to or considered by the Court
21  prior to its ruling.

22  Dated:  November 17, 2014          O'MELVENY & MYERS LLP
23                                      DANIEL M. PETROCELLI
                                        ROBERT M. SCHWARTZ
24                                      VICTOR H. JIH

25                                  By:   /s/ Daniel M. Petrocelli
                                          Daniel M. Petrocelli
26                                      Attorneys for Defendant
                                        Sirius XM Radio Inc.
27

28

SIRIUS XM'S MOT. FOR
RECONSIDERATION

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................... 1

II. RECONSIDERATION IS WARRANTED. ....................................... 2

III. THE COURT SHOULD DETERMINE THAT SECTION 980(A)(2) DOES NOT PROVIDE A PUBLIC PERFORMANCE RIGHT .................. 4

    A.    Owners of Sound Recordings Did Not Have a Public Performance Right at Common Law. ..................................... 4

    B.    Section 980(a)(2) Did Not Create a Public Performance Right. ......... 10

IV. THE COURT SHOULD DETERMINE THAT APPLYING A STATE PUBLIC PERFORMANCE RIGHT TO SIRIUS XM'S NATIONAL BROADCAST VIOLATES THE COMMERCE CLAUSE ........................ 12

V. THE COURT SHOULD DETERMINE THAT SIRIUS XM'S REMAINING AFFIRMATIVE DEFENSES PRECLUDE SUMMARY JUDGMENT FOR PLAINTIFF. ............................................... 17

VI. CONCLUSION ............................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*A&M Records, Inc. v. Heilman*,
  75 Cal. App. 3d 554 (1977) ...................................................................8

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003) ....................................................12, 14, 15

*Bagdasarian Prods., LLC v. Capitol Records, Inc.*,
  2010 WL 3245795 (Cal. Ct. App. 2010)...............................................8

*Balla v. Idaho State Bd. of Corr.*,
  869 F.2d 461 (9th Cir. 1989) .................................................................3

*Borg-Warner Protective Servs. Corp. v. Superior Court*,
  75 Cal. App. 4th 1203 (1999)...........................................................4, 10

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986) .......................................................................14, 15

*Capitol Records, LLC v. Escape Media Grp., Inc.*,
  Case No. 12-cv-06646, Dkt. 90 (S.D.N.Y. May 28, 2014)...................6

*Capitol Records, LLC v. Harrison Greenwich, LLC*,
  No. 65224 (N.Y. Sup. Ct. May 13, 2014) .............................................6

*Capitol Records, Inc. v. Erickson*,
  2 Cal. App. 3d 526 (1969) .....................................................................8

*Capitol Records, Inc. v. Mercury Records Corp.*,
  221 F.2d 657 (2d Cir. 1955) ..................................................................5

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  830 N.E.2d 250 (N.Y. 2005) .................................................................5

*Capitol Records, LLC v. BlueBeat, Inc.*,
  765 F. Supp. 2d 1198 (C.D. Cal. 2010).................................................8

*Castner v. First Nat'l Bank*,
  278 F.2d 376 (9th Cir. 1960) .................................................................3

*Davis v. Trans World Airlines*,
  297 F. Supp. 1145 (C.D. Cal. 1969) ......................................................8

*Esberg v. Union Oil Co.*,
  28 Cal. 4th 262 (2002)..........................................................................12

*Flood v. Kuhn*,
  407 U.S. 258 (1972) .............................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page

*Goodman v. Lee*,
  988 F.2d 619 (5th Cir. 1993) .................................................................. 20

*Graves v. Arpaio*,
  623 F.3d 1043 (9th Cir. 2010) ............................................................... 19

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ............................................................................. 12

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
  966 F. Supp. 2d 1031 (C.D. Cal. 2013) .................................................. 3

*In re JW*,
  29 Cal. 4th 200 (2002) ......................................................................... 11

*Los Angeles v. Santa Monica Baykeeper*,
  254 F.3d 882 (9th Cir. 2001) .................................................................. 3

*Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*,
  199 Misc. 786 (N.Y. Sup. Ct. 1950) ....................................................... 5

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  319 F. Supp. 2d 1059 (C.D. Cal. 2003) .................................................. 3

*NCAA v. Miller*,
  10 F.3d 633 (9th Cir. 1993) .................................................................. 14

*New Eng. Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) ................................................................... 1, 12, 13

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ............................................................... 18

*Partee v. San Diego Chargers Football Co.*,
  34 Cal. 3d 378 (1983) .......................................................................... 14

*Pike v. Bruce Church*,
  397 U.S. 137 (1970) ....................................................................... 15, 16

*RCA Mfg. Co. v. Whiteman*,
  114 F.2d 86 (2d Cir. 1940) ............................................................ *passim*

*Robb v. Bethel Sch. Dist. #403*,
  308 F.3d 1047 (9th Cir. 2002) ............................................................... 19

*Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*,
  5 F.3d 1255 (9th Cir. 1993) .................................................................... 4

SIRIUS XM'S MOT. FOR
RECONSIDERATION

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Shaw v. Time-Life Records*,
   38 N.Y.2d 201 (1975)..............................................................................8

4

5

*Sherlock v. Alling*,
   93 U.S. 99 (1876) ..................................................................................13

6

7

*Siegel v. Time Warner Inc.*,
   496 F. Supp. 2d 1111 (C.D. Cal. 2007)...................................................3

8

*Sinatra v. Goodyear Tire & Rubber Co.*,
   1968 U.S. Dist. LEXIS 9714 (C.D. Cal. 1968), *aff'd by* 435 F.2d
   711, 714 (9th Cir. 1970) ..........................................................................8

9

10

*St. Paul Fire & Marine Ins. Co. v. 12 F.H.*,
   55 F.3d 1420 (9th Cir. 1995) ...................................................................3

11

*Supreme Records, Inc. v. Decca Records, Inc.*,
   90 F. Supp. 904 (S.D. Cal. 1950) ........................................................1, 7

12

13

*Waring v. WDAS Broad. Station, Inc.*,
   327 Pa. 433 (1937) ..................................................................................5

14

15

16

## STATUTES

17

17 U.S.C. § 301(c) ............................................................................... 1, 12

18

CAL. CIV. CODE § 980(a)(2)...............................................................*passim*

19

20

## RULES

21

FED. R. CIV. P. 54(b) ...................................................................................3

22

FED. R. CIV. P. 56(a) .................................................................................18

23

Local Rule 7-18 ...............................................................................2, 3, 4

24

25

## OTHER AUTHORITIES

26

H.R. Rep. No. 104-274 (1995) ..................................................................17

27

S. Rep. No. 104-278 (1995) .......................................................................17

28

SIRIUS XM'S MOT. FOR
RECONSIDERATION

**TABLE OF AUTHORITIES**
(continued)

Page

*Applications for Consent to the Transfer of Control of Licenses, XM Satellite Radio Holdings, Inc., Transferor, to Sirius Satellite Radio Inc., Transferee,* 23 FCC Rcd 12348 (2008) ...................................................... 15

Copyright Law Revision: Hearing Before the Subcomm. of Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, 90th Cong., 494 (1967) ...................................................................................... 9, 16

Copyright Law Revision: Hearing on H.R. 2223 Before the Subcommittee on Courts, Civil Liberties, and the Admin. of Justice of the Comm. on the Judiciary, 94th Cong. 36 (1976) ........................................ 9

Douglas G. Baird, *Common Law Intellectual Property and the Legacy of International News Service v. Associated Press,* 50 U. CHI. L. REV. 411 (1983) ...................................................................................... 6

June M. Besek & Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings,* 37 COLUM. J. L. & ARTS 327 (2014) .............................. 7

Register of Copyrights, *Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights* (U.S. Copyright Office Dec. 2011) ............................................................... 6

Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings,* 43 GEO. WASH. L. REV. 152 (1974) ...................................................................................... 6

S. Comm. on Judiciary, *AB 3483 (Katz) as introduced Civil Code/Bus. & Professions Code RT, Copyright Conformity to Federal Law,* Reg. Sess. (Cal. Comm. Print 1981-82) ................................................ 4

Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current Law,* 1979 U. ILL. L.F. 337 (1979) ...................................... 6

Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law,* Technology & Marketing Blog (Oct. 1, 2014), http://blog.ericgoldman.blog/ ...................................................... 2

1

**I.**     **INTRODUCTION**

2          Sirius XM seeks reconsideration of the Court's September 22, 2014 Order

3  (the "Order") granting partial summary judgment for plaintiff.  The Court ruled that

4  California Civil Code Section 980(a)(2) grants a performance right to the owner of

5  a pre-1972 sound recording.  Reconsideration is warranted for three reasons:

6          ***First***, the Court's ruling, that Section 980(a)(2) grants a performance right,

7  was based on an erroneous conclusion that there are no cases holding that "the right

8  of public performance does not attach to ownership of sound recordings."  Order at

9  7, *see also id.* at 10.  There are such cases, and the Court did not have the benefit of

10  the two key authorities addressing this issue: (1) *RCA Mfg. Co. v. Whiteman*, 114

11  F.2d 86, 87 (2d Cir. 1940), in which Judge Learned Hand considered the question

12  of "whether [the record company] had any musical property at common-law in the

13  records which radio broadcasting invaded," and concluded that the record company

14  had no such right in its sound recordings and could not assert a claim for unfair

15  competition based on their broadcast, and (2) *Supreme Records, Inc. v. Decca*

16  *Records, Inc.*, 90 F. Supp. 904, 908 (S.D. Cal. 1950), which held that a "recording

17  of an arrangement of a musical composition by one who is not the author of the

18  composition" is *not* "a property right which should be given recognition."

19          ***Second***, the Court rejected Sirius XM's Commerce Clause argument because

20  it concluded—erroneously—that "Congress specifically authorized protection of

21  pre-1972 sound recordings by the states in 17 U.S.C. § 301(c)."  Order at 10-11 n.1.

22  The Court did not consider controlling Supreme Court cases, including *New*

23  *England Power Co. v. New Hampshire*, 455 U.S. 331 (1982), which establishes that

24  a provision like Section 301(c) is a mere "savings clause" that protects state

25  regulations from copyright preemption, but does not *authorize* state regulation that

26  burdens interstate commerce.  *Id.* at 341 (holding that provision stating, like Section

27  301(c), that Act "shall not … deprive a State or State commission of its lawful

28  authority now exercised over the exportation of hydroelectric energy," was a

SIRIUS XM'S MOT. FOR
RECONSIDERATION

savings clause and not "an affirmative grant of power to the states to burden interstate commerce"). Last week, Judge McMahon issued a ruling in the *Flo & Eddie* case pending in the Southern District of New York, and reached the opposite conclusion. Judge McMahon relied on *New England Power* and concluded that "it is reasonable to interpret § 301(c) as a [savings clause], and not as an authorization for states to interfere with interstate commerce." RJN Ex. A at 40-41. Although Judge McMahon ultimately held that the Commerce Clause did not apply (based on an error that Sirius XM addresses below), her disagreement with this Court about how to interpret Section 301(c) is an additional basis for reconsideration.

*Third*, the Court ruled on Sirius XM's laches defense only, and did not rule on its other defenses to liability, including license, waiver, estoppel, and fair use. Plaintiff failed to satisfy its burden of showing that these defenses do not apply as a matter of law, which precludes summary judgment for plaintiff.

Reconsideration is especially critical given the far-reaching implications of the Court's Order, including the threat of substantial litigation against the thousands of others who publicly perform sound recordings in California, such as terrestrial radio broadcasters, webcasters, background/foreground music services, retail establishments, restaurants, bars, bowling alleys, and nightclubs. *See* Professor Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law*, Technology & Marketing Blog (Oct. 1, 2014), http://blog.ericgoldman.blog/ (observing that the Order "will wreak havoc with existing commercial practices" because it "threatens to undo 75-year-old consensus that state law does not provide a public performance right for sound recordings"). The law on this pivotal legal issue must be correctly declared. Reconsideration is warranted and, upon reconsideration, plaintiff's summary judgment motion should be denied.

## II.   RECONSIDERATION IS WARRANTED.

In addition to the particular circumstances addressed by Local Rule 7-18, interlocutory orders granting partial summary judgment "may be reconsidered at

SIRIUS XM'S MOT. FOR
RECONSIDERATION

any time" pursuant to the Court's inherent authority. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1085 (C.D. Cal. 2003) ("[A]n interlocutory decision, such as a grant of partial summary judgment, is not final and may be reconsidered at any time."); *see also Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 887 (9th Cir. 2001) (court has broad inherent authority to "rescind an interlocutory order over which it has jurisdiction"). Moreover, Federal Rule of Civil Procedure 54(b) provides that such interlocutory orders "may be revised at any time." FED. R. CIV. P. 54(b); *see also Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) (Rule 54(b) "explicitly grant[s] courts the authority to modify their interlocutory orders"); *St. Paul Fire & Marine Ins. Co. v. 12 F.H.*, 55 F.3d 1420, 1425 (9th Cir. 1995) (partial summary judgment order is not final judgment and is always subject to reconsideration).

Reconsideration is warranted where, as here, the Court failed to take into account key legal authorities or arguments. *See Siegel v. Time Warner Inc.*, 496 F. Supp. 2d 1111, 1134-35 (C.D. Cal. 2007) (granting reconsideration and vacating in part grant of summary judgment where Court "failed to apply the governing body of copyright law" or take into account key legal argument); *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960) (upholding reversal on reconsideration and noting court cannot "permit[] … a prior erroneous ruling to control the case"); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 966 F. Supp. 2d 1031, 1040 (C.D. Cal. 2013) (reconsideration warranted where court committed "clear error"). As set forth below, the Court's Order overlooked three critical arguments that warrant reconsideration and reversal.

Reconsideration of the Court's Commerce Clause ruling is also warranted under Local Rule 7-18. Judge McMahon's November 14, 2014 ruling in the *Flo & Eddie* New York case found this Court's Commerce Clause analysis "[un]persuasive," and concluded that "it is reasonable to interpret § 301(c) as a [savings clause], and not as an authorization for states to interfere with interstate

SIRIUS XM'S MOT. FOR
RECONSIDERATION

commerce."  RJN Ex. A at 40-41.  Reconsideration is appropriate following such an intervening decision.  *See* Local Rule 7-18; *Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (reconsideration is warranted where court "committed clear error or … if there is an intervening change in controlling law.").

## III.   THE COURT SHOULD DETERMINE THAT SECTION 980(a)(2) DOES NOT PROVIDE A PUBLIC PERFORMANCE RIGHT.

### A.   Owners of Sound Recordings Did Not Have a Public Performance Right at Common Law.

In adopting Section 980(a)(2), the Legislature made clear that it was not creating new rights or expanding existing rights in pre-1972 sound recordings, but merely "maintain[ing]" the state of existing law.  S. Comm. on Judiciary, *AB 3483 (Katz) as introduced Civil Code/Bus. & Professions Code RT*, *Copyright Conformity to Federal Law*, Reg. Sess., at p. 2 (Cal. Comm. Print 1981-82).  At the time, no court had *ever* recognized a public performance right in sound recordings.  To the contrary, the common law rule was that no such right existed.  The Order recognized that Section 980(a)(2) cannot be read to "alter the common law," Order at 7 (citing *Borg-Warner Protective Servs. Corp. v. Superior Court*, 75 Cal. App. 4th 1203, 1207-08 (1999)), but assumed (erroneously, as explained herein) there was not "a single case in which a judge considered facts implicating this [public performance] right or even theorized on the right then decided that the right of public performance does not attach to ownership of sound recordings in California."  *Id.*; *see also id.* at 10 ("Defendant has not directed the Court to a single case cutting against the right to public performance, even implicitly or in dicta.").  Such cases exist, but they were not brought to the Court's attention.

Courts in California and elsewhere had considered and rejected the argument that a public performance right attached to sound recordings before the Legislature adopted Section 980(a)(2) in 1982.  The common law rule was established in

SIRIUS XM'S MOT. FOR RECONSIDERATION

*Whiteman*, 114 F.2d at 88—the only case before 1982 that squarely addressed the issue of *performance* rights in a sound recording.

*Whiteman* presented facts similar to those here.  A record company and orchestra leader brought common law copyright and unfair competition claims against a radio network for nationally broadcasting records that had been sold to the public.  Judge Learned Hand held that no common law right existed that would grant the owners of the sound recordings the right to control the public broadcast of their records.  *Id.* at 89-90.[1]  No performance right existed because common law copyright "consists only in the power to prevent others from reproducing the copyrighted work."  *Id.* at 88.  The radio network "never invaded any such right of Whiteman; they have never copied his performances at all; they have merely used those copies which he and [RCA] made and distributed."  *Id.*

Two courts applying New York law have declined to follow *Whiteman* on the question—*not* at issue here—of whether there is a right to control *copying* after the sale of a sound recording.  *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657, 661-62 (2d Cir. 1955) (relying on *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 796 (N.Y. Sup. Ct. 1950)); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 830 N.E.2d 250, 259-60 (N.Y. 2005).  Judge Hand stated that after a record's sale, "anyone may copy it."  *Whiteman*, 114 F.2d at 89.  Albeit dictum (because *Whiteman* did not involve the issue of copying), this portion of *Whiteman* has not been followed and courts have protected sound recordings from unauthorized duplication and distribution.  On the core issue of whether a common

---

[1] Judge Hand surveyed the common law and found that only one case—*Waring v. WDAS Broad. Station, Inc.*, 327 Pa. 433 (1937)—had recognized a performance right to the owner of a sound recording (in the limited form of protecting records sold with a label barring their broadcast).  Judge Hand declined to follow that case, and established what has become the longstanding rule that there is no performance right in sound recordings.

law *performance* right exists in a sound recording, *Whiteman* remains good law and the definitive case on performance rights in sound recordings.[2]

After *Whiteman*, a consensus formed that there was no performance right in a sound recording under state common law. *See* Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 GEO. WASH. L. REV. 152, 154-56, 171 (1974) ("The last reported case involving purported common law performing rights was *R.C.A. Mfg. Co. v. Whiteman*…. Furthermore, record companies have not tried to establish a public performance right through state legislation as they successfully did with respect to unauthorized record duplication."); Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current Law*, 1979 U. ILL. L.F. 337, 346-47, 358 (1979) ("*Whiteman* stands for the principle that the sale of a record divests the production company or the performing artists of their rights, if any, to control its use."); Douglas G. Baird, *Common Law Intellectual Property and the Legacy of International News Service v. Associated Press*, 50 U. CHI. L. REV. 411, 419 n.35 (1983) (noting that the "law did not (and in fact still does not) give a performer the right to control radio broadcasts of his performances"); Register of Copyrights, *Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights*, at 44-45 (U.S.

---

[2] In opposing Sirius XM's motion to certify the Order for interlocutory review, plaintiff cited two non-binding orders from New York courts to undermine *Whiteman*. But neither order discusses *Whiteman* or addresses the existence of a performance right in pre-1972 sound recordings. In *Capitol Records, LLC v. Harrison Greenwich, LLC*, No. 65224 (N.Y. Sup. Ct. May 13, 2014), the court merely granted an unopposed request for a factual finding that defendant engaged in an "unauthorized performance" of a 1970 song. In the *Flo & Eddie* New York case, Judge McMahon declined to consider that order because it "does not explain its ruling and cites no prior case law recognizing any public performance right in sound recordings." RJN Ex. A at 20 n.2. In *Capitol Records, LLC v. Escape Media Group, Inc.*, Case No. 12-cv-06646, Dkt. 90 (S.D.N.Y. May 28, 2014), which involves the digital uploading and streaming of pre- and post-1972 sound recordings, the magistrate accepted plaintiff's unopposed argument (without analysis) that if defendant infringed plaintiff's performance rights under federal law, then it also infringed plaintiff's rights under state law.

SIRIUS XM'S MOT. FOR
RECONSIDERATION

Copyright Office Dec. 2011) (report to Congress) (citing *Whiteman* and explaining that "state law does not appear to recognize a performance right in sound recordings"); June M. Besek & Eva E. Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J. L. & ARTS 327, 338 (2014) ("states do not appear to recognize a right of public performance in pre-1972 sound recordings").

California has followed *Whiteman*.  The state's common law not only did not recognize a public performance right, it generally did not recognize *any* ownership interest in sound recordings.  The seminal decision is *Supreme Records, Inc. v. Decca Records*, *Inc.*, 90 F. Supp. 904, 907-08 (S.D. Cal. 1950).  In that case, both Supreme and Decca, with permission from the copyright holder, recorded the same song and sold phonograph records containing the sound recordings.  Supreme sued, claiming that Decca had infringed its rights in recording the song.  While Decca did not physically copy Supreme's records, Supreme claimed that Decca imitated "the special manner in which they recorded" the song, "as embodied in the recording" it made of the song, when recording its competing version.  *Id.* at 906, 907.

Before reaching the issue of misappropriation, the court addressed the threshold legal question: does the owner of a sound recording even *have* "a property interest which it is the duty of a court of equity to protect?"  *Id.* at 906.  After analyzing general common law principles—including *Whiteman*—and California authorities, the court concluded that the owner of a sound recording "has no property rights."  *Id.* at 906-09.  Rather, the "recording of an arrangement of a musical composition by one who is not the author of the composition" is not "a property right which should be given recognition in equity."  *Id.* at 908.

While *Supreme Records* did not expressly discuss a public performance right, it addressed the predicate issue of whether there were *any* rights in a sound recording under common law, and concluded that there were none.  That disposes of plaintiff's claims here.  In the absence of *any* common law ownership interest,

1   there is no need to litigate its theoretical scope, such as whether it extends to radio

2   broadcasts.  Numerous courts have followed *Supreme Records* on that core

3   principle.  *See Davis v. Trans World Airlines*, 297 F. Supp. 1145, 1147 (C.D. Cal.

4   1969) (citing *Supreme Records* and granting summary judgment on plaintiffs' claim

5   that recording of a song in radio and television broadcast violated their rights in

6   their sound recording of the song); *Sinatra v. Goodyear Tire & Rubber Co*., 1968

7   U.S. Dist. LEXIS 9714, at *3-4 (C.D. Cal. 1968) (citing *Supreme Records* to deny

8   an unfair competition claim based on singer's alleged property interest in her sound

9   recording, which defendant imitated in radio and television commercials), *aff'd by*

10  435 F.2d 711, 714 (9th Cir. 1970) (declining to recognize distinct legal interest in

11  sound recording); *Shaw v. Time-Life Records*, 38 N.Y.2d 201, 205 (1975) (finding

12  no protectable property interest in sound recording of a composition to which the

13  performer did not own the copyright).

14          Courts have since carved out a limited exception to the rule that no rights

15  attach to sound recordings allowing owners, on a common law theory of unfair

16  competition, to prevent unauthorized *duplication*.  *See Capitol Records, Inc. v.*

17  *Erickson*, 2 Cal. App. 3d 526 (1969); *A&M Records, Inc. v. Heilman*, 75 Cal. App.

18  3d 554 (1977).  This exception is narrow, and consistent with the limited rights that

19  *Whiteman* recognized—namely, the right to prevent bootlegging.[3]

20

21  _____

22  [3] *BlueBeat* and *Bagdasarian* are not to the contrary.  Neither of these cases, which
    were decided in 2010, address the state of the law on performance rights at the time
    Section 980(a)(2) was enacted in 1982.  Indeed, neither of these cases directly

23  address the existence of a performance right at all.  *Capitol Records, LLC v.*
    *BlueBeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010), involved a service that sold

24  unlicensed downloads of songs (*i.e.*, pirated copies) and also allowed users to
    stream songs.  Plaintiffs argued that BlueBeat's "duplication, distribution, and

25  public performance" of pre-1972 songs constituted misappropriation, unfair
    competition, and conversion.  Dkt. 86 at 10 n.7.  The Court summarily adopted this

26  argument, without distinguishing between BlueBeat's bootlegging and streaming
    activities, and relying solely on *Heilman*, which did *not* recognize a performance

27  right for sound recordings.  In *Bagdasarian Prods., LLC v. Capitol Records, Inc.*,

28  2010 WL 3245795, at *11 (Cal. Ct. App. 2010), a contractual interpretation case,

- 8 -

SIRIUS XM'S MOT. FOR
RECONSIDERATION

Sound recording owners like plaintiff have understood this, particularly with respect to radio broadcasts, where widespread exposure drives consumers to purchase plaintiff's records.  In 1967, the president of Capitol Records testified before Congress in support of adding a performance right to control and receive compensation for the airing of sound recordings on the radio, and acknowledged that there was no such right under existing law:

> The record manufacturer makes his profit, if any, solely from the sale of records…. The record company receives nothing from the widespread performance-for-profit of its products, whether on radio or television, in clubs, or restaurants…. Our aim [in selling records] is to take advantage of the immediate demand caused by initial radio exposure…. [If a radio station plays a record before the record company has delivered enough copies to stores] that creates a demand which Capitol Records is unprepared to fill…. There is no clearly established legal remedy to stop this unauthorized use of our product.

*See Copyright Law Revision: Hearing Before the Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary*, 90th Cong. 494, 496, 501-02 (1967) (testimony of Alan Livingston, president of Capitol Records) ("1967 Hrg."); *see also Copyright Law Revision: Hearing on H.R. 2223 Before the H. Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the Comm. on the Judiciary*, 94th Cong. 36, 1304-05, 1308 (1976) (RIAA president Stanley Gortikov lobbying for a change in the law to require broadcasters to pay record companies for playing their sound recordings).

The case law cannot be read to support plaintiff's argument that the common law afforded a performance right in sound recordings.  If this were true, then the recording industry would not have admitted in its testimony before Congress that no such right existed.  The owners of sound recordings never asserted a performance right in the decades after *Whiteman* because no such right existed.

---

the court noted in dicta that the plaintiff's contract did not appear to grant rights to "publicly perform the records," but included no analysis or holding on this point.

SIRIUS XM'S MOT. FOR
RECONSIDERATION

## B.      Section 980(a)(2) Did Not Create a Public Performance Right.

In 1982, the California Legislature enacted Section 980(a)(2), which grants the owner of a pre-1972 sound recording "an exclusive ownership therein" until 2047.  Unlike the Copyright Act, Section 980(a)(2) does not define "ownership" or specify the bundle of rights it includes.  This Court held, however, that the meaning of "exclusive ownership" was unambiguous; because the Legislature specified one exception for "covers" in Section 980(a)(2), the Court "infer[red] that [it] did not intend to further limit ownership rights, otherwise it would have indicated that intent explicitly."  Order at 6.  The Court was also persuaded by the fact that Section 980(a)(2)'s "covers" exception tracked the federal Copyright Act "nearly word-for-word," yet the California Legislature did not expressly include the other exception in the Copyright Act for public performances of sound recordings.  *Id.* at 8-9.  The Court should reconsider this portion of its analysis.

*First*, such an interpretation of Section 980(a)(2) violates the rule that a statute should not be interpreted "to alter the common law unless *expressly* stated."  Order at 7 (citing *Borg-Warner*, 75 Cal. App. 4th at 1207-08).  There was no reason for the California Legislature to add a public performance exception when *Supreme Records* and *Whiteman* had already established that the common law did not recognize an ownership right over the public performance of a sound recording.  Ownership was limited to the right to prevent unauthorized copying, particularly in the form of bootlegging.  For that reason, the "cover" exception was necessary to prevent claims of copying-by-imitating, such as the type at issue in *Supreme Records*.  The "cover" exception is singularly focused on protecting a person who makes or "duplicates" a sound recording, as long as it consists of a new work or version, that is, "an independent fixation."  CAL. CIV. CODE § 980(a)(2).  In other words, the exception is focused on persons who, a sound recording owner could argue, makes copies of such sound recordings, even if they were not literal copies.

The Court's reliance on the omission of a public performance exception was rooted in the statutory canon of *expressio unius est exclusio alterius*—the expression of one thing in a statute ordinarily implies the exclusion of other things. *See* Order at 6. The California Supreme Court has made clear, however, that reliance on this statutory canon is error if "its operation would contradict a discernible and contrary legislative intent." *See In re JW*, 29 Cal. 4th 200, 209 (2002). "In the end, a court must adopt the construction most consistent with the apparent legislative intent and most likely to promote rather than defeat the legislative purpose and to avoid absurd consequences." *Id.* at 213. There is no dispute that the Legislature added the text concerning pre-1972 sound recordings in order to "maintain" existing rights and remedies, not create new ones. Given this legislative intent, it is error to interpret Section 980(a)(2) in a way that deviates from the common law rule set forth in *Supreme Records* and *Whiteman*.

**Second**, if the Court's reading of Section 980(a)(2) law were correct—such that ownership of a sound recording includes the right to control its performance— the "cover" exception would be insufficient to accomplish its ostensible purpose. The exception does not extend to one who "performs" a cover song that imitates a sound recording. Thus, assuming there is a performance right for sound recordings under California law, a person can create and duplicate a cover song, but cannot play it on the radio. The statute cannot be read to authorize such a result. The correct reading is that the cover exception accomplishes its intended purpose without the need for an express authorization to perform the cover because there is no performance right to begin with. That would also be consistent with the case law and commentary, noted above, rejecting the existence of a performance right.

**Third**, if the Legislature had intended to enlarge rights in sound recordings to include a public performance right, such a radical change would have attracted attention and been the subject of objections from untold affected stakeholders. Efforts to create a public performance right in sound recordings at the federal level

SIRIUS XM'S MOT. FOR
RECONSIDERATION

have been met with heated discussion and vigorous opposition.  There is nothing comparable in the Section 980(a)(2) legislative history—nothing even hints at the possibility that California was creating or recognizing a performance right for sound recordings.  Creating such a new right through negative implication is not appropriate where the Legislature made clear that it was *not* changing the existing law.  *Cf.* Order at 5 ("The role of the courts in construing statutes is 'to ascertain the intent of the drafts so as to effectuate the purpose of the law.'") (citing *Esberg v. Union Oil Co.*, 28 Cal. 4th 262, 268 (2002)).

## IV.   THE COURT SHOULD DETERMINE THAT APPLYING A STATE PUBLIC PERFORMANCE RIGHT TO SIRIUS XM'S NATIONAL BROADCAST VIOLATES THE COMMERCE CLAUSE.

The Court's Order summarily concluded that recognizing a California-specific public performance right for pre-1972 sound recordings would not violate the Commerce Clause.  The Court's reasoning was based on an erroneous conclusion that Congress had expressly *authorized* state action in this area via Section 301(c) of the Copyright Act.  Order at 10-11 n.1.  Judge McMahon recently reached the opposite conclusion on this point in the *Flo & Eddie* New York case, holding that "it is reasonable to interpret § 301(c) as a [savings clause], and not as an authorization for states to interfere with interstate commerce."  RJN Ex. A at 40-41.[4]  Judge McMahon relied primarily on *New England Power*, 455 U.S. at 341, a key authority that was not addressed in the summary judgment briefing.

---

[4] Judge McMahon ultimately rejected Sirius XM's Commerce Clause argument on the ground that "a state's general property law and associated liability principles" could not violate the Commerce Clause because this does not "amount to a 'regulation' of interstate commerce."  RJN Ex. A at 43.  This ruling was based on the erroneous assumption that a law of general applicability is immune from Commerce Clause scrutiny.  That is not correct.  The Supreme Court has made clear that a "state law that has the '*practical effect*' of regulating [interstate] commerce … is invalid," *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989) (emphasis added), even if it does not directly regulate interstate commerce.  *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 104 (2d Cir. 2003) (Vermont statute forbidding distribution of pornographic material to minors *per se* violated

SIRIUS XM'S MOT. FOR
RECONSIDERATION

1       In *New England Power*, the Supreme Court held that a savings clause is not

2   an "authorization" to exempt state regulation from Commerce Clause scrutiny.

3   *New England Power* concerned the Federal Power Act, which provided that the Act

4   "shall not … deprive a State or State commission of its lawful authority now

5   exercised over the exportation of hydroelectric energy which is transmitted across a

6   State line." *Id*. at 341.  The Supreme Court held that this language was a savings

7   clause that saves state regulations from preemption.  It further held that savings

8   clauses are "in no sense an affirmative grant of power to the states to burden

9   interstate commerce in a manner which would otherwise not be permissible." *Id*.

10       Judge McMahon recognized that, "[l]ike the statute at issue in *New England*

11   *Power*, § 301(c) is framed as a limitation on preemption, not a relaxation of

12   Commerce Clause limitations."  RJN Ex. A at 41.  Indeed, she found that

13   interpreting Section 301(c) as a savings clause is "even more persuasive here

14   because, unlike in the statute analyzed in *New England Power*, § 301(c) makes no

15   explicit reference to any sort of interstate commerce." *Id*.  Because Section 301(c)

16   is not an authorization for states to burden interstate commerce, plaintiff must

17   defend its attack on the Commerce Clause on the merits.  Here, it cannot do so.

18

---

19   Commerce Clause when applied to plaintiffs' internet speech, which has no
20   "geographic boundaries"); *Flood v. Kuhn*, 407 U.S. 258, 284-85 (1972) (violation
      of Commerce Clause to apply state antitrust statute to National League of
21   Professional Baseball, which would affect its nationally uniform reserve system).

22      Judge McMahon erroneously relied on *Sherlock v. Alling*, 93 U.S. 99 (1876),
      and its progeny, which held that a party that engages in interstate commerce cannot
23   use its status as a shield to avoid liability for conduct that occurs within a
      state.  RJN Ex. A at 42-43.  Those cases are inapposite.  Unlike *Sherlock*,
24   recognizing a state-specific performance right for sound recordings would not
      "indirectly and remotely affect[] the operations of commerce."  93 U.S. at 104.
25   Because its FCC licenses prohibit state-specific broadcasting, Sirius XM could not
      engage in interstate commerce *at all* without complying with this law.  This is
26   tantamount to imposing a state-specific "license fee" on interstate commerce, which
27   *Sherlock* recognizes would be improper.  *Id*. at 102.  Moreover, Judge McMahon
      did not address the "as applied" test, which affords an independent basis for finding
28   a Commerce Clause violation.

SIRIUS XM'S MOT. FOR
RECONSIDERATION

1    The direct regulation of interstate commerce by a state statute is a *per se*

2    violation of the Commerce Clause, and the Supreme Court has "generally struck

3    down [such a] statute without further inquiry."  *Brown-Forman Distillers Corp. v.*

4    *N.Y. State Liquor Auth.,* 476 U.S. 573, 579 (1986).  It is undisputed that Sirius XM

5    is engaged in interstate commerce, as it broadcasts to millions of people in every

6    state.  Dkt. 69-1 at 1.  Courts have consistently held that state-specific statutes

7    violate the Commerce Clause when applied to entities engaged in such nationally

8    uniform practices.  *See, e.g.*, *Am. Booksellers*, 342 F.3d at 104 (state regulation of

9    internet transmission *per se* violated Commerce Clause because internet does not

10   recognize "geographic boundaries" and such regulation would force "the rest of the

11   nation … to comply with [a single state's] regulation"); *Partee v. San Diego*

12   *Chargers Football Co.*, 34 Cal. 3d 378, 384-85 (1983) (enforcement of California

13   antitrust law would violate Commerce Clause by disrupting "nationally uniform"

14   NFL practices and "likely compel[ling] all member teams to comply with the laws

15   of the strictest state."); *NCAA v. Miller*, 10 F.3d 633, 638-40 (9th Cir. 1993)

16   (Nevada law imposing state-specific due process requirements for NCAA athletes

17   *per se* violates Commerce Clause because it affects NCAA's uniform enforcement

18   program in "40 or more states").

19       While plaintiff here invokes California law, it has filed two separate lawsuits

20   seeking to simultaneously apply the laws of New York and Florida to Sirius XM's

21   broadcasts.  *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, Case No. 1:13-CV-

22   5784 (S.D.N.Y.); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, Case No. 1:13-CV-

23   23182 (S.D. Fla.).  The prospect of each state adopting its own regime to regulate

24   performance rights in sound recordings would create intractable problems for

25   companies such as Sirius XM that operate a uniform national broadcasting service.

26       Nor can Sirius XM accommodate these state-specific requirements by merely

27   modifying its programing to satisfy each state.  To the contrary, Sirius XM is

28   legally prohibited from doing so, as its FCC licenses prevent it from offering state-

- 14 -

SIRIUS XM'S MOT. FOR
RECONSIDERATION

1   specific programming.  *See* Applications for Consent to the Transfer of Control of

2   Licenses, XM Satellite Radio Holdings, Inc., Transferor, to Sirius Satellite Radio

3   Inc., Transferee, 23 FCC Rcd 12348, ¶ 155 (2008) ("SDARS licensees are already

4   prohibited … from using terrestrial repeaters to distribute localized content that is

5   distinct from that provided to subscribers nationwide via satellite").

6        The practical effect of the Court's reading of Section 980(a)(2) would be that

7   Sirius XM could not broadcast pre-1972 sound recordings to any of its subscribers

8   anywhere in the country—including states that do not recognize any performance

9   right—without securing a license or otherwise complying with California law.  This

10  would directly "alter [] the interstate flow of the goods in question," *Am.*

11  *Booksellers*, 342 F.3d at 102, and cause a *per se* violation of the Commerce Clause.

12  *See, e.g.*, *Brown-Forman*, 476 U.S. at 582 ("Forcing a merchant to seek regulatory

13  approval in one State before undertaking a transaction in another directly regulates

14  interstate commerce.").

15       This would also amount to an "as applied" violation of the Commerce Clause

16  under the balancing test in *Pike v. Bruce Church*, 397 U.S. 137 (1970).  When a

17  state "statute regulates even-handedly to effectuate a legitimate local public interest,

18  and its effects on interstate commerce are only incidental, it will be upheld unless

19  the burden imposed on such commerce is clearly excessive in relation to the

20  putative local benefits."  *Id.* at 142.  The Court's reading of Section 980(a)(2)

21  would fail this test, as applied to Sirius XM's performance of plaintiff's recordings,

22  because: (1) the conduct has only a limited connection to California; (2) its effects

23  on interstate commerce are not "incidental"; and (3) any California-specific interest

24  is outweighed by the burden on interstate commerce.

25       As to the first element, the statute that Arizona sought to defend in *Pike*

26  required fruit grown in the state to be packaged in the state and in a way that

27  protected the interests of Arizona growers.  *Id.* at 142-43.  That constituted a

28  legitimate local interest.  *Id.*  In contrast, plaintiff's claims are not specific to

SIRIUS XM'S MOT. FOR
RECONSIDERATION

California, as evident from plaintiff's litigation tactics.  Plaintiff is simultaneously suing Sirius XM in three separate states and has not shown that any one of the states has a unique interest in extending public performance rights to owners of pre-1972 sound recordings.[5]  This is a dispute in which plaintiff—a corporation—seeks to control the *national* broadcast of its sound recordings by a *New York* business.

Even if some local benefit would accrue to California, under the second and third elements, the burden on interstate commerce of recognizing a performance right is not "incidental" and far outweighs any interest California could have.  *Cf. id.*  The burden on interstate commerce that a California performance right would impose is staggering.  As Judge McMahon observed in the *Flo & Eddie* New York case, recognizing a state-specific performance right for sound recordings would have "significant economic consequences" and "could upend the analog and digital broadcasting industries."  RJN Ex. A at 43-44.  At a minimum, broadcasters from states transmitting pre-1972 recordings into California could be forced to pay for licenses to rights holders nationwide.  This could shut down many broadcasters, or force them to remove all pre-1972 songs from their playlists, thereby depriving listeners nationwide of access to these recordings.

Even worse, Section 980(a)(2) lacks any legislative scheme to guide its implementation, operation, or enforcement of broadcasts received in California (much less, nationwide).  The statute does not answer any of these questions: Would the right be limited to performance of sound recordings, or would it include audiovisual performances?  Would the right be limited to digital performances, or would it include analog?  What about retransmissions of digital broadcasts by terrestrial broadcasters?  What about transmissions of digital broadcasts by long

---

[5] In fact, plaintiff's reading of the statute would likely *harm* composers residing in California (and elsewhere), because their songs would receive less exposure, reducing their existing royalties and other licensing opportunities.  That may explain why, when the president of Capitol Records testified before Congress in 1967, he said that songwriters opposed the recognition of a performance right for sound recordings.  *See* 1967 Hrg. at 502-03.

SIRIUS XM'S MOT. FOR
RECONSIDERATION

1   distance telephone to customers on hold?  What about storecasts?  Religious and

2   educational organizations?  Would there be a distinction between free and

3   subscription services?  Would a broadcaster of digital recordings outside of

4   California be liable for licensing fees within California if its broadcast were

5   retransmitted here?  What about out-of-state broadcasts from adjoining states that

6   are regularly heard in California?

7          Only once these answers and dozens more were answered—presumably

8   through voluminous litigation—could the actual burden on interstate commerce

9   even begin to be assessed.  In contrast, Congress crafted the Digital Performance

10  Act over months and after dozens of witnesses testified about the commercial

11  consequences and policy considerations, after committees produced multiple

12  reports detailing their findings, and after they drafted (and re-drafted) the Act to

13  address each issue.  *See, e.g.*, H.R. Rep. No. 104-274 (1995); S. Rep. No. 104-278

14  (1995).  Assuming these hurdles could be surmounted through the courts, how

15  would the statutory scheme operate?  Congress put into place a complex

16  compulsory licensing arrangement along with specific mechanisms to set licensing

17  rates and transmit payments.  *See* H.R. Rep. No. 104-274, at 14-15.  No such

18  counterpart exists in the California Civil Code.  Plaintiff has done nothing to assure

19  the Court that its interpretation of Section 980(a)(2) and its protection of claimed

20  "California interests" would not burden the commerce of other states.  For that

21  reason, as applied, it violates the Commerce Clause.

22  **V.      THE COURT SHOULD DETERMINE THAT SIRIUS XM'S**

23          **REMAINING AFFIRMATIVE DEFENSES PRECLUDE SUMMARY**

24          **JUDGMENT FOR PLAINTIFF.**

25          The Court's Order rejected Sirius XM's laches defense, but did not address

26  its other affirmative defenses, which preclude summary judgment for plaintiff.[6]

27  _____

28  [6] For purposes of this motion, Sirius XM does not challenge the Court's ruling on
    its laches defense, although it will seek appellate review at the appropriate time.

SIRIUS XM'S MOT. FOR
RECONSIDERATION

This alone warrants reconsideration and reversal of the Court's Order.

Sirius XM pleaded nine affirmative defenses to liability, in addition to laches: (1) license (implied *and* express), (2) waiver, (3) estoppel, (4) fair use, (5) statute of limitations, (6) lack of harm, (7) failure to mitigate damages, (8) lack of ownership, and (9) failure to state a claim. Dkt. 38 ¶¶ 36, 38-46. It was plaintiff's burden on summary judgment to show that these defenses do not apply. FED. R. CIV. P. 56(a) (movant must "identify[] each claim or defense … on which summary judgment is sought" and show "the movant is entitled to judgment as a matter of law"); *accord Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

Plaintiff failed to satisfy its burden. Other than laches, plaintiff mentioned only *three* defenses in its summary judgment motion (express license, waiver, and estoppel) but did not explain why these defenses were inapplicable or cite any law to support its cursory argument. Dkt. 69-1 at 19 n.9, 20 n.10.[7] As to the rest of the affirmative defenses Sirius XM placed at issue in the case, plaintiff said nothing at all in its motion and supporting brief. Sirius XM pointed this out in its opposition, explaining that "Plaintiff's motion all but ignores Sirius XM's affirmative defenses," and expressly "reserve[d] the right to address its affirmative defenses, none of which is raised in the body of Plaintiff's motion and several of which are not addressed at all." Dkt. 86 at 6 n.2. Sirius XM's separate statement also asserted undisputed facts underlying its defenses that preclude summary judgment for plaintiff, including the undisputed fact "that Flo & Eddie has been aware of

---

[7] Plaintiff's argument was based entirely on a mischaracterization of Mr. Frear's deposition testimony. Mr. Frear testified that Sirius XM has written license agreements with many rights holders and potential class members (*e.g.*, Elvis Presley, The Rolling Stones, and The Beatles) that include pre-1972 songs, but does not have any written licenses specific to pre-1972 songs or Flo & Eddie, since Sirius XM did not believe such a license was required. Dkt. 68-3 at 75:21-76:2. This is fully consistent with, and in no way precludes, Sirius XM's implied license, waiver, estoppel, or other defenses to Flo & Eddie's claims. And in no event does this preclude Sirius XM's defenses as to other potential class members.

SIRIUS XM'S MOT. FOR
RECONSIDERATION

1  Sirius XM's public performance of its sound recordings for over seven years and

2  has never demanded payment or sued Sirius XM."  Order at 15 (citing DSGF

3  ¶¶ 77-78); *see also, e.g.*, DSGF ¶¶ 75-76, 79-81, 86-108, 120-21, 123-24, 135.

4        Plaintiff had no response to these facts.  Instead, plaintiff's reply included

5  three pages of argument concerning Sirius XM's statute of limitations and fair use

6  defenses (along with an acquiescence defense, which was not pleaded).  Dkt. 111 at

7  9:1-10:21; 12:12-13:2.  This was insufficient because "arguments raised for the first

8  time in a reply brief are waived," *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir.

9  2010), and plaintiff failed to explain why these defenses (or the others pleaded in

10  Sirius XM's answer) do not apply as a matter of law.

11        Nor did Sirius XM waive any of its defenses.  Sirius XM's opposition stated

12  that it "reserve[d] the right to address" *all* of its defenses.  Dkt. 86 at 6 n.2.  At oral

13  argument, the Court had the following exchange with Sirius XM's counsel:

14    THE COURT:  But let's say, if I agree with the plaintiffs on their
15                  interpretation of 980, you are not going to be able to come
16                  back and say but our -- maybe as to damages, but our
                affirmative defenses somehow would eviscerate any ruling
                that I made on 980 which is the legal question.

17    MR. RICH:  Well, what we have in mind are equitable defenses such as
18                 sleeping on their rights --

19    THE COURT:  Laches.

20    MR. RICH:  -- laches types of defenses. They only raised it in footnotes in
21                 their opening brief, Your Honor. Given that fact and severe
               time constraints in briefing, we didn't reach the point.  Then
22                 in reply they sort of sprung two pages on us which we didn't
               have a chance to respond to.

23  Schwartz Decl. Ex. A at 5:18-6:9.  In other words, counsel did *not* say that Sirius

24  XM was abandoning any of its defenses, but confirmed that Sirius XM was

25  pursuing its "equitable defenses" and "laches types of defenses."[8]  Thus, it was in

26  error to grant summary judgment.

27

28  [8] Counsel's statement at oral argument could not waive Sirius XM's defenses given
Sirius XM's reservation in its opposition.  *See Robb v. Bethel Sch. Dist. #403*, 308

1      **VI.**    <u>**CONCLUSION**</u>

2          For the foregoing reasons, the Court should grant reconsideration of its Order

3  and, upon reconsideration, deny plaintiff's motion for summary judgment.

4          Dated:  November 17, 2014        Respectfully submitted,

5                                O'MELVENY & MYERS LLP
       DANIEL M. PETROCELLI

6                                ROBERT M. SCHWARTZ
       VICTOR H. JIH

7

8                              By:   <u>/s/ Daniel M. Petrocelli</u>
             Daniel M. Petrocelli

9                                Attorneys for Defendant
       Sirius XM Radio Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  F.3d 1047, 1052 n.4 (9th Cir. 2002) (courts will not "infer a waiver from oral
   argument lightly"; declining to find waiver where counsel stated at oral argument

27  that plaintiff had abandoned damages theory); *Goodman v. Lee*, 988 F.2d 619, 623-
   24 (5th Cir. 1993) (no waiver based on counsel's "ambiguous and equivocal"

28  statement at hearing that client "abandoned [its] damage claim").

SIRIUS XM'S MOT. FOR
RECONSIDERATION