FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FLO & EDDIE, INC., a California corporation, individually and on behalf of all others similarly situated, *Plaintiff-Appellee*, | No. 17-55844 |
| | D.C. No. 2:13-cv-05693-PSG-GJS |
| v. | |
| SIRIUS XM RADIO, INC., a Delaware corporation, *Defendant-Appellant.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, Chief District Judge, Presiding

Argued and Submitted February 8, 2021
Pasadena, California

Filed August 23, 2021

Before:  Richard C. Tallman, Consuelo M. Callahan, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Lee

## SUMMARY[*]

### Copyright / California Law

The panel reversed the district court's grant of partial summary judgment to Flo & Eddie, Inc. in its action against Sirius XM satellite radio, seeking royalties for pre-1972 songs that were played on Sirius XM without permission or compensation.

The complaint alleged a violation of California common law and statutory copyright law. Flo & Eddie control the rights to the songs of the rock band the Turtles. Relying on California's copyright statute, Cal. Civil Code § 980, Flo & Eddie argued that California law gave it the "exclusive ownership" of its pre-1972 songs, including the right of public performance, which required compensation whenever their copyrighted recordings were publicly performed.

The panel held that the district court erred in concluding that "exclusive ownership" under Section 980(a)(2) included the right of public performance. Without contrary evidence, the panel presumed that California did not upend the common law in establishing "exclusive ownership" in the statute. The panel remanded for entry of judgment consistent with the terms of the parties' contingent settlement agreement.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Anton Metlitsky (argued), O'Melveny & Myers LLP, New
York, New York; Jonathan D. Hacker, O'Melveny & Myers
LLP, Washington, D.C.; Daniel M. Petrocelli, Cassandra L.
Seto, and Patrick S. McNally, O'Melveny & Myers LLP,
Los Angeles, California; for Defendant-Appellant.

Kalpana Srinivasan (argued), Steven G. Sklaver, and Rohit
D. Nath, Susman Godfrey LLP, Los Angeles, California;
Stephen E. Morrissey and Rachel S. Black, Susman Godfrey
LLP, Seattle, Washington; Henry D. Goldstein and Maryann
Rose Marzano, Gradstein & Marzano P.C., Los Angeles,
California; for Plaintiff-Appellee.

Joseph C. Gratz, Durie Tangri LLP, San Francisco,
California; Prof. Tyler T. Ochoa, Santa Clara University
School of Law, Santa Clara, California; for Amici Curiae
Copyright and Intellectual Property Law Professors.

Stephen B. Kinnaird, Paul Hastings LLP, Washington, D.C.;
Richard Kaplan, Jerianne Timmerman, and Bijou
Mgbojikwe, National Association of Broadcasters,
Washington, D.C.; for Amicus Curiae National Association
of Broadcasters.

Russell J. Frackman and Hilary E. Feybush, Mitchell
Silberberg & Knupp LLP, Los Angeles, California, for
Amicus Curiae Recording Industry Association of America.

## OPINION

LEE, Circuit Judge:

When an AM/FM radio station plays a song over the air, it does not pay public performance royalties to the owner of the original sound recording. In contrast, digital and satellite radio providers like Sirius XM must pay public performance royalties whenever they broadcast post-1972 music. But until Congress amended the copyright code in 2018, they did not have to fork over royalties for playing pre-1972 music under federal law. What remains less clear is whether digital and satellite radio stations have a duty to pay public performance royalties for pre-1972 songs under state copyright law. This patchwork quilt of federal and state copyright laws, along with statutory distinctions between terrestrial radio and digital stations, led to a ball of confusion—and to this longstanding litigation.

At issue in this case is whether California law creates a right of public performance for owners of pre-1972 sound recordings. The district court held that SiriusXM must pony up payments for playing pre-1972 music because California law grants copyright owners an "exclusive ownership" to the music. Looking at the individual dictionary definitions of the words "exclusive" and "ownership," the district court gave broad meaning to the phrase "exclusive ownership" and reasoned that it must include "right of public performance."

To answer this 21st century question about the obligations of satellite radio stations, we must rewind back almost 150 years and look to the common law in the 19th century when California first used the phrase "exclusive ownership" in its copyright statute. At that time, no state had recognized a right of public performance for music, and California protected only unpublished works. Nothing

suggests that California upended this deeply rooted common law understanding of copyright protection when it used the word "exclusive ownership" in its copyright statute in 1872. So we do not construe "exclusive ownership" to include the right of public performance. We thus reverse the district court's partial summary judgment for the plaintiff-appellant Flo & Eddie.

## BACKGROUND

### I.  The Turtles Sue Sirius XM.

In 1971, Howard Kaylan and Mark Volman—the founding members of the Turtles—formed Flo & Eddie, Inc. to control the rights to the band's songs, including their iconic anthem, "Happy Together." Ever since, Flo & Eddie has licensed the rights to make and sell records, and to use its music in movies, TV shows, and commercials.

While Flo & Eddie reaps royalties from the Turtles' songs being played on the big screen and television, it does not receive performance royalties for airplay on AM/FM radio. Sound recording owners have no right to receive royalty for AM/FM airplay under federal law. Until August 2013, Flo & Eddie had not asked Sirius XM to pay for playing the Turtles' pre-1972 recordings. Flo & Eddie, however, apparently had a change of heart and was no longer content to let it be. It filed a putative class action suit against Sirius XM, alleging that it had played the Turtles' music and other pre-1972 songs without permission or compensation. The complaint alleged, among other things, a violation of California common law and statutory copyright law. Relying on California Civil Code Section 980, Flo & Eddie argued that California gives it the "exclusive ownership" of its pre-1972 songs, including the right of public

performance, which requires compensation whenever their copyrighted recordings are publicly performed.

Flo & Eddie also brought parallel suits against Sirius XM in Florida and New York, arguing that Sirius' actions violated the laws of both states. *See generally Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,* 62 F. Supp. 3d 325 (S.D.N.Y. 2014); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,* No. 13 Civ. 5784 (CM), 2015 WL 3852692 (S.D. Fla. June 22, 2015).

## II.  The Oldies: Common Law Conception of Copyright

To fully understand modern copyright law, we need to look at its common law origins.

America inherited the fundamental principles of copyright protection from England.  At the time of the Founding, common law copyright vested a perpetual monopoly over the initial publication of the creative work and all later physical reproduction of it.  *Capitol Records, Inc. v. Naxos of Am., Inc.,* 830 N.E.2d 250, 254–55 (N.Y. 2005).  Decades later in 1834, Parliament enacted the first statute extending copyright protections to include a novel protection for dramatic works, an exclusive performance right.  *See Palmer v. De Witt*, 47 N.Y. 532, 542 (1872).

Meanwhile, back in the U.S.A., the Supreme Court first recognized state common law copyright protection for pre-publication manuscripts in 1834.  *See Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 657–662 (1834).  But the *Wheaton* Court refused to extend common law copyright protections to published works; in fact, it held that publication divested the work of its copyright.  *Id*.  The Court explained that uniform federal copyright law provided the exclusive means of securing a limited, rather than perpetual, monopoly for

published works.  *Id*.  In 1856, Congress adopted Parliament's public performance right for published dramatic works, Act of Aug. 18, 1856, ch. 169, 11 Stat. 138, which it later incorporated into the 1870 Copyright Act.  Ch. 230, 16 Stat. 212.  Two years later, California enacted its first copyright statute, establishing protections for only *unpublished* materials.  That 1872 statute included the "exclusive ownership" language at issue in this appeal.  Except for a few amendments over the years, that California statute has remained in effect ever since.  Cal. Civ. Code § 980.

As early as 1908, the Supreme Court held that "the reproduction, through the agency of a phonograph, of the sounds of musical instruments playing the music composed and published," was *not* the "copy or publication of the same within the meaning of the [Federal Copyright Act.]'"  *White-Smith Music Pub. Co. v. Apollo Co.,* 209 U.S. 1, 12, 28 S. Ct. 319, 52 L. Ed. 655 (1908) (citation omitted). And when Congress enacted a new Copyright Act in 1909, it chose not to extend performance protections to sound recordings. California's statute, however, continued to provide a perpetual monopoly for unpublished sound recordings.  To sum up, federal law provided limited protection for published works, while state law offered robust protections but only for unpublished materials.

But performers and their record labels wanted more. Despite substantial lobbying efforts, they failed many times. *See generally* Kevin Parks, Music and Copyright in America: Toward the Celestial Jukebox*, 101–137 (2012). Nevertheless, they persisted.  In 1971, Congress—responding to lobbyists' pleas and the increasing prevalence of record piracy—finally prohibited "unauthorized

8        FLO & EDDIE V. SIRIUS XM RADIO

duplication and piracy of sound recording[s]."   Sound Recording Amendment, Pub. L. No. 92-140, 85 Stat. 391.

In 1976, Congress started a revolution.  It enacted a new Federal Copyright Act, seeking to wipe out the tenuous balance between state and federal copyright protection. 17 U.S.C. §§ 101, *et seq*.  The Act abrogated the distinction between published and unpublished works, so that parties no longer had to walk the line between state and federal copyright protections.  But there was a catch: The Act did *not* apply to sound recordings "fixed" on or before February 14, 1972. 17 U.S.C. § 301(c) (1976).  The Act also explicitly rejected a public performance right for sound recordings. 17 U.S.C. § 114(a) (1976) ("The exclusive rights of the owner of copyright in a sound recording . . . do not include any right of performance under section 106(4)").

Then, in 1982, California amended its own copyright law to, among other things, remove the now-irrelevant distinction between pre- and post-publication works.  But it still maintained the "exclusive ownership" language used in the original 1872 statute.

It was Congress' turn next to add yet another texture to the legal wall of sound.  In 1995, Congress enacted the Digital Performance Right in Sound Recordings Act ("DPRA").  Pub. L. No. 104-39 § 2(3), 109 Stat. 336 (1995). The DPRA recognized a limited performance right for the digital audio transmission of post-1972 recordings, requiring the copyright holders to license their music under a federalized pricing scheme.  17 U.S.C. § 114 (1995).  Put another way, digital music providers still did not have to pay public performance royalties for pre-1972 music under federal law.

That brings us to Sirius XM, a leader of the pack among
digital audio transmission companies.  It uses a network of
satellites, terrestrial repeaters, command-and-control earth
stations, and the internet to broadcast commercial-free
music, talk radio, and sports to an audience of nearly
26 million subscribers.  Its channels often played pre-1972
songs without paying the recording owners, including
15 separate tracks by the Turtles.  And in 2013, Flo & Eddie
sued Sirius XM under California's copyright law, seeking
payment for the broadcast of pre-1972 songs.

## III.    The Parties Come Together to Settle the Case.

In 2014, the district court granted partial summary
judgment to Flo & Eddie, ruling that sound recording owners
enjoy the right of public performance under California law.
After a brief discussion of the relationship between federal
and state law copyright protections, the district court turned
to the text of California Civil Code Section 980(a)(2):

> The author of an original work of authorship
> consisting of a sound recording initially fixed
> prior to February 15, 1972, has an exclusive
> ownership therein until February 15, 2047, as
> against all persons except one who
> independently makes or duplicates another
> sound recording that does not directly or
> indirectly recapture the actual sounds fixed in
> such recording, but consists entirely of an
> independent fixation of other sounds, even
> though such sounds imitate or simulate the
> sounds contained in the prior sound
> recording.

It concluded that "[t]he plain meaning of having 'exclusive
ownership' in a sound recording is having the right to use

and possess the recording to the exclusion of others."  It continued that there is "nothing in that phrase to suggest that the legislature intended to exclude any right or use of the sound recording from the concept of 'exclusive ownership.'"

The district court later certified a class of all pre-1972 sound recording owners whose recordings had been broadcast by Sirius and set the remaining claims for trial. But before trial, the parties settled.  Sirius XM agreed to pay for past performances of pre-1972 recordings in exchange for a prospective license to use those recordings until 2028. Even though the settlement agreement had been signed, sealed, and delivered, it did not end this case.  Under the settlement, both the royalty rate for future broadcasts of songs and compensation for past performances could go higher and higher, depending on the outcome of the appeals before the Second, Ninth, and Eleventh Circuits.  If Flo & Eddie prevails in any of those three appeals, it will receive about $5 million more under the settlement agreement.  The district court granted final approval of the settlement and entered final judgment.

Sirius then timely appealed to this court.  Sirius also successfully sought to stay the appeal pending the resolution of a related case, *Flo & Eddie, Inc. v. Pandora Media, Inc.,* 851 F.3d 950, 954 (9th Cir. 2017).  In *Pandora*, the panel had certified the Section 980(a)(2) question about the meaning of "exclusive ownership" to the California Supreme Court.  *Id.* at 954.

In the meantime, Sirius XM scored a series of victories in the parallel New York and Florida cases.  First, on certification from the Second Circuit, the New York Court of Appeals held that New York common law had never recognized a right of public performance for pre-1972 sound recordings.  *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,

70 N.E.3d 936, 952 (N.Y. 2016).  As a result, the Second
Circuit remanded the New York litigation with instructions
to dismiss the case.  *Flo & Eddie, Inc. v. Sirius XM Radio
Inc.,* 849 F.3d 14, 17 (2d Cir. 2017) (per curiam).  A year
later, the Florida Supreme Court issued a similar opinion,
also on certification.  *See Flo & Eddie, Inc. v. Sirius XM
Radio Inc.,* 229 So. 3d 305, 307 (Fla. 2017).  The Eleventh
Circuit then affirmed the district court's decision in favor of
Sirius.  *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,* 709 F.
App'x 661, 663 (11th Cir. 2018) (per curiam).  With these
losses in the Second and Eleventh Circuits, Flo & Eddie has
nowhere to run but to the Ninth Circuit.

A final twist to this case came in 2018 when Congress
enacted a new copyright law, the Music Modernization Act
("MMA"), amid lobbyists' shouts for more robust
protections.  17 U.S.C. § 1401(b) (2018).  At last, the MMA
extended earlier federal copyright protections to the
prospective digital transmission of pre-1972 recordings.  As
a result, the California Supreme Court—after keeping the
parties hanging on for over two years—ultimately dismissed
the certified case.  *Flo & Eddie, Inc. v. Pandora Media, Inc.*,
No. S240649, 2019 WL 5797219, at *1 (Cal. May 22,
2019).**[1]**  In January 2020, we lifted the stay for this appeal.

---

**[1]** This court then held that the MMA preempts "state law claim[s]
arising before the passage of the [MMA] from the digital audio
transmission of . . . pre-1972 [recordings] if the transmitting party meets
certain conditions."  *Flo & Eddie, Inc. v. Pandora Media, Inc.,* 789 F.
App'x 569, 570–71 (9th Cir. 2019).  The parties here agree—and we
concur—that the MMA does not preempt the claims because Sirius XM
has not met all the "certain conditions."  Without getting bogged down
river deep into detail, Sirius XM has not yet satisfied one of the
conditions—whether a party has "paid for . . . [the] digital audio
transmission[s] under that agreement" (17 U.S.C. § 1401(e))—because

After losses in every other court over the past eight years, it's now or never for Flo & Eddie.

## JURISDICTION

Jurisdiction properly vested in the district court under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A).  Flo & Eddie is a citizen of California, and Sirius XM is a citizen of New York and Delaware.  And the amount in controversy exceeds $5 million.  After the district court entered final judgment, Sirius XM timely appealed.  We thus have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment on questions of law.  *United States v. Phattey*, 943 F.3d 1277, 1280 (9th Cir. 2019).

## ANALYSIS

### The district court erred in concluding that "exclusive ownership" under Section 980(a)(2) includes the right of public performance.

We begin, as we must, with the text of the statute.  The statute seems seductively simple: "The author of an original work of authorship consisting of a sound recording initially fixed prior to February 15, 1972, has an exclusive ownership therein until February 15, 2047, as against all persons except [someone who makes a 'cover' recording]."  Cal. Civ. Code § 980(a)(2).

---

Sirius may still owe Flo & Eddie another $5 million, depending on the outcome of this case.

The district court started by looking at the individual dictionary definitions of the words "exclusive" and "ownership."[2]   Then combining these two dictionary definitions, the district court arrived at a capacious definition of "exclusive ownership": the right to "possess and control [something] and to not share that right to possess and control with others."   And given this broad and literal definition established by the court, it held that "exclusive ownership" of a copyrighted song must include the right of public performance.   That is so because the legislature included only one exception for those who make cover versions of songs. Cal. Civ. Code § 980(a)(2) ("cover" exception). And in applying the *expressio unius* canon, "[c]ourts should 'presume the Legislature included all the exceptions it intended to create.'"

But the district court glossed over an alternative—and more compelling—way to analyze the statutory text. Dictionaries and tools of grammatical construction can help determine plain meaning of specific words, but some phrases have a separate or more specialized "term of art" meaning that cannot be stripped away from its historical context or subject matter area.   *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 73 (2012) ("Sometimes context indicates that a technical meaning applies. Every field of serious endeavor develops its own nomenclature—sometime referred to as terms of art . . . . And when the law is the subject, ordinary legal meaning is to be expected, which often differs from common

---

[2] Even if we relied solely on dictionaries, we would not look at a dictionary from 2011 to interpret the text of a statute written in 1982 because often a change is going to come eventually.

meaning").[3]    In short, literalism is not necessarily textualism.  *See* Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 24 (1997) ("the good textualist is not a literalist"); *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1766 (2020) (Alito, J., dissenting) ("textualists . . . do not confine their inquiry to the scrutiny of dictionaries").[4]

Critically here, the term "exclusive ownership" retains a historical meaning that predates the Federal Copyright Act and differs from the modern dictionary's definitions of those two separate words.  *See* Brief for Law Professors as Amici Curiae Supporting Defendant-Appellant at 7, *Flo & Eddie Inc. v. Sirius XM Radio, Inc*., No. 17-55844 (9th Cir. July 1, 2020).   The California Civil Code's use of "exclusive ownership" dates to 1872 when the state first adopted it.  So, "when textualism is properly understood, it calls for an examination of the social context in which a statute was enacted because this may have an important bearing on what its words were understood to mean at the time of enactment.

---

[3] *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990) (analyzing the Constitution's phrase "the people" in the Fourth Amendment context and concluding that it "seems to have been a term of art employed in select parts of the Constitution."); John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 NW. U. L. REV. 1739, 1767–1819 (2008) (describing how the common law meaning of an "unusual" punishment evolved, developing unique legal connotations, from its early 17th century uses in England through early American case law).

[4] In our certification order to the California Supreme Court, we also noted that Section 980 "does not establish what 'ownership' rights are included in the first instance." *Pandora*, 851 F.3d at 956.  Put differently, the phrase "exclusive ownership" does not really answer what rights fall within that "ownership."  As explained below, the common law in the 19th century clarifies what rights are protected.

Textualists do not read statutes as if they were messages picked up by a powerful radio telescope from a distant and utterly unknown civilization." *Bostock*, 140 S. Ct. at 1767 (Alito, J., dissenting). We thus need to examine the understanding of the phrase "exclusive ownership" under the common law in 1872. And as explained below, the difference between the literal and context-specific definitions of "exclusive ownership" is night and day.

> A. *The common law meaning of "exclusive ownership" in 1872 did not include the right of public performance.*

California's courts did not start deciding cases on a blank slate. Nor did the California legislature draft a copyright statute based on just its imagination running away. Rather, they inherited the common law tradition. English law, at least before the Founding, remained relatively silent on public performance rights for songs. But we can learn much from the sound of silence.

Between the 1834 decision restricting common law copyright to unpublished works and California's first statutory copyright protection enacted in 1872, state courts outside of California heard a handful of cases about common law copyright and public performance. *See* Jessica Litman, *The Invention of Common Law Play Right*, 25 Berkeley Tech. L.J. 1381, 1403–10 (2010). And these cases largely rejected the existence of a common law public performance right, at least in cases involving published dramatic works.[5]

---

[5] *See. e.g.*, *Keene v. Kimball*, 82 Mass. (16 Gray) 545, 552 (1860) (concluding that public performance of a dramatic work from memory did not constitute copying or publishing prohibited by the common law);

Put another way, no court as of 1872 had recognized the right of public performance under any nascent understanding of copyright law. So when California first enacted its copyright statute in 1872, the term "exclusive ownership" almost certainly did not include a right of public performance. Rather, "exclusive ownership" referred, and still refers, to the owner's common law copyright in an unpublished work to reproduce and sell copies of that work. *See RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 88 (2d Cir. 1940) (Hand, J.), *cert. denied*, 311 U.S. 712 (1940) (collecting cases).

Little changed even decades after 1872. Only one state, Pennsylvania, ever changed its tune. *But see Wheatley*, 14 F. Cas. at 185. In *Waring v. WDAS Broadcasting Station*, the Pennsylvania Supreme Court held that its common law protected an exclusive performance right. 194 A. 631, 638 (Pa. 1937). Following Pennsylvania's lead, a district court in North Carolina created a similar common law right. *Waring v. Dunlea*, 26 F. Supp. 338, 340 (E.D.N.C. 1939). But the North Carolina legislature immediately passed a law disclaiming public performance rights, leaving Pennsylvania alone again. N.C. Gen. Stat. Ann. § 66-28. Florida and South Carolina soon passed similar statutes as well. S.C. Code Ann. § 39-3-510; Fl. St. §§ 543.02, 03 (repealed); *see also Flo & Eddie,* 229 So. 3d at 317 ("at the time the Legislature enacted sections 543.02 and 543.03, there was no Florida case law that in any way recognized a common law right of public performance for sound recordings"). Of

---

*Keene v. Wheatley*, 14 F. Cas. 180, 185 (C.C.E.D. Pa. 1861) (No. 7,644) (recognizing that, absent "any legislation for the special protection of dramatic literary property, an authorized public circulation of a printed copy of a drama . . . is a publication which legalizes an optional subsequent theatrical representation by anybody from such copy").

all the states in the union, only the lonely state of Pennsylvania in 1937 recognized a common law right of public performance.  In short, the common law meaning of "exclusive ownership" in the copyright context—before and after 1872—generally did not refer to a right of public performance.

The case against a right of public performance becomes even stronger when we examine New York law.  Section 980(a)(2) is not an example of California dreaming up a radical new copyright scheme.  Rather, New York's Civil Code, drafted by David Dudley Field, served as the template for California's law.  With New York on its mind and a little help from its friends in the Empire State, California adopted a similar copyright law, including what we now know as Section 980.  *See* Law Professors Amici Br. 10 n.7.  Section 983 of California's 1872 code—a word-for-word facsimile of Field's proposed § 432 in New York—divested any author of his or her "exclusive ownership" upon intentional publication of the protected work.  1 Civil Code of the State of New York 130–131 (1865).  In other words, "exclusive ownership" in New York, and by extension in California as well, encompassed only those few pre-publication common law copyright protections recognized by the state at that time.

The Second Circuit affirmed that limited common law understanding of "exclusive ownership," holding that New York common law did not recognize a copyright holder's right to control post-sale public performance of a sound recording.  *Whiteman*, 114 F.2d at 89.  And more recently, the New York Court of Appeals—hearing a certified question from the Second Circuit in a suit parallel to ours—issued a sound decision, ruling that "common-law copyright protection prevents only the unauthorized reproduction of

the copyrighted work, but permits a purchaser to use copies of sound recordings for their intended purpose, namely, to play them." *Flo & Eddie, Inc.*, 70 N.E.3d at 947.

Flo & Eddie tries to distinguish *Waring* by arguing that, unlike New York, California's post-1872 common law came to recognize a pre-publication right of public performance for dramatic works and screenplays. Of course, the California Supreme Court has recognized that "apart from statute the law recognizes certain rights of property in the original intellectual products of an author, which are entitled to the same protection as rights in any other species of property; that the author has the right of first publication and that such right is transferable." *Loew's Inc. v. Superior Ct. of Los Angeles Cnty.*, 115 P.2d 983, 984 (Cal. 1941).[6]

But the key to understanding these cases lies in the historical discrepancy between state common law copyright for non-published works and federal statutory copyright for published works. The California courts in *Goldmark* and *French* dealt with dramatic works that did *not* (in the courts' view) constitute "published" works. Common law provides a perpetual copyright for *unpublished* works, but Congress alone determines the length of a monopoly for *published*

_____

[6] *See also Goldmark v. Kreling*, 25 F. 349, 351 (C.C.D. Cal. 1885) (recognizing an exclusive right to produce an unpublished opera, and noting that "[t]here is also . . . great force in the suggestion that the owner, as in this case, of a play or opera, or other property not protected by patent or a copyright, is entitled to select his licensee"); *French v. Kreling*, 63 F. 621, 623 (C.C.N.D. Cal. 1894) (concluding that "[t]he law protecting the rights of authors in their compositions, literary and musical, where they have not been dedicated to the public, or published with the author's consent, is well established").

works.[7] Third-party performances of works not sufficiently "published" violated the author's exclusive right to publication under state copyright law. But, except for Pennsylvania's frolic, sale has always constituted "publication." For example, after selling a manuscript, the original owner cannot restrict the purchasers' performances because courts construe them as impermissible restraints on alienation. *See Whiteman*, 114 F.2d at 88 (collecting cases).

Of course, Flo & Eddie and its *amici* contest this interpretation. But they fail to direct us to a single case in which a court recognized a discrete property interest in the post-sale performance of a sound recording. In fact, every relevant case that Flo & Eddie and its *amici* cite implicate performance rights solely in the context of unauthorized reproductions of post-publication sound recordings. These cases distinguish between protections from post-sale copying and post-sale performance. And when a defendant's reproduction of the content violates recognized property rights, such as first publication or reproduction, then courts recognize a misappropriation or conversion. *See, e.g.*, *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 39 S. Ct. 68, 63 L. Ed. 211 (1918).

The common thread tying *International News* together with Flo & Eddie's other cited authorities[8] is that the

---

[7] The Federal Copyright Act of 1976 and DPRA create notable exceptions.

[8] *See A & M Records, Inc. v. Heilman*, 142 Cal. Rptr. 390, 394 (Cal. Ct. App. 1977) (defendant "admitted advertising and selling record and tape 'albums' which included performances of songs duplicated from recordings manufactured by A & M Records without making payments to A & M Records or to any of the musicians involved"); *Capitol Records, Inc. v. Erickson*, 82 Cal. Rptr. 798, 799 (Cal. Ct. App. 1969)

defendants there engaged in direct competition for the same body of potential customers, physically copied plaintiffs' work, and violated their other rights by usurping business opportunities.  In contrast, Sirius does not buy, reproduce, or resell Flo & Eddie's master records.  Nor can it reasonably be seen as competing with Flo & Eddie for the sale of a sound recording performance.  A customer interested in hearing the Turtles' magnum opus "Happy Together," or even their entire discography, cannot simply queue it up on a Sirius XM channel.

> B.  *Without contrary evidence, we must presume that California did not upend the common law in establishing "exclusive ownership" in the statute.*

Flo & Eddie suggests that we need not bother with the 1872 common law understanding of "exclusive ownership" because that was yesterday.  We should instead look at California's modern 1982 version of Section 980.  But the statute's use of the term "exclusive ownership" has remained unchanged for almost a century-and-half, despite the legislature's three amendments to the statute in 1947, 1949, and 1982.  We see no textual reason to believe that the

---

(defendant "purchase[d] on the open market records and tapes of musical performances which have been produced, recorded, and sold by Capitol . . . then [made] 'master' recordings from the records and tapes . . . and used the master recordings to produce tape cartridges which it [sold] to the general public").  Flo & Eddie also refers us to *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198 (C.D. Cal. 2010).  But *BlueBeat* only says that "publication of a protected work does not strip protectable and actionable ownership rights" under Section 980(a)(2), and thus that a party still has standing to sue for unfair competition claims.  *Id.* at 1206.  Further, because Flo & Eddie fails to demonstrate that California common law recognizes a right of public performance, its claims for misappropriation and conversion based on that alleged common law right necessarily also fail.

California legislature retained the same statutory language yet altered the original meaning of "exclusive ownership" as it existed in 1872.[9]

And under California law, "statutes are not presumed to alter the common law unless *expressly stated*." *Borg-Warner Protective Servs. Corp. v. Superior Ct.,* 89 Cal. Rptr. 2d 687, 689 (Cal. Ct. App. 1999) (citing *Saala v. McFarland*, 45 Cal. Rptr. 144, 148 (Cal. 1965)) (emphasis added). Thus, if "exclusive ownership" under California's common law in 1872 did *not* include the right of public performance, then that original meaning of "exclusive ownership" remains the only legal meaning unless the California legislature expressly changed it. Flo & Eddie does not point to any evidence suggesting that the California legislature intended to upend the common law understanding of "exclusive ownership" when it enacted its first copyright statute in 1872.

The district court declined to apply this canon of construction, pointing out that no California decision has expressly rejected a right of public performance. Of course, there is no California decision recognizing that common law right, either. Indeed, no state other than Pennsylvania has ever recognized one. In short, the lack of a judicially recognized right of public performance across dozens of

---

[9] Rather, we draw the opposite presumption. The legislature merely reiterated what it had said for 110 years before. *See* Norman J. Singer & Shambie Singer, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION, § 22:33 (7th ed. 2020); *Bakersfield Energy Partners, LP v. Comm'r of Internal Revenue*, 568 F.3d 767, 775 (9th Cir. 2009).

states underscores that no such right ever existed under the common law.[10]

## CONCLUSION

We **REVERSE** the district court's grant of partial summary judgment, and **REMAND** for entry of judgment consistent with the terms of the parties' contingent settlement agreement.

---

[10] Because we reverse the district court's grant of summary judgment on § 980(a), we need not determine whether it erred by concluding that California's law does not violate the Dormant Commerce Clause.